## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JACKIE HOSANG LAWSON,

        Plaintiff,

        vs.

FMR LLC, dba FIDELITY INVESTMENTS;
FMR CORP., dba FIDELITY INVESTMENTS;
and FIDELITY BROKERAGE SERVICES, LLC,
dba FIDELITY INVESTMENTS,

        Defendants.

No. 1:08-cv-10466 DPW

(Filed under seal)

## AMENDED COMPLAINT and DEMAND FOR JURY TRIAL

## INTRODUCTION

This action is brought against FMR Corp., its successor, FMR LLC, and their subsidiary, Fidelity Brokerage Services, LLC.   These Defendants operate under the trade name and are referred to herein as "Fidelity Investments."  The action is brought under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(a)(1) and Massachusetts common law prohibiting wrongful discharge against public policy.

Fidelity Investments holds itself out as the world's largest mutual fund company, investing billions in the assets of others.  Fidelity Investments simultaneously guards against scrutiny of its business practices, requiring its employees to sign confidentiality agreements purporting to preclude all disclosures of Fidelity Investments' internal information, without exception for disclosures to government agencies, and claiming that the federal government has no jurisdiction to investigate claims of retaliation filed by employee whistleblowers who report suspected wrongdoing to their supervisors or to the Securities and Exchange Commission or other government agencies.

This action involves retaliation taken against a long-term, exemplary employee, Jackie Hosang Lawson, a Senior Director of Finance at Fidelity Investments, after she expressed concerns regarding matters that she reasonably believed constituted a violation of rules or regulations of the Security and Exchange Commission or Federal law relating to fraud against shareholders of Fidelity mutual funds.  While still employed by Fidelity Investments, Ms. Lawson brought her concerns to her managers, to Fidelity Investments' then-General Counsel, to other in-house attorneys, and eventually to the Securities and Exchange Commission.  Fidelity Investments responded by embarking on a campaign to discredit, harass and intimidate Ms. Lawson.

Ms. Lawson filed claims regarding the retaliation with the Occupational Safety and Health Administration ("OSHA"), the federal agency within the Department of Labor charged with enforcing the whistleblower protections of the Sarbanes-Oxley Act. In response, Fidelity Investments continued the retaliation, and claimed that its employees are not protected by the Sarbanes-Oxley whistleblower provisions. When the federal agency advised Fidelity Investments that it was proceeding to investigate Ms. Lawson's factual allegations, Ms. Lawson's supervisors escalated their harassment of her while Fidelity Investments simultaneously attempted to derail the federal agency's efforts to investigate Ms. Lawson's claims. Denied access to the prompt protection the law requires, and subjected to unendurable working conditions, Ms. Lawson eventually was compelled to resign her position at Fidelity Investments.

This action in federal court is of import not only to Ms. Lawson, but to other Fidelity Investments employees and to the millions of Americans with money invested in Fidelity Mutual Funds. Ms. Lawson's reputation within Fidelity Investments was of a person with great integrity and dedication. She raised her concerns only through proper channels, including to her supervisors and other managers with authority to address these matters, Fidelity's Office of General Counsel, and the Securities and Exchange Commission. Her supervisors' gross mistreatment of Ms. Lawson once she raised concerns regarding potential fraud on shareholders was clearly evident to her co-workers. Ms. Lawson brings this suit not only to address her own injury, but also to obtain a declaration that Fidelity Investments is an employer covered by Sarbanes-Oxley's anti-retaliation provisions, so that Fidelity Investments' supervisors cannot continue to intimidate employees by asserting that they have no protection from retaliation for

reporting potential violations of rules and regulations of the Securities and Exchange Commission or Federal law relating to shareholders.

## VENUE

1.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(b). This is a civil action wherein jurisdiction is not founded solely on diversity of citizenship and a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District.

## JURISDICTION

2.     Jurisdiction over Plaintiff's federal claim is proper in the District of Massachusetts under 28 U.S.C. § 1331 and 18 U.S.C. § 1514A(b)(1)(B) because Plaintiff filed a complaint with the Secretary of Labor under 18 U.S.C. § 1514(b)(1)(A), and the Secretary of Labor has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that such delay is due to the bad faith of the Plaintiff. Jurisdiction over Plaintiff's state claim is proper under 28 U.S.C. § 1367(a).

## PARTIES

3.     Defendant FMR LLC is a limited liability company organized under the laws of Delaware and registered to do business in the Commonwealth of Massachusetts in the general character of "parent company." Its principal office in Massachusetts is at 82 Devonshire Street, Boston, MA 02109.  FMR LLC is the survivor and merger of Defendant FMR Corp.  FMR LLC conducts business under the name "Fidelity Investments."

4.     Defendant FMR Corp. is a Delaware corporation and, until recently, was registered to do business in the Commonwealth of Massachusetts in the general character

of "parent company of Fidelity subsidiaries" and with its principal offices in Massachusetts located at 82 Devonshire Street, Boston, MA 02109.   FMR Corp. conducted business under the name "Fidelity Investments" until its merger into FMR LLC.   FMR Corp. is no longer registered to do business in the Commonwealth of Massachusetts.

5.      Defendant Fidelity Brokerage Services, LLC is a limited liability company organized under the laws of Delaware, and registered to do business in the Commonwealth of Massachusetts in the general character of "investments."  Its principal office in Massachusetts is at 82 Devonshire Street, Boston, MA 02109.   Fidelity Brokerage Services, LLC conducts business under the name "Fidelity Investments." Fidelity Brokerage Services, LLC's sole member is Fidelity Global Brokerage Group, Inc., a Massachusetts corporation, with a business in the general character of "investments" and a principal office in Massachusetts at 82 Devonshire Street, Boston, MA 02109.   Fidelity Global Brokerage Group, Inc., is a wholly owned subsidiary of FMR Corp. and/or FMR LLC.

6.      Plaintiff Jackie Hosang Lawson is a former employee of FMR Corp. and/or its subsidiary Fidelity Brokerage Services, LLC.   Ms. Lawson is a resident of Brookline, Massachusetts.

## ALLEGATIONS REGARDING THE APPLICABILITY OF THE SARBANES-OXLEY WHISTLEBLOWER PROVISIONS TO THESE DEFENDANTS

7.      The Fidelity family of mutual funds are investment companies under the Investment Company Act of 1940, 15 U.S.C. § 80a-3(a)(1) and are required to file reports under section 15(d) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78o(d).

The Fidelity mutual funds, however, have no employees. They have been and are currently overseen by a single Fidelity Mutual Funds Board of Trustees.

8.      Fidelity Management & Research Co. is a Massachusetts corporation with a principal office in Massachusetts at 82 Devonshire Street, Boston, MA 02109. Fidelity Management & Research Co. is a wholly owned subsidiary of FMR Corp. and/or FMR LLC. Fidelity Management & Research Co. is a registered investment advisor under 15 U.S.C. § 80b-2(a)(11) and serves as the registered investment advisor to Fidelity Mutual Funds. By law, Fidelity Management & Research Co. may only provide services through a written contract that specifies the services to be performed and the fees to be paid and that is approved by the Fidelity Mutual Funds Board of Trustees.

9.      On information and belief, in order to comply with federal law, the Fidelity Mutual Funds Board of Trustees reviews and approves the Investment Advisory Contracts and other contracts and/or subcontracts with Fidelity Management & Research Co., FMR Corp., FMR LLC and/or other companies owned in whole or in part by FMR Corp. and/or FMR LLC.

9.1     On information and belief, the contracts reviewed by the Board of Trustees of Fidelity Mutual Funds include contracts for Management Fees and Transfer Agent Fees.

10.     On information and belief, prior to approving these contracts and/or subcontracts, the Fidelity Mutual Funds Board of Trustees reviews financial data and methodologies to determine fund profitability provided to it by FMR Corp. or FMR LLC and/or their subsidiaries, including Fidelity Management & Research Co., Fidelity Global Brokerage Group, Inc., and Fidelity Brokerage Services, LLC.

10.1     On information and belief, one of the key analytics that the Fidelity Mutual Funds Board depends on to make its determination on whether to renew its existing contracts for Management Fees and Transfer Agent Fees, or to negotiate a reduction in fees, is FMR Co.'s annual Profit & Loss statements.  The accuracy of the profit margins for Fund Profitability and Transfer Agent set forth in these statements is critical.  If the reported margins are high, the Mutual Fund Board will typically negotiate to lower the fees paid to Fidelity; if the reported margins are low or have relatively low variance year over year, the Mutual Fund Board will typically maintain the existing fee structure.  Hence, any understatement of Fidelity's profit margins could potentially result in Fidelity earning unwarranted fees, to the detriment of Fidelity Mutual Funds shareholders.

10.2     Under section 36(b) of the Investment Company Act of 1940 as amended, 15 U.S.C. § 80a-35(b), FMR Co. is deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid to it by the Fidelity Mutual Funds.

10.3     Under section 15 of the Investment Company Act of 1940 as amended, 15 U.S.C. § 80a-15, FMR Co. may not act as the investment advisor to the Fidelity Mutual Funds except pursuant to a written contract with the Fidelity Mutual Funds which has been approved by a vote of the majority of independent directors of the Fidelity Mutual Fund Board of Trustees.  Section 15(c) of the Investment Company Act of 1940 as amended, 15 U.S.C. § 801-15(c), requires further that FMR Co. must furnish to the Fidelity Mutual Funds Board of Trustees such information as may reasonably be necessary to evaluate the terms of the investment advisor contract.  Under Section 15(c)

and rules and regulations of the Securities and Exchange Commission, similar disclosure is required for contracts with affiliates of the investment advisor and principal underwriters.

10.3    Rules and regulations of the Securities and Exchange Commission mandate disclosure to shareholders of the Fidelity Mutual Funds of material factors and conclusions regarding those factors that form the basis of the Fidelity Mutual Funds Board of Trustees' recommendation for the Board's basis for approval of investment advisory contracts.

10.4    The Annual Reports to the Shareholders of the Fidelity Funds are filed with the Securities and Exchange Commission pursuant to Section 30(b)(2) of the Investment Company Act as amended, 15 U.S.C. § 80a-30(b)(2), and Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).  The Annual Report of the Fidelity Puritan Fund contains a section entitled "Board Approval of Investment Advisory Contracts and Management Fees."  One subsection is entitled "Cost of the Services and Profitability."  In that subsection, the Annual Reports states:

> The Board considered the revenues earned and the expenses incurred by Fidelity in conducting the business of developing, marketing, distributing, managing, administering and servicing the fund and its shareholders.  The Board also considered the level of Fidelity's profits in respect of all the Fidelity funds.
>
> On an annual basis, FMR presents to the Board Fidelity's profitability for the fund.  Fidelity calculates the profitability for each fund, as well as aggregate profitability for groups of Fidelity funds and all Fidelity funds, using a series of detailed revenue and cost allocation methodologies which originate with the audited books and records of Fidelity.  The Audit Committee of the Board reviews any significant changes from the prior year's methodologies.
>
> PricewaterhouseCoopers LLP (PwC), independent registered accounting firm and auditor to Fidelity and certain Fidelity funds, has been engaged annually by the Board as part of the Board's assessment of the results of

7

Fidelity's profitability analysis. PwC's engagement includes the review and assessment of Fidelity's methodologies used in determining the revenues and expenses attributable to Fidelity's mutual fund business, and completion of agreed-upon procedures surrounding the mathematical accuracy of fund profitability and its conformity to allocation methodologies. After considering PwC's reports issued under the engagement and information provided by Fidelity, the Board believes that while other allocation methods may also be reasonable, Fidelity's profitability methodologies are reasonable in all material respects.

The Board has also reviewed Fidelity's non-fund businesses and any fall-out benefits related to the mutual fund business as well as cases where Fidelity's affiliates may benefit from or be related the fund's business.

The Board considered the costs of the services provided by and the profits realized by Fidelity in connection with the operation of the fund and determined that the amount of profit is a fair entrepreneurial profit for the management of the fund.

On information and belief, the Annual Reports for all Fidelity mutual funds contains similar disclosures.

10.5    The Statement of Additional Information of Fidelity Puritan Funds was also filed with the Securities and Exchange Commission and was incorporated by reference into the Fund's prospectus. That Statement contains a section entitled "Management Services" that provides:

Under the terms of its management contract with each fund, FMR acts as investment adviser and, subject to the supervision of the Board of Trustees, has overall responsibility for directing the investments of the fund in accordance with its investment objective, policies and limitations. FMR also provides each fund with all necessary office facilities and personnel for servicing the fund's investments, compensates all officers of each fund and all Trustes who are interested persons of the trusts or of FMR, and all personnel of each fund or FMR performing services relating to research, statistical and investment activities.

In addition, FMR or its affiliates, subject to the supervision of the Board of Trustees, provide the management and administrative services necessary for the operation of each fund. These services including providing facilities for maintaining each fund's organization; supervising relations with custodians, transfer and pricing agents, accountants, underwriters and other persons dealing with each fund; preparing all

> general shareholder communications and conducting shareholder relations; maintaining each fund's records and the registration of each fund's shares under federal securities laws and making necessary filings under state securities laws; developing management and shareholder services for each fund; and furnishing reports, evaluations and analyses on a variety of subject to the Trustees.

On information and belief, similar disclosure is contained in the Statements of Additional Information for all of the Fidelity Funds.

11.     Plaintiff's whistle-blowing activities relate primarily to the accuracy of the information on fund profitability provided to the Fidelity Mutual Funds Board of Trustees, as detailed below.

12.     FMR Corp., FMR LLC and/or their subsidiaries, including Fidelity Management & Research Co., Fidelity Global Brokerage Group, Inc., and Fidelity Brokerage Services, LLC. are contractors and/or subcontractors of the Fidelity mutual funds.  As contractors and/or subcontractors of companies required to file reports under section 15(d) of the Securities Exchange Act, Defendants are prohibited under 18 U.S.C. § 1514A from taking actions against their employees for whistle-blowing activity relating to potential fraud against the shareholders of Fidelity mutual funds.

13.     Defendants FMR Corp. or FMR LLC and their subsidiaries, including Fidelity Global Brokerage Group, Inc., Fidelity Brokerage Services, LLC and Fidelity Management Research Co., also are sufficiently related as an integrated employer to constitute a single entity for purposes of coverage and liability under Sarbanes-Oxley. Defendants are referred to collectively herein as "Fidelity Investments."

## ALLEGATIONS REGARDING MS. LAWSON'S EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     On December 20, 2006, Ms. Lawson filed her first complaint under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley

Act of 2002, 18 U.S.C. § 1514A with OSHA.  The Complaint was docketed by OSHA as
Case Number 1-0120-07-005.  A copy of this Complaint is attached hereto as Exhibit 1.

     15.     On or about February 26, 2007, Fidelity Investments submitted its
response.  The response sought dismissal of the complaint, claiming that employees of
Fidelity Investments are not entitled to whistleblower protections because Fidelity
Investments is privately held.

     16.     On April 24, 2007, Ms. Lawson filed her second complaint under Section
806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley Act of
2002, 18 U.S.C. § 1514A with OSHA.  The Complaint was originally docketed by OSHA
as Case Number 1-0120-07-0008, (but was later added to amended Case Number 1-0120-
07-005).  A copy of this Complaint is attached hereto as Exhibit 2.

     17.     On or about August 27, 2007, the OSHA investigator assigned to Ms.
Lawson's case advised both parties that OSHA was rejecting Fidelity Investments' claim
that it was not subject to the Sarbanes Oxley whistleblower provisions and that OSHA
intended to proceed to investigate the merits of Ms. Lawson's complaint.

     18.     On or about September 15, 2007, Ms. Lawson filed her third complaint
under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-
Oxley Act of 2002, 18 U.S.C. § 1514A with OSHA.  The Complaint was originally
docketed by OSHA as Case Number 1-0120-07-012 (but was later added to amended
Case Number 1-0120-07-005).  A copy of this Complaint is attached hereto as Exhibit 3.

     19.     On November 9, 2007, Ms. Lawson filed her fourth complaint against
Fidelity Investments under Section 806 of the Corporate and Criminal Fraud
Accountability Act, Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A with OSHA.  The

Complaint was docketed as Case Number 1-0120-08-001 (but was later added to amended Case Number 1-0120-07-005). A copy of this complaint (but excluding its attachments) is attached hereto as Exhibit 4.

     20.    On or about November 26, 2007, Ms. Lawson's counsel received notice from the Associate Solicitor, Division of Fair Labor Standards, United States Department of Labor, that Fidelity Investments had been in contact with his office regarding Ms. Lawson's Sarbanes-Oxley complaint. Ms. Lawson's counsel subsequently was provided copies of two letters submitted on Fidelity Investments behalf by its outside counsel in an effort to stop OSHA's investigation of Ms. Lawson's complaint. The first letter, dated September 13, 2007, was addressed to the head of the Office of the Whistleblower Protection Program at the Occupational Safety and Health Administration, and references an August 30, 2007 telephone conversation between Fidelity Investments' outside counsel and the head of the Office of the Whistleblower Protection Program. The second letter, dated November 1, 2007, was addressed to the head of the Office of the Whistleblower Protection Program at the Occupational Safety and Health Administration, the Associate Solicitor, Fair Labor Standards, Office of the Solicitor of Labor, and the Counsel for Whistleblower Programs, Office of the Solicitor of Labor, and referenced an October 19, 2007 meeting between the addressees and Fidelity Investments' outside counsel.

     21.    On December 20, 2007, Ms. Lawson submitted to the Associate Solicitor, Division of Fair Labor Standards, United States Department of Labor, her response to Fidelity Investment's letters. Ms. Lawson's response is attached hereto as Exhibit 5.

22.     On January 3, 2008, Ms. Lawson gave notice, pursuant to 29 C.F.R. §

1980.114(b) of her intention to file an action in the United States District Court for the

District of Massachusetts in her first two cases, Case No. 1-0120-07-005 and Case No. 1-

0120-07-008.   A copy of this notice is attached hereto as Exhibit 6.

23.     On January 28, 2008, Ms. Lawson received notice from OSHA

consolidating her four complaints under the original complaint number, and stating

further that the Complaint, as amended, was closed due to her election to proceed in

Federal Court.  A copy of this notice is attached hereto as Exhibit 7.

## ALLEGATIONS
### CONCERNING MS. LAWSON'S EMPLOYMENT WITH FIDELITY INVESTMENTS, HER PROTECTED ACTIVITY AND FIDELITY INVESTMENTS' RETALIATION

### *Background Facts*

24.     Ms. Lawson began her employment with Fidelity Investments in 1993,

working as a contract employee in various positions until 1996 when she became a

regular Fidelity Investments full-time employee.   Throughout her employment, from

1993 through the termination of employment in 2007, Ms. Lawson received weekly or

monthly paychecks from FMR Corp.

25.     Ms. Lawson's career at Fidelity Investments was successful until the

events at issue here which began in 2005.  In 1999, she was promoted to the position of

Director of Finance, and in 2001 to the position of Senior Director of Finance.

26.     Prior to August 2004, the three main companies within Fidelity Brokerage

Services, LLP (Personal Investments or "PI", National Financial or "NF", and Registered

Investment Advisors or "RIA") each performed its own fund profitability calculations

and each worked directly with FMR Co., and Fidelity Investments' outside auditor, PwC, to report fund profitability to the Fidelity Mutual Funds Board of Trustees.

27.     In May 2004, Ms. Lawson was asked by her manager to review the current models being used by two of these businesses (NF and RIA) for Fund Profitability analysis. It is her further understanding that she was selected to perform this review because the models were based on the principles of "Activity Based Costing," an area where Ms. Lawson has considerable expertise. Ms. Lawson's performance review through June 2004 reflects her efforts to understand and rectify issues in these Fund Profitability models, and the willingness and support of the Chief Financial Officers for NF and RIA to have her do so. Her merit review for the period July 1, 2003 through June 30, 2004 gives her an overall rating of "Exceeds Expectations." The Overall Comments state that:

> "Jackie is a subject matter expert and viewed as such by everyone. She's committed to producing quality work and is passionate about doing the right thing for business and putting Fidelity first. She is forward thinking, innovative and always looking to learn and improve. She has demonstrated leadership with her staff and her finance peers. Jackie excels at fixing problems. She has recently demonstrated this yet again by taking it upon herself to understand [Fund Profitability], what was wrong with it and what's needed to be done to fix it. The NF and RIA businesses are thrilled and appreciative that she is leading this effort. Jackie has solicited help from CFIT and has developed a project plan which she will lead in order to fix FP."

28.     In August 2004, a new group called "Shared Services" was formed to provide information for the NF, RIA and PI companies to the Board of Trustees of the Fidelity Mutual Funds.

29.     Fidelity Investments first offered the Head of Board Support position to another candidate who prior to the formation of the FBC Shared Services group held that

position for the PI company.  On information and belief, this candidate declined because she believed there were too many problems with the PI Fund Profitability model.

30.      In August 2004, Fidelity Investments appointed Ms. Lawson as Head of the Board Support Group.

31.      One of Ms. Lawson's first tasks as Head of Board Support was to rebuild the Fund Profitability models for NF and RIA.  Ms. Lawson's bonus review for the period January 1, 2004 through December 31, 2004, gives her an overall rating of "Exceeds Expectations" reflecting her work on these models.  The Overall Comments given by her new manager state that:

> "Jackie is very well-respected among her peers and business partners, has an extremely strong work ethic, and can be depended on to get results. She has a lot of knowledge about Fidelity and finance, and shows her concern for both the firm and its people.  She is a strong manager who is well-liked and well-respected by the analysts in her group, and she puts a lot of work into developing her people and looking out for their best interests.  She is an excellent role model for analysts as well as directors in terms of management, leadership and commitment to achieving results. She is very focused on working collaboratively and building strong relationships with our business partners, whether it is business unit finance, FMR Co. finance or PWC.  Jackie is very comfortable presenting to Sr. Mgt.  I very much enjoy working with Jackie and look forward to continuing our strong relationship and helping her achieve success in 2005."

31.1     Also in 2004, Fidelity Investments began offering a new initiative, called "Guidance Interactions," to give investment advice to the public.  Fidelity Investments advertised the activity as free of charge, and consistent with that representation, prior to 2005, this expense was allocated as 100% Sales/Distribution activity and not considered an expense charged to existing shareholders.

### *Ms. Lawson's Spring 2005 Protected Activity (Reporting of the Switch of Source System Without Knowledge or Approval of the Fidelity Board of Trustees)*

32.      Beginning Spring 2005, Ms. Lawson began raising concerns regarding certain actions by the PI group.  The details regarding Ms. Lawson's initial concerns are set forth in Ms. Lawson's Complaint filed with OSHA on December 20, 2006, as Case Number 1-0120-07-005, (attached hereto as Exhibit 1) and Part II of her reply of May 14, 2007, to Fidelity Investments' redacted February 26, 2007 Response (attached hereto as Exhibit 8).  Ms. Lawson raised these concerns with her immediate manager, his manager (the Senior Vice President for Shared Services, Harris Komishane), as well as then CFO of PI Finance (Jean Raymond) and PI Finance Vice President John Cahill.

32.1      During PwC's annual audit of the 2005 Fund Profitability Cycle, PwC detected certain discrepancies.  These discrepancies involved a large year over year variance for expenses for one mutual fund, Fidelity Cash Reserves.  Ms. Lawson and her team determined that the large year over year variances were attributable to faulty allocations by a new source system implemented by PI Finance.  Ms. Lawson and her team determined that PI Finance had switched to this new source system without proper review, and that the new source system did not provide comparable data to the old source system.  Ms. Lawson and her group also determined that PI Finance had not disclosed this switch of source systems or obtained approval of PwC or FMR Co. beforehand.  The absence of disclosure or approval by PwC or FMR Co. beforehand also meant that the switch of source systems had been done without the knowledge or approval of the Fidelity Mutual Funds Board of Trustees or its audit committee.

32.2      Ms. Lawson believed that switching the source systems without the knowledge or approval of the Fidelity Mutual Funds Board of Trustees was in violation

of SEC rules and regulations or federal laws concerning fraud against shareholders. This belief was reasonable. The Fidelity Board of Trustees required that refinement and changes to the methodologies used to determine profitability be reported to the Fidelity Board of Trustees or its Audit Committee. In the absence of such reporting of changes in methodology, the financial statements provided to the Fidelity Mutual Funds Board of Directors are misleading and/or inaccurate, and may result in improper fees being paid by the Fidelity mutual funds to the Fidelity companies at the expense of shareholders, and may result in improper filings with the SEC and incorrect notices to shareholders.

32.3    In March 2005, Ms. Lawson first advised her then-manager, Michael Freeman, his manager, Senior Vice President Harris Komishane, then-CFO of PI Finance Jean Raymond and PI Finance Vice President John Cahill that she had learned that the discrepancy had resulted from PI Finance's use of a new source system, and that that switch by PI Finance to the new source system had not been disclosed or approved by PwC or FMR Co. She subsequently presented her findings at a meeting attended by Jean Raymond, Harris Komishane, Michael Freeman, and representatives from FMR Co. (J.S. Wynant and John Farinacci) and PwC (including Dave Trerice and Nick Sylvester).

***Fidelity Managers' Initial Responses to Ms. Lawson's Spring 2005 Protected Activity***

33.    Ms. Lawson succeeded in having these first concerns addressed by Fidelity Investments, and she received excellent verbal and written feedback concerning her work from FMR Co., PwC and the Chief Financial Officers for NF and CFO. The "Overall Comments" in Ms. Lawson's merit review for the period July 1, 2004 through June 30, 2005 performance review by her manager reflect this assessment of Ms. Lawson's work:

"In the past year Jackie has been placed in a new role managing Board Support for all of FBC. Jackie had never before been in a role where she was required to perform analysis of the Board of Trustees, so being asked to manage a group of analysts who performed this work without having done it herself was a big challenge. Jackie met this challenge by achieving excellent results for both FP and TA. The feedback that we received from PwC and FMR Co. was that the analysis provided by her group was the best of any business unit, after having been the worst in the prior year, before our group existed. A survey my manager conducted showed that all FBC b/u's [business units] and FMR Co. rated the work provided by Jackie's group in the Annual FP [Fund Profitability] cycle very highly. Jackie consistently put in an outstanding effort in all aspects of her role in the past year, working many long nights and weekends. She has learned a significant amount about Fund Profitability and the Transfer Agent process, and has been an excellent manager of her group. She has made significant improvements to the FP and TA processes for both RIA and NF, one of the key wins from having this work performed in Shared Services.

Her commitment and effort are consistently at the highest level."

34.     In raising her concerns of the PI Fund Profitability methodologies previously used by the PI finance group, however, Ms. Lawson incurred the hostility and subsequent retaliatory actions of PI Finance.   Despite the Overall Comments given by her manager, she was given an Overall Rating of "Proficient," rather than "Exceed Expectations" or "Outstanding."   On information and belief, this lower rating was based on the unwarranted negative feedback from the CFO for PI Finance, Jean Raymond.

34.1    On information and belief, following the March 2005 meeting, PI Finance CFO Jean Raymond also asked that Ms. Lawson be removed from her position.

*Ms. Lawson's Summer 2005 Protected Activity (Reporting on PI Finance's Failure to Implement Methodology Approved by the Board of Trustees for Allocation of Internet Expenses)*

35.     From June 2005 through October 2005, Ms. Lawson's Group reviewed additional PI fund profitability methodologies, and Ms. Lawson raised additional concerns to her managers (including Harris Komishane), to the then PI Finance CFO

(Jean Raymond), to PwC and to FMR Co. These concerns are detailed in Ms. Lawson's Complaint filed with OSHA on December 20, 2006, as Case Number 1-0120-07-005 (and attached hereto as Exhibit 2), and in Part II of her reply of May 14, 2007, to Fidelity Investments' redacted February 26, 2007 Response (attached hereto as Exhibit 8).

35.1    In the summer of 2005, Ms. Lawson and her team questioned PI Finance's allocation of internet expenses. After research, Ms. Lawson and her group determined that a new methodology for the allocation of internet expenses had been approved by the Mutual Funds Board in November 2003. Ms. Lawson determined further that although the Board had approved the new methodology for allocation of internet expenses in November 2003, as of the summer of 2005, PI Finance had still failed to implement the methodology approved by the Board, and had failed to advise FMR Co. or PwC that it was not following the approved methodology. Ms. Lawson reasonably believed that failing to implement the methodology approved by the Board of Trustees, without notice or approval, was in violation of SEC rules and regulations or federal laws concerning fraud against shareholders.

35.2    Ms. Lawson, her then-supervisor Michael Freeman, and an analyst who reported to Ms. Lawson presented the analysis to Senior Vice President Harris Komishane and to then Vice President of PI Finance John Cahill. On information and belief, Mr. Freeman also presented Ms. Lawson's analysis to the then-PI Finance CFO Jean Raymond and Vice President of PI Finance Richard Lyons.

### Fidelity Managers' Further Responses to Ms. Lawson's Protected Activity

35.3    Following the reporting of PI Finance's failure to implement the 2003 web methodology, a two-day meeting was held offsite to discuss "Roles and Responsibilities"

between the groups in Shared Services and the business finance teams. At the end of the two day meeting everyone was encouraged to post comments on different white boards in the section of their concern. PI Finance CFO Jean Raymond expressed her view that the Head of Board Support – the position then held by Ms. Lawson – "has too much control."

36.     In October 2005, Ms. Lawson was asked by Harris Komishane to give up day to day management of the Board Support Group and to complete instead a long-term project. In February 2006, however, Ms. Lawson's immediate manager brought Ms. Lawson back into the Fund Profitability group because he needed her assistance to complete the annual 2006 Fund Profitability cycle.

36.1     During Ms. Lawson's absence from her responsibilities of day to day management of the Board Support Group, FMR presented the change to the methodology to the Fidelity Board of Trustees in November 2005 as part of the 2005 Semi-Annual Fund Profitability Review. When it did so, it failed to note that the change had actually been approved two years earlier and had not been implemented for two years.

*Ms. Lawson's Initial (Spring and Summer 2006) Protected
Activity Concerning the Back Office Group and the Phones / Call Centers Group*

37.     In May 2006, Ms. Lawson resumed her review of Fund Profitability methodologies. Ms. Lawson became aware that during her absence from the Board Support Group, PI Finance had succeeded in obtaining her manager's authorization to have the Board Support Group implement certain methodologies out of cycle. Ms. Lawson raised concerns regarding the implementation and use of these methodologies to her manager, to Harris Komishane, to PwC and to a PI finance sub-committee formed to review all the PI methodologies.

19

37.1    One of the methodologies that had been implemented during Ms. Lawson's absence from the Board Support Group was applied to one PI Department, the PI Back Office group, which services shareholders' accounts. Ms. Lawson's group found that the new methodology had been implemented without review by FMR Co. or by the external auditors, PwC, and without any impact analysis or test of data or drivers for reasonableness and appropriateness. The 12b-1 reports for the first and second quarter of 2006 were created by the Board Support Group using information obtained from the methodology that was implemented in Ms. Lawson's absence. Ms. Lawson and her group found two major errors when the methodology was finally analyzed, resulting in additional expenses being allocated incorrectly to the Fidelity Mutual Funds. Although the errors were corrected by Ms. Lawson's group, the incorrect 12b-1 reporting for the first and second quarter of 2006 were not corrected. Ms. Lawson reported this failure to correct the 12b-1s to Senior Vice-President Harris Komishane.

37.2    In the summer of 2006, it also came to Ms. Lawson's attention that there was a significant year over year shift in the Phones / Call Centers Group's expenses from "Sales/Distribution" to Transfer Agent "Service." From the size of the shift, Ms. Lawson suspected that at least some of the shift was caused by erroneous data. Ms. Lawson and her group attempted to determine the reason for the shift.

38.    From May 2006 through September 2006, the Board Support Group and the PI Finance subcommittee met bi-weekly to review the PI fund profitability methodologies.

38.1    Because of the complexity of the call content model, it took months to reproduce the results submitted by PI Finance. During this review, Ms. Lawson and her

team discovered that the same type of phone call was not categorized consistently across

multiple phone functions and that PI Finance could not provide documentation for the

rationale/classification of the sale/service categorization of these calls.  Ms. Lawson

continued to raise her concerns regarding these methodologies during these biweekly

meetings.

### Fidelity Managers' Further Responses to Ms. Lawson's Protected Activity

38.2    As Ms. Lawson raised these concerns, her immediate manager supported

her, but PI Finance management responded with hostility and began a course of action to

prevent her concerns from being addressed.

39.    In July 2006, Ms. Lawson received only a below average raise.  In her oral

review, her manager gave no explanation for the below average raise.   Despite Fidelity

Investments' policies mandating a written merit review, no such review was given to Ms.

Lawson at the time.

39.1    Ms. Lawson was also denied Fidelity shares for that bonus cycle, even

though her team won an award for the TA Framework project undertaken during this

review period and even though the written review for the period that was eventually

provided to Ms. Lawson accurately reports that "Jackie effectively led the [TA

Framework] project, in which the control and documentation that never existed within

[Fidelity Brokerage Service] were created.  The team received accolades from PwC,

Internal Audit, FMR Co., and [Fidelity Brokerage Services]."

### Ms. Lawson's September 2006 Protected Activity Concerning the Phones / Call Center Group

39.2    In early September 2006, Ms. Lawson advised her immediate manager,

Michael Freeman, that she and her group had identified a large shift in expenses from

Distribution to Processing for the Phones / Call Center Group, and that PI Finance could not provide documentation for the rationale or classification of the categorization of each call. Ms. Lawson advised him further that the model being used by PI Finance to account for the expenses of the call centers appeared to be incorrect, and was resulting in Fidelity allocating too much of the expense to its transfer agent activities as opposed to its distribution activities and thus making the transfer agent business appear less profitable than it actually was on the FMR Co. Profit and Loss statements. The incorrect accounting was important because the Board of Trustees of the Fidelity Mutual Funds relies on FMR Co.'s Profit & Loss statements in setting Fidelity's fees for serving as the transfer agent.

39.3    At a meeting in September attended by Ms. Lawson, her supervisor Michael Freeman relayed Ms. Lawson's concerns about the Call Content model being used by PI Finance to numerous other high level managers, including PI Finance Vice President Tim Rooney, who oversaw the finance group supporting the phone centers, in early September 2006, and PI CFO Richard Lyons.

### *Fidelity Managers' Further Response to Ms. Lawson's Protected Activity*

39.4    At the September 2006 meeting, when Ms. Lawson's concerns with the PI Fund Profitability methodologies were relayed to him, PI Finance Vice President Tim Rooney responded during the meeting by yelling at Ms. Lawson.

40.    In September 2006, Ms. Lawson's manager was notified that he would be transferred to another position. Once the manager was so notified, he turned responsibilities for the review of PI Fund Profitability to a PI Finance Director (Claire Cadogan), who approved the implementation of the methodologies over Ms. Lawson's

objections. Ms. Lawson's manager left the group in October, 2006, prior to completing Ms. Lawson's merit review.

40.1    Ms. Cadogan approved the methodology for the Phones / Call Center Group, falsely claiming that the Fidelity Transfer Agent contract allowed guidance expenses to be categorized as service expenses covered by the Transfer Agent contract.

41.    When Ms. Lawson learned that her manager was being transferred, Ms. Lawson requested that she be considered for the position to be vacated by her manager. In response, the Senior Vice President for Shared Services Harris Komishane told Ms. Lawson that she had done a great job over the past two years, and had made tremendous improvements in the Board support group. He said that her performance was at a superior level and that her analytical skills were outstanding. Nonetheless, Claire Cadogan, who had overruled Ms. Lawson's concerns regarding PI Fund Profitability, who had no Board Support experience, and who had significantly less management experience, was placed in the position instead. Ms. Lawson was told by her manager that she was to train the PI Finance Director (Claire Cadogan) because Ms. Cadogan had no Board Support experience.

42.    On September 21, 2006, Harris Komishane advised Ms. Lawson that Claire Cadogan would become the Director of the Board Support Group. When Ms. Lawson pointed out conflicts of interest with the independence and governance of the Board Support group, Mr. Komishane told Ms. Lawson that Ms. Lawson was highly compensated. Ms. Lawson understood this statement as an implied threat that Ms. Lawson would lose that compensation if she raised further questions about this conflict of interest.

43.     On information and belief, PI Finance insisted on placing Ms. Cadogan in her position as Director of Board Support to cover up Fund Profitability issues. The action was also taken in retaliation for Ms. Lawson having raised concerns regarding the PI Finance methodology.

44.     On September 29, 2006, Ms. Lawson's attorney wrote to Fidelity Investments then-General Counsel Lena Goldberg, reporting Ms. Lawson's earlier concerns regarding the practices by PI Finance, and her concerns regarding the future independence of the Board Support Group following the assignment of Claire Cadogan, the former PI Finance Director, to head the Board Support Group. Through her attorney, Ms. Lawson also requested a transfer out of the Board Support Group. That request was denied.

44.1     A copy of Ms. Lawson's attorney's letter of September 29, 2006, is attached to the Complaint filed with OSHA on December 20, 2006, and attached hereto as part of Exhibit 1.

45.     On October 9, 2006, the former PI Finance Director Claire Cadogan formally assumed the title of Director of Board Support Group and Ms. Lawson was officially removed as the Head of the Board Support Group.   Despite the change of title and removal of authority, Ms. Lawson continued to have full work responsibility for supervising the Board Support Group.

*Ms. Lawson's October 2006 Protected Activity*
*Concerning the Call Content Issue and Fidelity Managers' Response*

46.     Ms. Lawson expressed to her new supervisor her grave concerns regarding the Fund Profitability methodology that was implemented, and provided documentation detailing the problem. Instead of addressing the issues raised in this documentation,

Claire Cadogan and other Fidelity Investments' managers continued their campaign to discredit Ms. Lawson.

47.     This campaign was evident to Ms. Lawson's staff who reported to Ms. Lawson that her new manager came to the Board Support group "gunning" for Ms. Lawson.

47.1    At Fidelity's attorneys' request, Ms. Lawson met with them (without her own counsel present) regarding the concerns set forth in the September 2006 letter to Fidelity's general counsel.  Claire Cadogan demanded to know the reason for her meeting with Fidelity's attorneys, and when she did not disclose the substance, Ms. Cadogan and Mr. Komishane make unfounded accusations against Ms. Lawson for the purpose of discrediting her.

47.2    For example, Ms. Cadogan reported that PI Finance Vice President Tim Rooney had given unsolicited feedback that Ms. Lawson had failed to prepare business partners for their meeting with PwC.  This allegation was false, as Ms. Lawson had in fact prepared each of the managers except one who opted against a prep meeting.

47.3    On December 6, 2006, Ms. Lawson again raised the call content issue in a meeting with Ms. Cadogan and the outside auditor, PwC.  Ms. Cadogan declined to address the issue.

48.     On December 7, 2006, Ms. Lawson's attorney again wrote to Fidelity Investments' attorneys regarding the ongoing operations and independence of the Board Support Group, to report Ms. Lawson's supervisors' unwarranted attempts to discredit Ms. Lawson, and to request again Ms. Lawson's immediate transfer out of her current

position – where she could no longer support the methodologies being used -- to an alternative position at Fidelity Investments.

48.1    A copy of Ms. Lawson's attorney's letter of December 7, 2006, to Fidelity's attorney is attached hereto as Exhibit 9

49.    On December 11, 2006, after Fidelity Investments' attorneys received this letter, Ms. Lawson was provided copies of her most recent performance reviews.  Among the documents provided was a purported merit review for the July 1, 2005 through June 30, 2006 period by her former manager.  The review had not been prepared in the normal course of business and had not previously been provided to Ms. Lawson, but instead was prepared months late, and without consulting with Ms. Lawson.

50.    This review contained inaccurate statements regarding Ms. Lawson's performance.  These inaccurate statements were made in retaliation for her raising concerns and in an effort to falsely discredit her.

51.    On December 18, 2006, Ms. Lawson's supervisors retaliated against Ms. Lawson for raising concerns regarding the PI Finance methodologies by giving her a reduced bonus compensation.

### Ms. Lawson's December 2006 and January 2007 Protected Activity (Filing a Sarbanes-Oxley Complaint With OSHA and Further Communications Regarding the Guidance Interaction)

51.1    On December 20, 2006, Ms. Lawson filed her first complaint under Section 806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A with OSHA, setting forth her claim that Fidelity had retaliated against her for her whistleblower activities.  A copy of this complaint is attached hereto as Exhibit 1.

52.    On December 20, 2006, Ms. Lawson, through her attorney, advised Fidelity Investments' then-General Counsel that Ms. Lawson had filed a retaliation claim with OSHA by providing a facsimile copy.  On January 5, 2008, Ms. Lawson also advised the Securities and Exchange Commission of the filing by providing a copy of Sarbanes-Oxley complaint filed with OSHA and the earlier letters to Fidelity Investments' counsel by mail and facsimile.  On February 16, 2007, Ms. Lawson orally provided the Securities and Exchange Commission further information regarding the matters relating to potential fraud against Fidelity Mutual Funds shareholders.

53.    On information and belief, on or about January 8, 2007, OSHA notified Fidelity Investments and the individuals named in Ms. Lawson's complaint, including Harris Komishane, Claire Cadogan, Jean Raymond and Tim Rooney, of the pending complaint.

53.1    In late December 2007, Ms. Lawson learned that the Phones /Call Centers Group had copied the methodology they were using from the PI Investor Center Group. Ms. Lawson learned further that the PI Investor Center Group had implemented this methodology in December 2005 at the direction of then PI CFO Jean Raymond.  Under the methodology (being used by both the Phones / Call Centers Group and the PI Investor Center Group), guidance interaction expenses in amounts of over $100 million dollars were being incorrectly categorized as service covered under the TA Contract, rather than as Distribution, which is not covered.

53.2    On January 4, 2007, Ms. Lawson met with one of the PI Investor Center Group offices, Fidelity's Congress Street Financial Representatives.  Although Ms. Cadogan had been invited to this meeting, she declined to attend.  From this meeting, Ms.

Lawson determined that in fact the accounting for guidance interaction implemented by PI Finance in Ms. Lawson's absence from her role at the Board Support Group was incorrect. Ms. Lawson confirmed that all expenses related to guidance should be 100% Sales/Distribution (as it had been categorized in 2005), and not Transfer Agent service.

53.3  On information and belief, despite the shift of approximately $100 million from Sales/Distribution to Transfer Agent service expenses as a result of the methodology implemented by then PI CFO Jean Raymond, no disclosure was made to the Fidelity Mutual Funds Board of Trustees of the change in methodology.

54.  During the week of January 8, 2007, Ms. Lawson contacted the Vice President of Board Support and Business Analysis at FMR Co. regarding the PI Fund Profitability methodology. Ms. Lawson took this action because she reasonably believed that the methodology resulted in inaccurate numbers being presented to the Fidelity Mutual Funds Board of Trustees, her attempts to have her supervisors and the General Counsel's office address the matter had failed, and because the Vice President of Board Support and Board Analysis at FMR Co. was in a position to prevent the inaccurate reporting.

55.

56.  On January 22, 2007, FMR Co. scheduled a meeting to review the PI Fund Profitability methodology question. The meeting attendees (by phone or in person) included: Ms. Lawson; Ms. Lawson's manager Claire Cadogan (who had approved the continuing use of the methodology over Ms. Lawson's concerns); Ms. Lawson's prior manager (who had approved the methodology during the period when Ms. Lawson was not involved in the day-to-day operations of the group); their manager, Senior Vice

President for Shared Services Harris Komishane; the former PI Finance CFO Jean

Raymond (who had originally requested the PI methodology, and (who by then served as

Executive Vice President and Chief Financial Officer); the CFO for FMR Co.; the Vice

President for Board Support and Business Analysis at FMR Co., external auditors from

PwC; and Fidelity Investments' legal counsel.

57.     Ms. Lawson presented her concerns at the meeting.  When attempts were

made by managers to delay review of the issue until later in the year, Ms. Lawson

informed the attendees that she had filed a complaint with OSHA and that the SEC was

also aware of her complaint.  FMR Co. concluded the meeting with a mandate for a

committee to be formed which was to include Ms. Lawson and PwC.

### *Fidelity Managers' Responses to Ms. Lawson's Protected Activity*

57.1     When Claire Cadogan learned that Ms. Lawson had contacted FMR Co.,

she harshly berated Ms. Lawson for doing so, and also responded by increasing Ms.

Lawson's workload and unfairly criticizing her performance.

58.     Following the January 22, 2007 meeting, Ms. Lawson's manager Claire

Cadogan announced that she was the chair of the Committee.  Ms. Cadogan then

excluded Ms. Lawson from all meetings of the committee.  On January 26, 2007, four

days after the meeting with FMR Co., Claire Cadogan gave Ms. Lawson a document

entitled Performance Expectations in which Ms. Cadogan made the unfair criticism of

Ms. Lawson a part of her employment record.

59.     On January 29, Claire Cadogan retaliated against Ms. Lawson further by

denying approval for Ms. Lawson's legitimate expense report.

60.     Meanwhile, in January 2007, Claire Cadogan had asked Ms. Lawson to

research a different issue.  Ms. Cadogan informed Ms. Lawson that she and Harris

Komishane had been aware of this issue since October 2006, and had been working with

FMR Co. on the issue. Ms. Lawson determined that the issue was of concern, that the

matter had not yet been brought to the attention of the Fidelity Mutual Funds Board, and

that it had arisen in another Fidelity Company outside of Ms. Lawson's area of

responsibility (and not part of Fidelity Brokerage Services, LLC). Nonetheless, in

March 2007 and April 2007, Claire Cadogan and Harris Komishane in a chain of e-mails

tried to implicate Ms. Lawson in the potential fraud.

      60.1    The issue raised by Ms. Cadogan related to the improper retention of 12b-

1 fees by National Financial. Ms. Lawson's group had no prior knowledge and no reason

to know of National Financial's improper retention of the 12b-1 fees.

### Ms. Lawson's April 2007 Protected Activity (Filing a Second Sarbanes-Oxley Complaint with OSHA)

      60.1    On April 24, 2007, Ms. Lawson filed her second complaint under Section

806 of the Corporate and Criminal Fraud Accountability Act, Sarbanes-Oxley Act of

2002, 18 U.S.C. § 1514A with OSHA, alleging further retaliation for her protected

activity.

      61.    Ms. Lawson is informed and believes that on or about May 9, 2007,

OSHA notified Fidelity Investments, Claire Cadogan and Harris Komishane of the

second OSHA complaint.

### Ms. Lawson's May 2007 Protected Activity (Concerning the Retained 12b-1s, the FPI Marketing Fund Profitability Issue, and the Call Content/Guidance Interaction Issue) and Fidelity Managers' Response

      62.    On May 10, 2007, Ms. Lawson notified Fidelity in-house counsel and the

Fidelity Investments' Chief Financial Officer of Ms. Lawson's concerns regarding the

matter that she had learned of when her managers attempted to implicate her in it. Claire

Cadogan was extremely upset when she found out that Ms. Lawson had reported the matter to Fidelity Investments legal counsel.

62.1    In her memorandum to Fidelity's counsel, Ms. Lawson explained that she had been advised by Ms. Cadogan in January 2007 that a group within Fidelity Brokerage Services, National Financial ("NF"), had retained approximately $10 million in 12b-1 fees paid by the mutual funds. Ms. Lawson reported further that Claire Cadogan and Harris Komishane had asserted that the issue was a "fund profitability" error, and had asked Ms. Lawson to send an executive summary to Claire Richer, Fidelity CFO. Ms. Lawson reported further that she had learned in investigating the issue that: (1) NF Financial had retained the 12b-1s without authorization and without disclosure to the Fidelity Mutual Funds Board of Trustees; (2) that the Board Support Group had no records tying any NF expenses or traditional distribution activities that would support retention of the 12b-1 activity; (3) that NF had failed to report the retained 12b-1's; (4) that FMR Co. had misleadingly reported to the Fidelity Mutual Funds Board of Trustees that the 12b-1 fees were "improperly omitted from fund profitability" without disclosing that they had been withheld without authorization and without disclosure to the Board Support Group; and (5) that FMR Co. had misleadingly reported to the Fidelity Mutual Funds Board of Trustees that "National Financial incurs expenses and performs traditional distribution activities that supports retention of 12b-1 fees." Ms. Lawson advised Fidelity's counsel that she believed that the failure by National Financial to disclose the retained 12b-1 fees was a violation of securities laws. Ms. Lawson's letter to counsel is attached as Exhibit A to her third OSHA complaint, which is attached hereto as Exhibit 3.

63.     On May 17, 2007 Ms. Lawson was issued in writing an "oral warning" from the Senior Vice President for Shared Services Harris Komishane for purportedly violating Fidelity Investments' policy regarding Insubordination. The "Oral Warning – Policy Violation" was given in retaliation for Ms. Lawson informing the Fidelity Investments legal counsel on May 10 regarding the matters in which her managers had attempted to implicate her and for filing the second Sarbanes-Oxley complaint with OSHA.

63.1     On May 21, 2007, Ms. Lawson wrote again to Fidelity counsel, advising counsel that: (1) in 2004 there had been significant changes in certain methodologies in the marketing area; (2) the PI Marketing group was aware of the methodology changes but had failed to update their model to reflect those changes; (3) the use of stale methodology by PI Finance prior to 2006 resulted in unexplained year over year variances; and (4) FMR Co. falsely reported to the Board of Trustees that the year over year variances were caused by fund profitability errors, rather than disclosing that PI Finance had used stale methodology.

63.2     On June 6, 2007, Ms. Lawson wrote again to Fidelity counsel, explaining in detail the issues regarding call content and guidance interaction. Ms. Lawson explained that the cost pool at issue was significant ($156 million for 2006), that she had learned since her meetings with Fidelity counsel in December 2006 that her fears had been confirmed and that the treatment of these costs were enabling Fidelity to commit fraud against the mutual funds shareholders by charging the mutual funds excessive Transfer Agent fees. Ms. Lawson explained further that the annual Transfer Agent renewal for 2006 and 2007 were based on an understatement of the profit margins in the

Transfer Agent Profit & Loss statement, and that these renewals were thus based on false data. Ms. Lawson specified that Fidelity Investments had reported to the Fidelity Mutual Funds Board of Trustees that Transfer Agent profitability for 2005 was 17.6% and for 2006 was 15.1%, and that these profit margins would have been 20.9% and 20.4% for 2005 and 2006 respectively. Ms. Lawson's letter is attached as Attachment C to her third OSHA complaint, which is attached hereto as Exhibit 3.

64.     In June 2007, Fidelity Investments assigned a new Vice President, Betsy Connolly, into a newly created, temporary position over Claire Cadogan. Ms. Lawson provided this Vice President with copies of the material Ms. Lawson had prepared regarding her ongoing concerns. Ms. Lawson also advised Betsy Connolly of her pending Sarbanes-Oxley claims and her submissions to the SEC.

65.     On July 2, 2007, Ms. Lawson was advised by Vice President Betsy Connolly that Ms. Lawson should take a six to twelve months sabbatical from Fidelity Investments. Ms. Connolly advised Ms. Lawson that it was impossible for her to continue working at Fidelity Investments because of the claims she had made to OSHA and the SEC. Ms. Connolly advised Ms. Lawson that Ms. Connolly had been asked to give Ms. Lawson her annual review, but had declined, because in her view, the review was not consistent with Ms. Lawson's work performance that Ms. Connolly had observed, and because Ms. Connolly had not been present during most of the year covered by the evaluation.

66.     On July 2, 2007, Ms. Lawson also learned that she would not be receiving an annual salary increase. Every other member of her team received an annual salary increase.

67.     On July 17, 2007, Claire Cadogan and Harris Komishane informed Ms. Lawson that her performance was being rated at the lowest possible level ("Needs Improvement"). This was the first time in 11 years that Ms. Lawson had received such an evaluation. In giving this evaluation and in denying a salary increase, Ms. Lawson's managers ignored all objective evidence of her successful performance, and instead retaliated against her for bringing forward the issues concerning potential fraud against Fidelity Investments mutual funds shareholders.

67.1    On August 2, 2007, Ms. Lawson, through her attorney, advised Fidelity counsel that the Fidelity Funds' Annual Reports to Shareholders, filed with the Securities and Exchange Commission, were false and misleading in that they did not disclose that incorrect information had been submitted by FMR Co. to the Fidelity Mutual Funds Board of Trustees, that some methodologies approved by the Fidelity Mutual Funds Board of Trustees had not been implemented, and that other methodologies were implemented without being approved by the Fidelity Mutual Funds Board of Trustees. Through her attorney, she also advised Fidelity's counsel that the Annual Reports were also misleading in that they contained numerous statements designed to give the impression that Fidelity Investments and Fidelity Mutual Funds are trustworthy organizations that care about SEC compliance and the shareholders of the Fidelity Funds, and failed to disclose that they were vigorously contesting the applicability of the Sarbanes-Oxley whistleblower provisions and taking the position that Fidelity was free to retaliate against whistleblowers who inform Fidelity of conduct that may involve fraud against shareholders or violate SEC rules or regulations. A copy of counsel's letter is attached hereto as Exhibit 3, Attachment D.

67.2    On August 10, 2007, Ms. Lawson's counsel advised the OSHA investigator of Ms. Lawson's addition concerns.   A copy of this letter with attached documents is attached hereto as Exhibit 9.

68.    On August 16, 2007, Ms. Lawson submitted her response to her 2007 Annual Merit Review to Claire Cadogan, Harris Komishane, Fidelity Investments Human Resources and Fidelity Investments in-house counsel.  In that response, Ms. Lawson alleged that the negative evaluations in her 2007 Annual Merit Review were given in retaliation for her protected activity under Sarbanes-Oxley.  The protected activity is further detailed in Ms. Lawson's third Complaint and attachments thereto, docketed by OSHA as Case Number 1-0120-07-012, and incorporated herein by reference.

69.    On August 27, 2007, the OSHA investigator assigned to Ms. Lawson's case advised both parties that OSHA was rejecting Fidelity Investments' claim that it was not subject to the Sarbanes Oxley whistleblower provisions and that OSHA intended to proceed to investigate the merits of Ms. Lawson's complaint.

70.    After Fidelity Investments was advised by OSHA that it would be investigating Ms. Lawson's claims, Ms. Cadogan's abusive behavior toward Ms. Lawson escalated.  Ms. Connolly joined Ms. Cadogan in this abusive behavior toward Ms. Lawson.  This abusive behavior towards Ms. Lawson is detailed in her complaint of November 9, 2007, which is attached hereto as Exhibit 1 and incorporated herein by reference.  The conduct resulted in working conditions that became so intolerable that Ms. Lawson felt compelled to resign.

71.    On September 21, 2007, Ms. Lawson gave notice that she could no longer continue working in her current position due to the extreme harassment that she was

35

being forced to endure.   She tendered her resignation, effective October 19, 2007.  A copy of Ms. Lawson's letter is attached hereto as Exhibit 5, and incorporated herein.

72.     Fidelity Investments did not allow her to continue in her position through October 19, 2007, however, and instead, Ms. Lawson was removed from her position, effective immediately on September 21, 2007.

## COUNT I - RETALIATION IN VIOLATION OF 18 U.S.C. § 1514A

73.     The allegations of paragraphs of 1-72 are incorporated herein by reference.

74.     Defendants are contractors and/or subcontractors of companies that are required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 780(d)) within the meaning of 18 U.S.C. § 1514A.

75.     Plaintiff is an employee of the Defendants within the meaning of 18 U.S.C. § 1514A.

76.     The information Plaintiff provided to the Fidelity managers, in-house counsel and the SEC (detailed above) regarded conduct which Ms. Lawson reasonably believed constitutes violations of rules or regulations of the Securities or Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.

77.     The Fidelity managers to whom Ms. Lawson provided such information (detailed above) each had supervisor authority over Ms. Lawson and/or had authority to investigate, discover, or terminate misconduct.

78.     In providing this information to Fidelity managers, in-house counsel and the SEC, Ms. Lawson engaged in protected conduct.

79.     The Complaints Ms. Lawson filed with OSHA (detailed above) related to an alleged violation of rules or regulations of the Securities and Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.  In filing these complaints with OSHA, Ms. Lawson engaged in protected conduct.

80.     Ms. Lawson's managers responsible for the discriminatory actions and/or harassing conduct were aware of Ms. Lawson's protected conduct.

81.     Ms. Lawson's protected conduct constituted contributing factors in Fidelity Investments' discrimination of and harassment towards Ms. Lawson.

82.     Fidelity Investments, through its managers Harris Komishane, Betsy Connolly, Claire Cadogan, Jean Raymond and Tim Rooney, engaged in discrimination, harassment and constructive discharge of Plaintiff because of and in retaliation for her lawful and protected acts of providing this information to managers and government agencies and/or for filing her Complaints with under 18 U.S.C. § 1514A.

## COUNT II – WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

83.     The allegations of paragraphs of 1-82 are incorporated herein by reference.

84.     Plaintiff was an employee at will at Fidelity Investments.

85.     Plaintiff was subjected to working conditions that were so intolerable that she felt compelled to resign.

86.     Plaintiff's reasonable decision to resign because of unendurable working conditions constitutes a constructive discharge under Massachusetts law.

87.     Fidelity Investments' action in not allowing her to continue in her position through the date of resignation Ms. Lawson had offered, and the removal from her position one month earlier, also constitutes a discharge.

88.     Plaintiff was constructively and/or otherwise discharged because she provided information as detailed above to Fidelity managers who had supervisory authority over Ms. Lawson and/or had authority to investigate, discover, or terminate misconduct and/or to the SEC, regarding conduct that Plaintiff reasonably believed constitutes violations of rules or regulations of the Securities or Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.

89.     Plaintiff's discharge and/or constructive discharge contradicted well-defined public policies of the Commonwealth of Massachusetts.

89.1    Massachusetts public policy protects whistleblowing concerning potential violations of SEC rules and regulations and federal laws concerning fraud against shareholders.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the court grant the following relief:

(1) A declaration that Fidelity Investments, as a contractor and/or subcontractor to the Fidelity Mutual Funds, is a covered employer under 18 U.S.C. § 1514A;

(2) Permanent injunctive relief directing Defendants to reinstate Ms. Lawson at her prior level of Senior Director;

(3) Back pay, with interest;

(4) Emotional distress damages;

(5) Punitive damages; and

(6) Compensation for special damages, including litigation costs, expert witness fees and reasonable attorney fees.

## **JURY TRIAL DEMAND**

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

**JACKIE HOSANG LAWSON**

By her attorney,

Indira Talwani
**SEGAL ROITMAN, LLP**
111 Devonshire Street
5th Floor
Boston, MA  02109
(617) 742-0208

Dated:  September 19, 2008

39

## CERTIFICATE OF SERVICE

I, Indira Talwani, certify that on September 19, 2008, I served the above Amended Complaint and Demand for Jury Trial by first class mail, postage pre-paid, on Defendants through their counsel of record:

> Eugene Scalia, Esq.
> Gibson, Dunn & Crutcher, LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C. 20036-5306
>
> Wilfred J. Benoit, Jr.
> Goodwin Procter LLP
> Exchange Place
> 55 State Street
> Boston, MA 02109

_____
Indira Talwani