UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JACKIE HOSANG LAWSON, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| FMR LLC, dba FIDELITY INVESTMENTS; | ) CIVIL ACTION NO.: 1:08-cv-10466 DPW |
| FMR CORP., dba FIDELITY INVESTMENTS; | ) |
| and FIDELITY BROKERAGE SERVICES LLC, | ) |
| dba FIDELITY INVESTMENTS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff Jackie Hosang Lawson ("Lawson") resigned from her employment with Fidelity on September 21, 2007.  Lawson claims Fidelity retaliated against her in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("§1514A" or "SOX"), because she complained about how Fidelity calculated and reported fund profitability and about a fee retention issue.

Fidelity is entitled to summary judgment because the undisputed facts demonstrate that Lawson cannot establish a *prima facie* case of retaliation under Section 1514A: that (a) she suffered an adverse employment action; (b) the adverse action came after she reported conduct that she "reasonably believed" was prohibited by a law or regulation enumerated in the SOX statute; and (c) her report was a "contributing factor" to the adverse action taken against her.  Even if Lawson could establish a *prima facie* case, summary judgment must enter because the undisputed facts demonstrate that Fidelity would and did take the same employment actions regardless of Lawson's allegedly protected activity.

Finally, Fidelity is entitled, at a minimum, to partial summary judgment on the issue of back and front pay damages because Lawson admits that she has not applied for a single identified, open job since her resignation *over eight years ago*.

## SUMMARY OF UNDISPUTED FACTS[1]

### A.    Lawson's Background At Fidelity

Lawson began full-time work at Fidelity in 1996.  SUF ¶24.  Lawson was generally a good worker, but her evaluations in 2003, 2004, and 2005 consistently noted certain areas for improvement; specifically, that she needed to improve her project management skills, listen more, delve into irrelevant detail less, and accept differing opinions.  SUF ¶¶32-35, 76-80.  For

---

[1]    Pursuant to Local Rule 56.1, the material facts in support of Defendants' Motion for Summary Judgment are set forth in the accompanying Statement of Undisputed Facts ("SUF").

example, her 2005 evaluation stated that she should "focus on having clear project plans with dates and deliverables . . . and consider her audience.  She has the tendency to go into a lot of technical details without providing the necessary background.  I recommend that she spend more time preparing the key points she wants to communicate…[and] practice taking a step back and thinking about things at a higher level to anticipate the questions a senior person will ask her. While in meetings, Jackie should focus on listening carefully to other participants who are asking or responding to questions before responding to them."  SUF ¶80.

In December 2005, Lawson had received a "Proficient" rating, a bonus of $22,350, and no Chairman's shares.  SUF ¶89.  In 2006, Lawson received a "Proficient" rating, a bonus of $19,575, and no Chairman's shares.  SUF ¶¶45-59.  These decisions were made before Lawson made any complaint about shareholder fraud (or anything else).  SUF ¶84.

**B.**     **The Shared Services Board Support Group**

In August 2004, Lawson was assigned to a newly-created group called the Shared Services Board Support Group ("SSBSG"), which was part of the finance organization within Fidelity Brokerage Company ("FBC").  SUF ¶¶45-59.  The SSBSG, like other board support groups within Fidelity,[2] was formed to help coordinate the collection and analysis of fund profitability data from the five business units within FBC, as well as to work with the business units to identify errors, discrepancies and potential improvements in fund profitability methodologies.  *Id.*

Fund profitability ("FP") is an exercise in allocating the costs that Fidelity incurs while managing and servicing mutual funds.  SUF ¶¶38-44.  Generally Accepted Accounting Principles ("GAAP") do not apply to FP, so the process is not intended or understood to result in

---

[2] For ease of the Court's reference, Ex. 1 of the Addendum contains an organizational chart illustrating the SSBSG's position relative to other Fidelity channels and business units.  FBC was one of five primary channels distributing and servicing the Fidelity Funds during the relevant time.

exact or audit-quality numbers such as those found in an audited financial statement.  SUF ¶40. FP results need only be "reasonable."  SUF ¶41.  FP is a complicated process, and errors are not unusual.  SUF ¶¶40-42.  Hundreds of methodologies go into the [FP] process.  There is a constant debate and discussion about changing methodologies and making sure that the methodologies reflect business unit activities.  SUF ¶42.  Large mutual fund complexes such as Fidelity calculate FP and report the results to their Board of Trustees for the Fidelity Funds ("the Board") in order to assist the Board in evaluating the reasonableness of management and transfer agent contracts between a fund and Fidelity.  SUF ¶39.

Once a business unit developed and tested its methodologies for analyzing data for FP and provided that information to its board support group, that group, in turn, reported the data to the FMR Co. Finance Group, which rolled up the data from all of the business units, analyzed it, and created presentations to the Board.  SUF ¶¶51-56.  The Board considered FP data as one of several factors when conducting its annual review and approval of management and transfer agent contracts between Fidelity and the individual mutual funds.  SUF ¶39.  Further, the Board engaged the independent accounting firm PriceWaterhouseCoopers ("PWC") to conduct an annual review of the fund profitability methodologies for reasonableness. SUF ¶¶60-66.  PWC also conducted Agreed Upon Procedures that involved recalculating the fund P&Ls and a sample of expenses allocated to FP for purposes of verifying mathematical accuracy. SUF ¶60.

When Lawson was assigned to the SSBSG in August 2004, she reported to Mike Freeman; four or more junior analysts reported to Lawson.  SUF ¶59.

## C.    Lawson Is Passed Over For a Position

Around September 2006, when Freeman moved to a new position within Fidelity, his supervisor, Harris Komishane, selected Claire Cadogan to replace Freeman.  SUF ¶¶98-109.

Komishane had worked with Cadogan previously and knew she had experience working in the FBC business units which the SSBSG had responsibility to assist in the FP process.  SUF ¶99. Cadogan was also rated more highly than Lawson in Fidelity's internal assessments.  SUF ¶¶104-017.  Komishane did not consider Lawson for the position due to his own experiences with her, including her shortcomings on a particular project as well as deficiencies in communication and synthesis of information that Komishane and Lawson's prior supervisors had observed and noted in her performance evaluations.  SUF ¶101.

**D.    Lawson's Reaction to Komishane's Selection of Cadogan**

In the wake of Komishane's decision, Lawson complained to people within and outside of Fidelity that she was surprised and disappointed that she did not receive the position.  SUF ¶¶112-118.  She also stated to Freeman and her friend Judy Anderson that she resented having to report to Cadogan, whom Lawson perceived to be at the same level or junior to her.  SUF ¶¶113, 114.

Lawson's conduct in the workplace declined when Cadogan was chosen.[3]  SUF ¶¶120-127.  She walked out during a discussion with Freeman and interrupted Komishane by walking into his office without knocking.  SUF ¶125.  She failed to prepare for a meeting with a high-level individual, and forced a junior analyst to run the meeting with no notice.  SUF ¶122.  She failed to speak with one of her supervisees about attendance issues, as Freeman had directed, and told him to do it himself.  SUF ¶123.  As a result, Freeman and Komishane addressed Lawson's workplace conduct with Human Resources.  SUF ¶127.

---

[3] One of Lawson's colleagues encouraged Lawson not to be sour about Cadogan being chosen instead of Lawson.  It appeared that Lawson was unhappy because Connolly and Cadogan were holding her to certain level of work (high level analysis, accuracy, consistency, timeliness) that Lawson was struggling with.  That same colleague reported at the time that she was disappointed in Lawson when she did not heed her advice and created a negative workplace environment by undermining her supervisor.  SUF ¶¶230-233.

**E.**    <u>**Lawson's September 29, 2006 Letter**</u>

Eight days after Komishane told Lawson that his selection of Cadogan was a final decision, Lawson (through counsel) sent a letter to Fidelity's General Counsel Lena Goldberg. SUF ¶128.  In the September 29, 2006 letter, Lawson complained about the selection of Cadogan and her lack of board support experience, and raised concerns that Cadogan's business unit experience rendered her insufficiently "independent" for the SSBSG role.  SUF ¶¶129-131.[4]  The letter also noted Lawson's disagreement with a "back office" cost allocation methodology change and with the call content model – both methodologies for allocating costs within FBC. *Id.*  But Lawson's letter stated that those issues "perhaps could somehow be chalked up to miscommunications, differences in understandings or professional opinions, or simply mistakes." SUF ¶130.  The letter did not claim that the issues she had raised amounted to shareholder fraud. SUF ¶129.  The letter sought a transfer for Lawson to a new position.  SUF ¶129.  Fidelity offered her a transfer, which she rejected.  SUF ¶164, 165.

Once Cadogan assumed her role as Lawson's supervisor, a precipitous decline in Lawson's performance and professionalism ensued.  SUF ¶¶137-171.  Among (many) other incidents of poor performance and insubordination, Lawson told Cadogan, that she (Cadogan) was not qualified for her new job, was "clueless," and that Lawson did not care what she wanted and did not need to follow her direction.  *Id.*  Lawson ignored Cadogan's emails, refused to speak to her in meetings, and refused to make eye contact with her, even going so far as to say that because there was no written rule requiring her to make eye contact with Cadogan, she could not be made to do so.  *Id.*  Lawson paid little heed to deadlines, requiring superiors to cover for her failures by doing the work themselves.  *Id.*  Lawson began to leave work early with little or

---

[4] Lawson did not have the same complaint about her prior supervisor Freeman, who also had worked in PI.

no notice to her supervisors and ignored and/or declined meeting invitations from her

supervisors. *Id.*

### F.      Lawson's December 7, 2006 Letter

Lawson sent a second letter to Fidelity in-house counsel on December 7, 2006, stating

that the call content model "may not be incorrect" and complaining that her group had not yet

"adequately researched" it.  SUF ¶180.  Like her September 29, 2006 letter, this letter contained

no claim of shareholder fraud.  *Id.*  It demanded that Lawson be placed in the position Cadogan

had filled.  *Id.*

### G.      Lawson's December 20, 2006 OSHA Complaint

Lawson alleged shareholder fraud for the first time five days after receiving a bonus that

she felt was too low when, on December 20, 2006, Lawson sent a letter to OSHA.  SUF ¶184.

That letter claimed: (1) that the call content model inappropriately shifted expenses in a manner

that lowered the profit margin for the Transfer Agent contract,[5] and (2) that an error in the

allocation of web expenses had occurred (*i.e.,* that a 2003 Board-approved methodology was not

implemented until 2005).  *Id.*  Lawson had known about both of these issues for years; she had

been involved in the analysis of the call content model (which her December 7, 2006 letter had

acknowledged was not necessarily incorrect) since October 2004 and Lawson had been aware of

the web expense error since (at the latest) the summer of 2005.  SUF ¶¶418-423.

### H.      Lawson's Additional Complaints

Between her December 20, 2006 OSHA complaint and September 21, 2007 (when

Lawson voluntarily resigned from Fidelity), many assignments that crossed Lawson's desk

---

[5] A Transfer Agent contract governs the relationship between Fidelity and an entity that maintains investor records, processes mailings, and provides other transactions and services for investors.  SUF ¶422.

became fodder for new complaints. [6]   After receiving each complaint, in-house Fidelity attorneys Colleen Hankins and/or Susan McSwain sought to understand Lawson's concerns, consulted subject matter experts within Fidelity, and ascertained PWC's position on each issue. SUF ¶¶483-522.  They concluded that each complaint was meritless.  *Id.*  As set forth at length in the accompanying Statement of Undisputed Facts, and summarized at Addendum Exhibit 3, FMR Co., the Board, and PWC knew about each issue prior to Lawson raising it, and none caused Fidelity, PWC or the Board any concern related to shareholder fraud.  *Id.*

In each of her complaints, Lawson claimed to have uncovered wrongdoing by Cadogan or something nefarious.  In reality, however, she identified inadvertent errors that Fidelity was already aware of and was reviewing, had rectified, or were immaterial to FP.  *See infra.*  Indeed, as to every issue, Lawson – a self-declared "subject matter expert" in FP – knew or should reasonably have known that the error or issue was immaterial to FP and that Fidelity was already well aware of each issue.  *Id.*

Lawson's complaints between December 20, 2006 and her resignation follow a simple but predictable pattern: in every instance, her complaint followed shortly after a real or perceived employment action taken by one of Lawson's supervisors, as follows:

i.   <u>Lawson's May 10, 2007 Internal Letter Arrives Days After Reprimand</u>

In the fall of 2006, Fidelity discovered that certain 12b-1 fees had been retained by National Financial Services LLC ("NF" or "NFS"), and that, although the total amount of 12b-1 fees the particular funds paid had been correctly disclosed to the Board, the fact that NF had retained a small amount of those fees had not been identified separately, and the retained fees had not been included as revenue in FP calculations.  SUF ¶¶350-364.  A number of Fidelity

---

[6] For ease of the Court's reference, a summary of Lawson's letters and OSHA complaints is presented at Exhibit 2 of the Addendum (Summary of Claims).

employees looked into this issue to understand why the fee revenue was not included in FP and why NF's retention had not been specifically listed in disclosures to the Board.[7] SUF ¶¶350-364. In March 2007, months after Fidelity identified the issue, Komishane asked Lawson to collaborate on a memorandum to Clare Richer, CFO of FMR Co., to explain how the error happened and how recurrence could be prevented. SUF ¶388. Also in March 2007, Fidelity gave the Board several memoranda detailing the history of the issue and the justification for retaining the 12b-1 fees. The Board then voted to approve both the prior and future retention of 12b-1 fees. SUF ¶¶362-369.

In the first week of May 2007, Komishane insisted Lawson revise the Richer memorandum to make it more factual and less about who was to blame for the error. SUF ¶391. Several days later, on 5/10/07, Lawson sent a memorandum to Fidelity's General Counsel concerning NF's retention of 12b-1 fees. SUF ¶400. In that memorandum, Lawson claimed that (a) NF's failure to disclose the retention of 12b-1 fees was a violation of securities laws; (b) a March 7, 2007 memo to the Board explaining NF's retention was incomplete; and (c) Lawson had not received clear authority that the Board had given approval for NF to retain the 12b-1 fees. *Id.*

At the time that she sent her May 10, 2007 letter, Lawson had known about the retained 12b-1 fee issue for five months. SUF ¶374. And before Lawson filed her complaint, Fidelity's Legal Department had given her the Board memos explaining NF's retention of fees. SUF ¶398.

ii.   Lawson's May 14, 2007 OSHA Complaint Arrives Days After Reprimand

---

[7] Fidelity discovered that in 2003 NF had acquired an entity that routinely retained 12b-1 fees. After the acquisition, the practice continued. The revenue from the retained fees was combined with other 12b-1 revenue on the company's general ledger but was not specifically disclosed to the SSBSG during the FP process. There is no evidence that this was anything more than an oversight. SUF ¶¶383-391.

On May 14, 2007, seven days after Cadogan informed Lawson that her refusal to set up a meeting that Cadogan had requested was unacceptable, Lawson filed another OSHA complaint, this time claiming that: (a) Fidelity's failure to implement a 2003 methodology for allocating web expenses until 2005 and (b) its failure to advise FMR or PWC that it was not following the approved methodology between 2003 and 2005, constituted shareholder fraud.  SUF ¶¶328, 399. Lawson had learned about the web expense error when Fidelity did—in the summer of 2005. SUF ¶¶311-313.  She had been aware of the issue for nearly 18 months when she filed her December 20, 2006 OSHA complaint (which made no allegation of wrongdoing or securities fraud with respect to the web expense issue).  *Id.;* SUF ¶¶311-326.  She did not communicate any concerns about alleged fraud concerning the web expense methodology to anyone until May 14, 2007.  When she sent her May 14, 2007 letter, she was aware that the web expense methodology issue had long since been resolved and that the Board, PWC and FMR Co. were all aware of and content with the resolution of the issue.

iii.     Lawson's May 21, 2007 Letter Arrives Four Days After Oral Warning

On May 21, 2007, four days after Komishane issued Lawson an oral warning for extending a job offer without authority to do so, Lawson sent another internal complaint to Fidelity General Counsel Goldberg, claiming that Fidelity's conduct with respect to a marketing cost allocation methodology was fraudulent because a memorandum to the Board concerning the methodology (a) allegedly told the Board that the failure to update the methodology was an "FP error" and (b) failed to inform the Board that the "methodology had been stale since 2003."  SUF ¶348.  Lawson did not claim that the failure to update the marketing methodology was fraudulent or unlawful.  By May 21, 2007, she had known about the delayed updating of the marketing

methodology for over eighteen months and had raised no concerns.  SUF ¶¶332-341.  There is no evidence the error was ever called an "FP error."  SUF ¶¶344-349.

> iv.    Lawson's June 6, 2007 Internal Letter

On June 6, 2007, Lawson sent another internal complaint letter, this time claiming that the allocation of certain expenses in connection with Guidance (*i.e.,* investment discussions with customers) was fraudulent because that allocation resulted in an understatement of profit margins reported to the Board in 2005 and 2006.  SUF ¶479.  She sent this letter just seven days after her supervisor asked her to clarify her position on the Guidance issue. When she sent the letter, Lawson knew that the SSBSG, FMR Co., and PWC had all reviewed the methodology and found it to be reasonable.  SUF ¶¶421-478**.**  By June 2007, Lawson had been working on the Guidance allocation process for two years. *Id.*

> v.    Lawson Sends August 2, 2007 Omnibus Letter Two Weeks After Merit Review

On August 2, 2007, two weeks after receiving a Merit Review with which she disagreed, Lawson sent a catch-all complaint to Fidelity reiterating prior claims and adding an allegation that Fidelity's annual reports were improper because, among other reasons, Fidelity was at the time "vigorously contesting that the SOX whistleblower provisions apply to it" in this matter, so it was improper for Fidelity through its annual reports to "give the impression that Fidelity is trustworthy and cares about SEC Compliance."  SUF ¶523.

## I.    Lawson's Performance in 2007

Throughout 2007, Lawson's performance and professionalism declined.  SUF ¶¶187-239; 243-250; 253-263.  Among many other examples which are set forth at length in the accompanying Statement of Undisputed Facts, Lawson was uncooperative and hostile toward Cadogan, unprepared for important meetings and unwilling to provide updates on project status

or outstanding tasks (while complaining, though refusing to provide the support showing, that she was understaffed).  *Id.*  During one meeting between Human Resources, Komishane, and Lawson, Lawson threatened to disclose some (unspecified) incriminating evidence about Komishane.  SUF ¶223.  She characterized their disputes as "a game", and stated that she had "said too much for playing this game."  SUF ¶223.

It is undisputed that Lawson and Cadogan had a strained relationship, although certain incidents alleged by Lawson are disputed and uncorroborated.  Lawson claims that Cadogan set unrealistic deadlines, reassigned work, changed deadlines, and failed to provide Lawson with enough staff to accomplish her work.  Lawson also claims that Betsy Connolly, an intermediate supervisor hired by Komishane in May 2007, yelled at Lawson, threw a document at her, rescheduled Lawson's meetings, and required Lawson to provide an accounting of her work day; and that on September 20, 2007, Cadogan and Connolly required her to attend four impromptu meetings.  SUF ¶268.

**J.    Lawson's Resignation on September 21, 2007**

Lawson submitted a letter of resignation on September 21, 2007.  SUF ¶¶264-265.  In that letter, she offered to stay and work at Fidelity for another month.  *Id.*  Fidelity declined her offer but paid her for the additional month.  SUF ¶265.

When Lawson resigned, a representative from Human Resources visited her in person and offered her outplacement services to assist in her job search (free of charge, with nothing required of Lawson in return).  SUF ¶¶266, 270.  Lawson rejected that offer.  *Id.*  Since quitting, she has focused her time on renovating four to five rooms in her Brookline home.  SUF ¶280.

And since the day that she quit, Lawson has not applied for a single identified, open position in the financial industry or anywhere else.  SUF ¶¶269-282.

**K.      The SEC's Inquiry Into Lawson's Claims**

In response to the complaints Lawson filed with the SEC, in 2008 the SEC inquired of and met with Fidelity and, separately, PWC.  SUF ¶¶533-542.  PWC made a presentation to the SEC concerning each of Lawson's complaints related to cost allocation methodologies.  *Id.*  In that presentation, PWC explained that each year between 2005 and 2007, it had reviewed Fidelity's FP methodologies, including those Lawson disagreed with, and certified that they were reasonable.  *Id.*  It also explained that none of Lawson's issues were material to shareholders, or to FP overall.  *Id.*  Following its meeting with Fidelity, the SEC requested and received from Fidelity one document and one piece of clarifying information.  *Id.*  The SEC then closed its inquiry.  *Id.*  This lawsuit followed.[8]

**STANDARD OF REVIEW**

Summary judgment is appropriate when "materials in the record. . . show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Although the moving party bears the initial burden of identifying "the absence of any genuine issue of material fact," once "the moving party has accomplished this feat, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  *Borges v. Serrano-Isern,* 605 F.3d 1, 5 (1st Cir. 2010).

---

[8] The procedural history is well known to this Court, and will not be repeated here.

## ARGUMENT

### I.      LAWSON CANNOT MAKE A *PRIMA FACIE* SHOWING OF RETALIATION.

To survive a motion for summary judgment on the sole remaining Count in her Amended

Complaint,[9] Lawson must establish a *prima facie* case that "(i) [she] engaged in a protected

activity or conduct; (ii) [Fidelity] knew or suspected, actually or constructively, that [she]

engaged in the protected activity; (iii) [she] suffered an unfavorable personnel action; and (iv)

the circumstances were sufficient to raise the inference that the protected activity was a

contributing factor in the unfavorable action."  *Day v. Staples, Inc.*, 555 F.3d 42, 53 (1st Cir.

2009); *see also* 29 C.F.R. § 1980.104(e)(2)(2015).   In addition, to establish that she engaged in

protected activity, she must prove that she had an objectively reasonable belief and a subjective

(actual) belief that Fidelity was engaging in securities fraud, violation of an SEC rule or

regulation, or violation of a federal law relating to fraud against shareholders.  *See* 18 U.S.C.

§ 1514A; *Day*, 555 F.3d at 55.

#### A.      Lawson Voluntarily Resigned and Was Not Constructively Discharged

Lawson claims that nearly every one of Fidelity's employment actions concerning her in

2005, 2006, and 2007 was an adverse action taken in retaliation for alleged protected activity,

and that Fidelity ultimately forced her to resign.  To establish a claim of constructive discharge,

Lawson has the burden of establishing that her working conditions were "so intolerable that a

reasonable person in the employee's position would feel forced to resign.  The plaintiff's burden

is substantial."  *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1133 (10th Cir.

2013) (quotation omitted); *see also Landrau-Romero v. Banco Popular De Puerto Rico*, 212

F.3d 607, 613 (1st Cir. 2000) (applying intolerableness standard to constructive discharge in

---

[9] Lawson's second Count, claiming wrongful discharge, was dismissed by this Court on March 30, 2010. Dkt. 43.

Title VII context); *Jackson v. McKesson Health Solutions LLC*, 2004 WL 2453000, at \*8 (D.

Mass. Oct. 29, 2004) (same, in FLSA context). "The standard is objective: the employer's

subjective intent and the employee's subjective views on the situation are irrelevant." *Lockheed*

*Martin*, 717 F.3d at 1133 (quotation omitted); *see also Jackson*, 2004 WL 2453000, at \*8. In

considering whether a constructive discharge occurred, the court considers the totality of

the circumstances. *See Lockheed Martin*, 717 F.3d at 1133.

Lawson cannot establish that she was constructively discharged. Critically, after

voluntarily resigning, Lawson *offered to remain working at Fidelity for an additional 30 days*.

SUF ¶¶264-265. This drastically undercuts any claim that her working conditions were so

intolerable she was forced to quit. *See, e.g., Hillenbrand v. Coldwater Creek, Inc.*, ALJ No.

2008-SOX-00010, at 89-90 (Dep't of Labor Apr. 23, 2010) (in SOX retaliation case, plaintiff's

offer to continue working after her resignation "undermines her claim that she perceived her

working conditions at the Company to be intolerable").[10]

Nor do any of the adverse actions she complains about – whether taken individually or

considered together – come close to constituting a constructive discharge. The undisputed facts

establish that Lawson received a "Proficient" rating in 2005 and 2006, a "Needs Improvement"

rating in 2007, an oral warning, lower bonuses than she believed she deserved, and no merit

increase to her salary in June 2007. SUF ¶¶79, 89, 95, 183, 222-227, 243, 251. She also

received a non-disciplinary "performance expectations" memorandum in January 2007 that *she*

*requested,* and in September 2007 Connolly placed a non-disciplinary memorandum in Lawson's

---

[10] *Case available at* http://www.oalj.dol.gov/Decisions/ALJ/SOX/2008/HILLENBRAND
*_LAURIE_A_v_COLDWATER_CREEK_INC_2008SOX00010_(APR_23_2010)_201239_CADEC_SD.P
DF#search=hillenbrand* To the contrary, the undisputed evidence shows that between December 2006
and September 21, 2007, Fidelity took pains to retain Lawson at Fidelity despite her unacceptable conduct
towards her supervisors. SUF ¶¶174, 225.

personnel file that explained the steps that Cadogan and Lawson should take to ensure that future deadlines were met.  SUF ¶263.

In addition, Lawson asserts that Cadogan set unrealistic deadlines, reassigned work, changed deadlines, and failed to provide Lawson with enough staff to accomplish her work; that Connolly yelled at and berated Lawson, threw a status report document at her, rescheduled Lawson's meetings, and required Lawson to provide an accounting of her work day; and that on September 20, 2007, Cadogan and Connolly required her to attend four impromptu meetings with little advance notice, during which she alleges that both of them yelled at her.  SUF ¶268. Fidelity disputes these assertions.  But even if they were true, they fail as a matter of law to establish a constructive discharge claim because whether considered independently or together, the alleged workplace environment would not make her job so intolerable that quitting was the only option.  *See Luciano v. Coca-Cola Enters.,* 307 F. Supp. 2d 308, 321 (D. Mass. 2004) (constructive discharge claim failed as a matter of law because receiving negative evaluation and perceived foot-dragging by managers in response to complaints did not create such an unbearable work environment that resignation was her only choice).  For example, the plaintiff in *Paul v. Johnson*, 2013 WL 5299399, at *9-11 (D. Mass. Sept. 17, 2013), claimed that she had been constructively discharged because she received a low performance rating, lost telework privileges, had to endure supervisor's increased supervision and criticism of her work, and was issued a warning letter.  The Court granted summary judgment for the defendant because, even collectively, these actions did not objectively create an environment that compelled plaintiff to resign.  *See also Jackson*, 2004 WL 2453000, at *9 ("[m]ere dissatisfaction with the nature of assignments, criticism of an employee's performance, and dissatisfaction with compensation

have been held insufficient to establish a triable question of fact on the issue of constructive discharge").

To the extent that the evidence confirms that Lawson and Cadogan, and/or Lawson and Connolly had a contentious relationship, that is insufficient to establish constructive discharge. "[T]oiling under a boss who is tough, insensitive, unfair, or unreasonable can be burdensome," but employees are not "protect[ed]. . . from the 'ordinary slings and arrows that suffuse the workplace every day.'" *Ahern v. Shinseki*, 629 F.3d 49, 59 (1st Cir. 2010) (no actionable constructive discharge where employee was subjected to nothing more than a generally "nerve-wracking environment).[11]

**B.**     **None of Fidelity's Actions with Respect to Lawson Were Actionable Adverse Employment Actions**

Nor can Lawson establish that any of Fidelity's actions were "materially adverse," meaning that they "well might have dissuaded a reasonable worker from making or supporting" a protected claim." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The standard is objective, and to be "materially adverse," an employment action may not be a "trivial harm[]." *Id.; see also Allen v. Admin. Review Bd.*, 514 F.3d 468, 476 n.2 (5th Cir. 2008) (applying *Burlington* "material-adversity" standard to SOX retaliation claim).

**1.**     **Alleged Adverse Actions in 2005 and 2006 – All Before Lawson Complained of Purported Shareholder Fraud.**

The overreach of Lawson's retaliation claim is clearly demonstrated by the undisputed fact that she seeks redress for purported 2005 and 2006 "adverse employment actions" – *all* of

---

[11] *See also Ahern*, 629 F.3d at 59 (vast majority of employees who were subjected to a supervisor's working style chose to stay, "underscore[ing] the absence of any foundation for a claim of constructive discharge").  No other employees who reported to Cadogan or Connolly between September 2006 and September 2007 resigned.  SUF ¶267.

which occurred *before* Lawson engaged in any activity that could even potentially be considered "protected."

Lawson concedes that her September 29, 2006 letter does not constitute protected activity – nor could it, given that it does not allege shareholder fraud. To the contrary, it states that the issues raised "perhaps could somehow be chalked up to miscommunications, differences in understandings or professional opinions, or simply mistakes." SUF ¶¶130-136, 279, 435.[12]

Similarly, Lawson's December 7, 2006 letter did not raise any concerns regarding shareholder fraud. SUF ¶¶180, 444. The letter expressed her potential disagreement with a cost allocation methodology, but did "not take the position that the . . . model is necessarily incorrect," only that it had not been vetted sufficiently yet. *Id.* By the time Lawson filed her December 20, 2006 OSHA Complaint, the decisions regarding her December 2006 bonus and Chairman's shares had been made. SUF ¶¶181-182. Thus, to the extent the December 20, 2006 letter to OSHA is protected activity, it could not have been the basis for decisions that were made before it was sent.

Despite having made no complaint of shareholder fraud before her December 20, 2006 OSHA Complaint, Lawson's Amended Complaint sets forth a laundry list of "adverse actions" that predate her complaint that she asserts were retaliatory. Among those actions are: (1) her "Proficient" rating in July and December 2005, and in December 2006;[13] (2) her $22,350 bonus in December 2005 and $19,575 bonus in December 2006; (3) the failure to award Chairman's

---

[12] Lawson also admitted during a meeting with Fidelity's attorneys regarding this letter that the errors she complained about were going to be corrected and had no impact on FP. SUF ¶¶490-491.

[13] Under the Fidelity performance evaluation system, employees could be rated Outstanding, Exceeds Expectations, Proficient, or Needs Improvement. SUF ¶10.

shares to her in December 2005 or December 2006;[14] and (4) that Cadogan was selected for Freeman's position instead of her.  Of course, in the absence of protected activity prior to those actions, they could not have been retaliatory.  Accordingly, any claim related to those actions must be dismissed.[15]

### 2.    2007 Alleged Adverse Employment Actions

In the nine months preceding her September 21, 2007 resignation, Lawson's poor performance and unprofessional conduct escalated dramatically.  To be sure, Lawson's personnel file reflects her supervisors' reaction to that conduct.  However, none of Fidelity's actions concerning Lawson in 2007 support a claim for retaliation.

In January 2007, *as a result of at least four requests by Lawson* for written clarification of her responsibilities, Lawson was provided with the "Performance Expectations Document" she now claims was retaliatory.  SUF ¶¶175, 191, 195, 202.  The document delineated Lawson's

---

[14] Chairman's Shares are shares awarded to high-performing and high-potential employees or those who have skills that are critical to Fidelity's business. A key program goal is to recognize an employee's current and expected contributions by directly tying a portion of an employee's total compensation to the longer-term success of Fidelity. SUF ¶12.

[15] Even if any protected action had occurred, Lawson's "Proficient" rating alone cannot constitute an adverse employment action because it resulted in no material change to her employment.  *Hall v. FMR Corp.*, 667 F. Supp. 2d 185, 200 (D. Mass. 2009) (performance rating of 'proficient' and other "objective statements about employee's shortcomings or need for improvement do not, by themselves, constitute an adverse employment action").  It is undisputed that each year, FBC managers were allotted a budget for bonuses that had to be divvied up among employees. SUF ¶13.  Lawson has neither alleged nor proven that her bonus materially decreased or reflected anything other than her performance.  Lawson's combined salary and bonus was higher than three of her peers in 2005 and 2006 (including Cadogan).  Likewise, the selection of Cadogan was not materially adverse to Lawson because it is undisputed that Lawson's selection would have been a lateral move in title and pay for her, not a promotion.  Even in her new role, Cadogan was paid *less* than Lawson. SUF ¶109**.**  Nor has Lawson ever alleged any material harm to her by virtue of being passed over for that role apart from allegedly being prevented from "safeguarding the integrity of the [FP] process." SUF ¶131.  Even if that were true (which Fidelity disputes), Lawson's purported inability to "safeguard the integrity of the process" is not a material impact on Lawson's employment constituting an adverse employment action.  *See Jackson*, 2004 WL 2453000, at *7 (adverse actions involve employers taking something of consequence from employee, like demotions and salary reductions").

responsibilities and re-stated the tasks she had been doing for two and a half years. *Id.* By its own terms, it was not disciplinary in nature (*i.e.*, it had no impact on the terms and conditions of her employment). *Id.*

In May 2007, Lawson was issued an oral warning following her attempt to extend a job offer to an individual her supervisors had rejected for the position. SUF ¶202. This was followed, in June 2007, by a Needs Improvement merit rating. SUF ¶243. Neither the oral warning nor the merit rating constituted adverse actions. *See, e.g., Melton v. U.S. Dep't of Labor*, 373 Fed. Appx. 572, 578 (6th Cir. 2010) (upholding decision that a warning letter was not materially adverse and would not dissuade a reasonable employee from objecting to unsafe activity); *Aulisio v. Baystate Health Sys.*, *Inc.*, 2012 WL 3947738, *9 (D. Mass. Sept. 7, 2012) (supervisory comments, Performance Improvement Plan, written warnings, and one week suspension did not support constructive discharge claim as matter of law, because they had no material disadvantage).

Finally, Connolly's decision to place a non-disciplinary memorandum in Lawson's personnel file on September 19, 2007 concerning the steps Cadogan and Lawson should take to ensure deadlines were met is not an actionable adverse employment action. The memorandum had no impact on the terms and conditions of Lawson's employment. SUF ¶263.

### 3.    Other Allegedly Retaliatory Actions

As set forth above, Lawson also seeks redress for the following: that Cadogan set unrealistic deadlines, reassigned work, changed deadlines, failed to provide Lawson with enough staff to accomplish her work, rescheduled Lawson's meetings, and required her to provide an hourly accounting of her work day. Amended Complaint, Dkt No. 22, Ex. 4. Lawson further alleges that Cadogan and Connolly required her to attend four impromptu meetings with little

advance notice, *id.*, and that Connolly yelled at her and threw a document at her.  *Id.*  These, too, are not actionable "adverse actions."

First, Lawson's assertions that anyone yelled at her and threw a document at her are completely uncorroborated and unsupported by the evidence.  Lawson's burden at this stage does not permit her to "rest on mere allegations;" she "must set forth specific facts showing there is a genuine issue for trial" beyond uncorroborated testimony.  *See Willard v. MHM Corr. Servs., Inc.,* 2015 WL 7194585, at *5 (D. Mass. Nov. 16, 2015) (citations omitted); *Santangelo v. New York Life Ins. Co.,* 2014 WL 3896323, at *9 (D. Mass. Aug. 7, 2014) *aff'd,* 785 F.3d 65 (1st Cir. 2015) (no reasonable jury could find for plaintiff, despite plaintiff's uncorroborated assertions).[16]

Second, managerial tasks such as setting deadlines, assigning work, changing deadlines – even if Lawson disagreed with Cadogan's or Connolly's approach to those tasks– are not actionable adverse employment actions.  *See Jackson*, 2004 WL 2453000, at *9.  They are precisely the type of "trivial" matters and workplace "slings and arrows" that do not materially impact employment conditions so as to constitute adverse actions.  *Burlington,* 548 U.S. at 68; *Ahern*, 629 F.3d at 59.

Similarly, Lawson's claim that her group was understaffed as punishment for her complaints is nonsense.  The undisputed evidence shows that, while claiming to be understaffed, Lawson refused to give supervisors requested status updates of ongoing projects to allow them to evaluate how much work was outstanding and prioritize the work.  SUF ¶¶256, 259.  When Connolly undertook an analysis of the team's workload, she concluded that there were enough

---

[16] *See also Norwood Aviation v. Boston Metro. Airport,* 1988 WL 148779, at *5 (D. Mass. Dec. 28, 1988) (uncorroborated affidavits and depositions of plaintiff were insufficient to state viable antitrust claims); *Reines v. Venture Bank,* ALJ No. 2005-SOX-00112, 2007 WL 7139504 (U.S. Dep't. of Labor Mar. 13, 2007) (finding no adverse action where plaintiff's assertion that she was "verbally abused" by her supervisor at a meeting in front of peers as a result of a SOX complaint was uncorroborated and unsupported by the evidence in the record).

people to accomplish the work – in fact, that the staff did not have enough to do. [17]   SUF ¶258.

In addition, it is undisputed that Fidelity reduced open requisitions (*i.e.* ability to hire new staff)

as a company-wide policy, so Connolly was unable to fill a SSBSG position that had opened up.

SUF ¶256.

### C.   Lawson Cannot Raise Any Inference that Protected Activity Was a Contributory Factor in Fidelity's Actions

Lawson also cannot, as matter of law, establish that any protected activity was a

contributing factor to Fidelity's employment actions.  A "contributing factor" is "any factor,

which alone or in connection with other factors, tends to affect in any way the outcome of the

decision."  *Lockheed*, 717 F.3d at 1136.  In evaluating circumstantial evidence of causation,

temporal proximity—that is, protected conduct closely followed by adverse action—is alone

insufficient evidence of retaliatory motive.  *See Riddle v. First Tenn. Bank, Nat'l Ass'n*, 497 Fed.

Appx. 588, 596 (6th Cir. 2012).  Any causal connection suggested by temporal proximity "may

…be severed by the passage of a significant amount of time, or by some legitimate intervening

event."  *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014).

As discussed above, most of the employment actions that Lawson alleges were retaliatory

took place *before* any of Lawson's alleged protected activity and before any of Lawson's

supervisors knew about that activity.  Specifically, Lawson claims a number of adverse actions

took place in 2005 and 2006, but the undisputed facts confirm that Komishane – the only person

Lawson alleged to have engaged in the purported "adverse actions" during those years – was not

aware of the letters Lawson sent to in-house counsel and did not know Lawson was making any

allegations until after the December 20, 2006 OSHA complaint.  SUF ¶¶134, 185**.**  In addition,

---

[17] Fidelity HR Solutions representative Linda Stephenson testified that in her long career in Human Resources, 90% of managers Stephenson spoke with believed that they were understaffed and could do better work if they had additional resources. SUF ¶259.  Stephenson heard those complaints from many groups all the time. *Id.*

Lawson cannot show that her complaints contributed to Connolly's actions in 2007, because it is undisputed that at that time, Connolly was aware of only a single complaint (the NF retention claim) that she did not consider to be an allegation of shareholder fraud because she understood it was a non-issue given that it had been completely resolved.  SUF ¶¶240-242.  As explained below, the NF issue had been brought to the Board and resolved months prior to the alleged actions by Connolly in late summer 2007.  SUF ¶¶362-369.

Thus, Lawson's *prima facie* case fails because there is no evidence that the decision-makers knew that Lawson had engaged in protected activity at the time of their decisions. *Sussberg v. K-Mart Hold. Corp.*, 463 F. Supp. 2d 704, 714-15 (E.D. Mich. 2006) (granting summary judgment where supervisors took employment actions before knowing of plaintiff's alleged protected activity).

In addition, there is no reasonable inference that anything other than Lawson's own shortcomings caused the employment actions she complains about.  *See Day*, 555 F.3d at 53; *see also Feldman* 752 F.3d at 350 (affirming summary judgment for employer where there was lengthy history of antagonism which began before alleged protected activity); *Boyd v. Accuray, Inc.*, 873 F. Supp. 2d 1156, 1170 (N.D. Cal. 2012) (SOX activity was not contributing factor where employee was "on the termination track" as early as a year before the protected activity). It is undisputed that Lawson's merit ratings in 2005 and 2006 were the same ("Proficient") and were consistent with the performance feedback she had received as far back as 2002, when she was told she needed to work on her communication skills, and in 2003 when she was told she needed to listen more, be more succinct, and not take comments personally. SUF ¶¶32-34.

In fact, the undisputed facts make clear that it was *Fidelity's employment actions that were contributing factors to Lawson's complaints* and not vice versa.  *See* Addendum at Ex. 4

(Trigger Chart).  For example, just over a week after Lawson learned that Cadogan had been chosen as her new supervisor, Lawson sent her first internal letter through counsel on September 29, 2006.  Five days after Lawson received an unsatisfactory bonus in December 2006, she filed an OSHA complaint.  Five days after she received an oral warning in 2007, Lawson sent yet another internal letter.  And just two weeks after receiving a 2007 Merit Review she disputed, Lawson sent an omnibus complaint letter.  The timing and circumstances of each of her complaints demonstrates that they were made in *response* to employment actions she disagreed with – and not the other way around.[18]

Any inference that Lawson's alleged protected activities were a contributing factor to any employment action is further eroded by the undisputed evidence demonstrating that Fidelity, the Board, and PWC already knew about all of the issues Lawson raised *before* she raised them, and had already corrected them or were in the process of doing so when they were first raised.  *See* Addendum at Ex. 3 (Fidelity Prior Knowledge Chart).  There was simply no reason for Fidelity to retaliate against Lawson for raising issues that were widely known, fully understood, and resolved.  *See, e.g., Hillenbrand*, ALJ No. 2008-SOX-00010, at 89-90 (the tax rate that was the basis of plaintiff's report did not cause her employer to retaliate or cause management concern because the rate was common practice and justified; however, plaintiff's disrespectful outbursts towards her manager contributed to employment decisions).

Accordingly, Lawson's claim fails as a matter of law, because she cannot raise an inference that her protected activity was a factor in Fidelity's employment actions.

---

[18] See Addendum Exhibit 2 (Summary of Claims), with SUF references.

**D.** **Lawson Did Not Have an Objectively or Subjectively Reasonable Belief that Fidelity's Conduct Violated any of the Laws Enumerated in Section 1514A**

**1.** **The Applicable Legal Standard**

The *prima facie* standard for SOX retaliation cases differs from that in other contexts, because to establish that her activity was protected, a claimant must show that she "provide[d] information . . . regarding any conduct which [she] *reasonably believe[d]* constitute[d] a violation of" the laws or regulations enumerated in §1514A: 18 U.S.C. §§ 1341, 1343, 1344, or 1348 (mail fraud, wire fraud, bank fraud, securities fraud), violation of an SEC rule or regulation, or violation of a federal law relating to fraud against shareholders. *See* 18 U.S.C. § 1514A (emphasis added); *Day*, 555 F.3d at 53 n. 6, 55 (noting that the burden in SOX retaliation cases may be "more difficult to meet" than the burden in Title VII cases).

**2.** **Lawson Did Not Have an Objectively or Subjectively Reasonable Belief That Fidelity's Conduct with Respect to any of the Issues She Raised[19] Constituted a Violation of One of the Laws Enumerated in Section 1514A.**

**a)** *Lawson's Complaints Relate to Her Campaign to Undermine Cadogan, Not Shareholder Fraud*

During the first decade of Lawson's Fidelity career before Komishane selected Cadogan for Freeman's position, she never raised a single concern regarding Fidelity's FP process. In fact, she fully endorsed Fidelity's FP system in March 2006, when she met with and provided a presentation on FP to Russell Peppet, an expert Fidelity retained in connection with another litigation matter. SUF ¶¶90-92. In March 2006, Lawson was fully aware of the back office, web

---

[19] This motion addresses six of Lawson's claims, referred to as: back office, web expense, marketing, call content, guidance, and NF's retention of 12b-1 fees. In Lawson's December 20, 2006 OSHA complaint, she also asserted that "[d]uring the 2005 annual audit, PwC discovered several major errors. These errors were corrected and were documented by PwC as 'Findings.'" The "errors" discovered by PwC allegedly include "both that the statistics from a new source system were incorrect, and that PI Finance's switch to the new source system to get statistics in 2004 had not been disclosed or approved by PwC or FMR Co." Fidelity's motion does not address this claim because Lawson admits that she "succeeded in having these first concerns addressed by Fidelity Investments, and she received excellent verbal and written feedback concerning her work from FMR Co., PwC and the Chief Financial Officers for NF and CFO [sic]." SUF ¶283. Accordingly, they cannot serve as the basis of her SOX retaliation claim.

expense, Guidance, and marketing issues which would later form this basis of her complaints to OSHA and this Court.

However, a mere *eight days* after she learned that Cadogan was going to be her new supervisor, Lawson claimed in a lawyer's letter that selecting Cadogan for the position exacerbated a "conflict of interest" that allegedly existed between the "independent"[20] SSBSG and the business units, because Cadogan had "strong loyalty and ties to PI Finance." SUF ¶131. Tellingly, Lawson never raised any conflict of interest concerns when Freeman was her supervisor, even though he—like Cadogan—had also previously worked for PI Finance. SUF ¶132. While raising concerns about the purported "independence" of the SSBSG inside Fidelity, Lawson was telling her best friend and Freeman that her concerns centered on having to report to Cadogan, whom Lawson believed was at the same level or junior to her. SUF ¶¶113-114.

Between her first letter in September 2006 and the date of her resignation, Lawson launched repeated attacks at Cadogan. Many issues that crossed her desk in the form of routine assignments became fodder for new complaints sent which, as discussed above, typically were lodged just days after an employment action that Lawson did not like. See Addendum at Ex. 4 (Trigger Chart). The pattern and personal nature of Lawson's attacks against Cadogan cannot be disputed. Although Lawson couched her complaint letters in terms of a "whistleblower" campaign, her efforts were actually geared toward criticizing Cadogan's competence and management style. For example:

> ● On December 4, 2006, Lawson told Cadogan that she thought Cadogan was "clueless." SUF ¶¶171, 176. On the same day, Lawson sent an email to Komishane stating, "Claire's

---

[20] Lawson's letters and complaints suggest that the SSBSG was some kind of independent "watchdog" group. This is simply false. It is undisputed that the SSBSG was created in order to make certain intra-business unit functions more streamlined and efficient. It is non-sensical to suggest that the SSBSG was "independent;" it was part of the finance organization. It was not in a compliance function, had no legal expertise, and was intended to facilitate the FP process and coordinate efforts with the business units. SUF ¶50. Even Lawson's expert conceded that the SSBSG is "not independent". *Id.*

behavior makes me wonder whether there were [sic] any training or transition between herself and Mike Freeman regarding the workings of the group.. . .[A]s of today she is not performing at the level where she can provide guidance to myself and/or my team. . ." SUF ¶175.

● On January 17, 2007, after Cadogan explained to her that it was difficult to work together when Lawson ignored her emails, and refused to respond to questions or make eye contact, Lawson claimed that she did not need to make eye contact with Cadogan, that there was no written rule that required her to make eye contact, and that Cadogan could not make her do so.  SUF ¶198.

● On January 24, 2007, Lawson encouraged Human Resources to evaluate Cadogan's performance.  SUF ¶201.

● On February 27, 2007, Lawson told Komishane that the fact Cadogan had not been through an annual FP cycle was causing "angst" among Lawson's staff.  She blamed Cadogan for lowering "the team's morale" and complained that Cadogan was unduly criticizing one of Lawson's direct reports.  SUF ¶204.

● On March 20, 2007, Lawson questioned Komishane and HR how Cadogan could "intelligently claim" the group was behind schedule when Cadogan had not been through the FP cycle before.  SUF ¶205.

● On May 10, 2007, Lawson lodged an internal complaint objecting to Cadogan's decision to give an FP award to another employee, claiming that Cadogan's motives for the award were suspect because Lawson had not been consulted about the award.  She demanded that Cadogan "share[] the write-up that she submitted to justify the award given to [the employee]." SUF ¶210.

● On June 4 and 5, 2007, Lawson emailed Fidelity's General Counsel and others to complain that Cadogan had invited one of "Lawson's" analysts to a meeting.  She then requested a meeting to address Cadogan going to "[Lawson's] staff to assign work." SUF ¶236-237.

● On August 16, 2007, Lawson again took issue with Cadogan's decision to give the FP award to another employee, claiming that "her action in awarding someone outside the group for FP accomplishments suggests . . . that [she] may not be fairly critiquing my work and my team's work."  SUF ¶255.

These (and other) attacks against Cadogan, launched alongside the supposed "whistleblower" letters, were unrelated to any claim of shareholder fraud, and further demonstrate that Lawson's campaign had nothing to do with shareholder fraud, and everything to do with undermining Cadogan.

26

b)      *"Objectively Reasonable" Standard and Factors Common to All Complaints*

To establish an objectively reasonable belief of a violation of securities law, the subject matter of a complaint cannot be too trivial, and the connection to shareholder fraud cannot be too tenuous.  In *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222-23 (2nd Cir. 2014), for example, the plaintiff alleged that certain conduct had the potential of exposing the company to extreme financial risk and thus constituted potential shareholder fraud.  In that case, the court affirmed a motion to dismiss, finding plaintiff's bald statement "insufficient as a matter of law to make out a [SOX retaliation] claim" because "[t]he connection between Nielsen's claims and supposed fraud against shareholders is simply too tenuous."  *Id*. at 223.  The court further noted that "the statute does require plausible allegations that the whistleblower reported information based on a reasonable belief that the employer violated *one of the enumerated provisions* set out in the statute [and] . . . to be reasonable, the purported whistleblower's belief cannot exist wholly untethered from these specific provisions."  *Id*. at 221 n. 6; *see also Sylvester v. Parexel Int'l LLC*, 2011 WL 2165854, at *19 (Dep't of Labor May 25, 2011) ("It may well be that a complainant's complaint concerns such a trivial matter," in terms of its relationship to shareholder interests, "that he or she did not engage in protected activity under Section 806.").

There is a Circuit split with respect to what a plaintiff must show to meet her burden of establishing that she had an objectively reasonable belief that the company's conduct violated one of the laws enumerated in §1514A.  Under *Day*, which is controlling authority in this Circuit, "[t]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud. . . .Those elements typically include a material misrepresentation or omission, scienter, loss, and a causal connection between the misrepresentation or omission and

27

the loss." 555 F.3d at 55-56.  The employee need not identify a specific statute in her complaint or prove actual harm, but "[s]he must have an objectively reasonable belief that the company *intentionally misrepresented or omitted certain facts* to investors, which were *material and which risked loss*." *Id*. (emphasis added).

In 2011, the ARB diluted that standard in *Sylvester*, 2011 WL 2165854.  *Sylvester*, in turn, has been followed by some Circuits.[21]  In *Sylvester*, a SOX plaintiff was *not* required to allege or prove the specific elements of fraud.  Nonetheless, even under *Sylvester*, there must be a reasonable belief that there is a connection between the conduct and shareholder fraud.  *See Nielsen*, 762 F.3d at 223 (deferring to *Sylvester* standard but affirming dismissal of the complaint because plaintiff's allegations were not sufficiently related to shareholder fraud).

Under either *Day* or *Sylvester,* "[o]bjective reasonableness 'is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.'"  *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009) (*quoting Allen*, 514 F.3d at 477).  In assessing objective reasonableness, one "must look at the totality of the circumstances, taken in context with [plaintiff's] experience." *Vannoy v. Celanese Corp*., 2009 WL 6496753, at *14 (Dep't of Labor June, 24, 2009).  Factors courts typically consider include: the plaintiff's training and experience, the company's knowledge of the error and what it did to resolve the problem, the company's

---

[21] The cases adopting the *Sylvester* standard include *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015) (applying the *Sylvester* standard and noting that the plaintiff need not establish materiality or intent to defraud); and *Wiest v. Lynch*, 710 F.3d 121, 133 (3d Cir. 2013) (applying the *Sylvester* standard and noting that a complainant can engage in protected SOX activity even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation).  Since *Sylvester*, cases continuing to apply *Day* include: *Rock v. Lifeline Sys. Co.,* 2015 WL 6453139, at *12 (D. Mass. Oct. 23, 2015) (requiring plaintiff's complaint to "at least approximate the basic elements of a claim of securities fraud," i.e., materiality, scienter, loss, causation); and *Beacom v. Oracle Am., Inc.,* 2015 WL 2339558, at *5 (D. Minn. 2015) (employee's theory must "approximate the basic elements of a claim of securities fraud").

response to the employee's complaint, and the opinion of internal compliance officers and external regulators. *See id.; see also Harp,* 558 F.3d at 723-24.

As set forth in more detail below, *all* of the relevant factors demonstrate that Lawson had no objectively reasonable belief that Fidelity's conduct constituted shareholder fraud.[22]

### i.     Training and Experience

Lawson was, by her own account and according to others at Fidelity, a "subject matter expert" in fund profitability.  SUF ¶¶67, 160, 175.  She was a finance professional with over 20 years' experience in the services industry, with the ability to understand and manage complex financial matters.  SUF ¶69.  She had specialized expertise in high level financial analysis and reporting, and the creation, management, and analysis of complex client, product and mutual fund profitability models.  She was intimately familiar with Fidelity's FP cycle.  SUF ¶¶70-71.  Where an employee has particular expertise in a subject, her objectively reasonable belief must be assessed in light of that expertise.  *See, e.g., Haley v. Dep't of Treasury*, 977 F.2d 553, 557 (Fed. Cir. 1992) (employee with extensive experience as an examiner of savings associations did not have a reasonable belief that his employer's conducted violated a law that clearly allowed for such conduct); *Stewart v. Lockheed Martin Aeronautics Co.*, ALJ No. 2013-SOX-00019, at 30-31 (Dep't of Labor Jan. 24, 2014) (CPA with 20 years of experience had no reasonable belief that she was being forced to rubber stamp an audit because the company told her to continue to work on the audit and note problems);[23] *Kilpatrick v. Citigroup*, ALJ No. 2013-SOX-00017, at 8 (Dep't of Labor Nov. 1, 2013) (plaintiff with 30 years of computer programming and other

---

[22] Throughout this memorandum, the term "shareholder fraud" is used to refer to the laws and regulations covered by §1514A.

[23] *See* Addendum Exhibit 5 (*Stewart* case)

relevant experience should have known that errors were insignificant and remedied at the end of each month).[24]

In light of Lawson's FP expertise, she could not have had an objectively reasonable belief that her allegations concerned an issue of shareholder fraud. In particular, the triviality of her concerns is self-evident and she could not have believed that her allegations materially impacted shareholders. First, some of her complaints concerned the *wording* of internal documents, the immateriality of which is obvious. *See, e.g., Xie v. Hospira, Inc.*, 2011 WL 3921451, at *3 (N.D. Ill. Sept. 2, 2011) (materiality not established where documents not given to shareholders).

Second, as to the errors that she contends could theoretically have had a financial impact on shareholders, a reasonable person with Lawson's FP expertise would not have considered the issues she raised to be material or to carry any risk of loss. Under *Day*, "[t]his materiality requirement means the complainant must believe there is a 'likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" 555 F.3d at 57 (citation omitted). Lawson cannot make this showing, where the relative impact of the errors were as follows:

---

[24] *See* Addendum Exhibit 6 (*Kilpatrick* case)

# MATERIALITY

| Issue | Impact | Compared to | % Impact on FP or after tax margin |
|---|---|---|---|
| Back Office | 2006: $6.9 million decrease in FP expenses | $5.9 *billion* total FP expenses | .12% of total FP expenses<br><br>.054% difference in after-tax margin |
| Web Expense | 2003: over-allocated $11 million<br><br>2004: over-allocated $18 million | 2003: $3.9 *billion* total FP expenses<br><br>2004: $4.5 *billion* total FP expenses | 2003: Even less than .1%<br><br>2004: 0.1 % (19.1 % reported vs. 19.2% actual) |
| Call content/Guidance | 2005: $3.5M increase in FP expense; by 2006, increase in Guidance activity increased impact to $130m . | 2005: $4.8 *billion*  total FP expenses | .07% of total FP expenses<br><br>0.03% reduction in after-tax margin. |
| NF's Retention of 12b-1s | 2003-2006: $10 million in 12b-1 fees retained on Cash Management Funds | 2006 CMF assets on NF platform: $17 *billion*<br><br>2006 fund paid fees: $61.3 million, of which $4.6 million or 7.5% was retained<br><br>2003-2006 fund paid 12b-1 fees to NF on CMF assets: $200 million | 5% of fund paid 12b-1 fees retained<br><br>After tax margin for three CMF funds was understated ranging from 0% to 1.4%. |
| Marketing | 2005: Under-allocated approx. $36M in costs to money market funds; over-allocated $25 million (equity funds), and $11 million (bond funds) | 2005: $4.8 *billion* total FP expenses | 1.3% of total FP expenses |

Lawson was aware of the level of expense or revenue involved with each of the issues she raised.  Lawson's methodology-related issues involved only FBC, which was only one business in a massive Fidelity fund complex.  The FP process in FBC alone involved the cost allocation of billions of dollars in expenses.  SUF ¶¶43-44.  As summarized in the chart above, none of the issues Lawson raised could possibly have any material impact on any shareholder given the magnitude of the dollars involved in Fidelity's cost allocation matrix.  Cases routinely find that issues reflecting a similar trivial impact as those in above chart are immaterial. *See, e.g.*, *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 631 (S.D.N.Y. 2005) (finding that "[c]hanging the accounting treatment of approximately 0.3% of JPM Chase's total assets . . .

would not have been material to investors");[25] *Deremer v. Gulfmark Offshore Inc.*, 2007 WL 6888110, at *38 (Dep't of Labor June 29, 2007) (the impact of issues was not material when compared to Gulfmark's revenue of $139 million); *See also In re Duke Energy Corp. Sec. Litig.*, 272 F. Spp. 2d 158, 161 (S.D.N.Y. 2003), *aff'd* 113 Fed. Appx. 427 (2nd Cir. 2004) (finding that the inflation of $217 million or 0.3% of the company's revenues was "an immaterial percentage as a matter of law"); *Nazif v. Computer Scis. Corp.*, 2015 WL 3776892, at * 6 (N.D. Cal. 2015) ("[E]ven if this Court assumes that the entire value of the [relevant contracts] was improperly booked as revenue in a financial statement that was ultimately disseminated to investors, a $1-2 million overstatement of revenue would be a 'minor or technical violation' that is not material to a company, like CSC, that . . . reported annual revenue of over $14 *billion* during the relevant period.") *In re Turkcell Iletism Hizmetler, A.S. Sec. Litig.*, 22 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (9% drop in operating income for one quarter was too small a decline to trigger disclosure obligation); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (finding the misrepresentation of 2% of a company's total assets was immaterial as a matter of law)..[26] Notably, it is undisputed that the Board's Chair of Audit Committee, an independent trustee of the Board who acts as a representative of Fidelity shareholders, was made aware of the errors raised by Lawson (typically prior to Lawson identifying them), and did not believe any of the issues raised by Lawson would have had any bearing on the Board's decision-making process. SUF ¶¶346, 368.

### ii.  Fidelity's Prior Knowledge and Efforts to Address Each Issue

---

[26] *See also In re Daou Sys., Inc.*, 411 F. 3d 1006, 1018 (9th Cir. 2005) (in securities case, "although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud," a plaintiff must show "how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position.").

As to each of Lawson's claims, the undisputed evidence shows that Fidelity was well aware of the error or issue and had already corrected it, or was addressing it, at the time of Lawson's complaint. *See* Addendum at Exhibit 3 (Fidelity Prior Knowledge). This fact weighs against any finding of protected activity, because the identification of an already-identified error may not be sufficient to render conduct protected. *See Allen*, 514 F.3d at 481 ("Considering the fact that [the company] did not intentionally cause the . . . problem, did not conceal it, and attempted to correct it," a reasonable person could not conclude that the company's conduct violated a provision of federal law relating to fraud against shareholders). It is undisputed that it was part of Lawson's position in the SSBSG to identify errors and to correct them and/or bring them to the attention of her supervisors. SUF ¶53. But in each and every instance, someone other than Lawson had already identified and escalated the issue.

### iii.    Fidelity's Response to Plaintiff's Complaint and Opinion of Internal Compliance and Regulators

In response to each of Lawson's complaints, Fidelity's in-house attorneys and others responded diligently and with the appropriate level of concern. SUF ¶¶483-532. In several instances, Lawson was invited to share details of her concerns with a broader audience so that they could be thoroughly addressed.

The evidence is also undisputed that none of Lawson's complaints concerned issues that troubled those charged with internal Fidelity compliance and legal oversight. In addition, PWC had evaluated each cost allocation issue at the time that it arose, and found Fidelity's methodologies to be reasonable. Finally, the SEC met with representatives of Fidelity and (separately) PWC about Lawson's complaints. After requesting and receiving from Fidelity one document and one piece of further information, the SEC closed its inquiry. *See Mann v. Fifth Third Bank*, 2011 WL 1575537, at *11 (S.D. Ohio Apr. 25, 2011) (fact that regulators knew

about plaintiff's concerns and did not find them to be violations meant that no reasonable person could believe defendant was defrauding shareholders).

> c) ***Application of Objective Reasonable Belief Standard to Lawson's Letters and Complaints***

> i. **Back Office Expense Methodology**

In her September 29, 2006 letter, Lawson claimed that the methodology used to allocate certain back office expenses had been changed without proper review, and that Fidelity provided Q1 and Q2 12b-1 reports to the Board containing incorrect information that flowed from the un-vetted methodology. The letter conceded that the errors had been discovered and corrected, but Lawson complained that Fidelity did not go back and correct the Q1 and Q2 12b-1 reports.

> *(a) Plaintiff's Training and Experience*

A reasonable person with Lawson's level of experience would know that there was nothing nefarious about the change to the back office methodology and the resulting errors. Any reasonable person with Lawson's level of FP experience should have known that methodologies were often implemented in the business unit before they were approved or vetted, that mistakes were sometimes made when methodologies changed, and that methodology changes were typically reported to the Board annually in November. SUF ¶¶64, 32¶¶64, 324, 327, 503. Given her experience, and the fact that she was involved in evaluating the impact of the back office refinement, Lawson should have known that there was nothing amiss – much less fraudulent.

Lawson should have also known that Fidelity's decision not to retroactively correct the 12b-1 Q1 and Q2 reports did not constitute shareholder fraud. As an initial matter, it is undisputed that the annual 12b-1 report – the only one used by the Board in this instance to make any decision about the 12b-1 plans – was correct, and there was no need to restate earlier reports. SUF ¶¶300-301.

In addition, and in contrast to her FP expertise, Lawson admits that she has absolutely no experience with Board matters.  SUF ¶¶72-75.  She did not review Board materials before they were presented to the Board, did not know how the Board considered and weighed various pieces of information when it made decisions, and never attended a Board meeting.  *Id.*  As to Lawson's Board-related complaints, therefore, her *lack* of expertise precludes her from making unsupported allegations of fraudulent conduct.  *See Day*, 573 F. Supp. 2d 336, 346 (D. Mass. 2008) aff'd, 555 F.3d 42 (1st Cir. 2009) (plaintiff employed for seven weeks did not have knowledge and training to harbor reasonable belief of fraud).[27]  Lawson had no basis to believe that it was inappropriate (much less fraudulent) for Fidelity to provide the Board a corrected annual report on which to base its decision instead of re-stating the Q1 and Q2 12b-1 reports.

Moreover, it is undisputed that the Board anticipates that errors may occur from time to time in the FP process.  SUF ¶40.  The Board knows that FP does not produce precise numbers, so it evaluates trends, and understands that different allocation methodologies (any of which may be "reasonable") can result in different outcomes.  *Id.; see also Krinsk*, 715 F. Supp. at 489 ("[A]llocation of costs . . . is an art rather than a science.  Little certainty exists in this field where different, albeit rational, methodologies lead to widely disparate results."); *see also Schuyt v. Rowe Price Prime Reserve Fund*, 663 F. Supp. 962, 978 n. 48 ("[A]ll full-cost accounting systems are subject to significant variation in results depending on how the individuals creating the system chooses to allocate common costs.").  It would take a swing of hundreds of millions

---

[27] *See also Andaya v. Atlas Air, Inc.*, 2012 WL 1871511, at *5 (S.D.N.Y. Apr. 30, 2012) (nothing in record suggested plaintiff had sufficient expertise to conclude conduct violated 1514A); *Feldman v. Law Enforcement Assocs. Corp.*, 955 F. Supp. 2d 528, 551 (E.D.N.C. 2013) (plaintiffs did not have an objectively reasonable belief that a violation had occurred because they had very little information on which to make the insider trading allegation.) For efficiency's sake, these cases are not repeated in each section applying the standard to the particular facts of each complaint below, but are relevant to each one.

of dollars to create a change large enough to impact the Board's decision-making. *See* Addendum, Ex. 8; SUF ¶43. An Independent Trustee, serving as the representative of the shareholders, was aware of the issue and did not believe either would be relevant to the Board's decision-making. SUF ¶43.

### (b) Company's Prior Knowledge and Efforts to Address the Issue

FMR and PWC knew about the back office methodology change before Lawson's counsel sent her September 29, 2006 letter. SUF ¶¶286-293, 498-53. Moreover, at the time the letter was sent, the SSBSG—including Lawson—was in the process of analyzing the impact of the refinement so that it could be reported to the Board in November.[28] SUF ¶¶286-293. Indeed, Lawson has admitted that once Fidelity became aware of the error associated with the back office refinement, the company corrected the error and made the necessary adjustments in cost allocations on a going-forward basis. SUF ¶¶300-301.

### (c) Company Response to Plaintiff's Complaint

In response to Lawson's counsel's September 29, 2006 letter, in-house attorneys Colleen Hankins and Susan McSwain met with Lawson to better understand her concerns. They spoke with John Farinacci, who was a VP within FMR Co. Finance overseeing the Board Support and Business Analysis Group. In that role, he was responsible for providing FP information to the Board and answering the Board's methodology-related questions. SUF ¶55. Farinacci put the issue in context and explained that he had no concerns with the way the back office refinement had been handled. SUF ¶¶435, 497-500. Other than reiterating to Lawson that the issue had been corrected, Fidelity took no further action with respect to the back office issue because none was warranted.

---

[28] *See* Addendum at Exhibit 3 (Fidelity Prior Knowledge Chart).

36

*(d) Opinion of Internal Compliance Officers and Regulators*

Farinacci, who had significant expertise in this area and interacted with the Board and the Head of the Board's Audit Committee on a regular basis, was not concerned about the back office issue. The Board approved the 12b-1 plans after receiving the accurate annual 12b-1 report and information about the back office refinement. SUF ¶¶350, 365-368. PWC had no concerns, and certified that Fidelity's methodologies, including the back office methodology, were reasonable. *Schuyt*, 663 F. Supp. at 978 & n.49 (cost accounting system was "reasonable" where it was "reviewed by Price Waterhouse & Co. to assure that the major assumptions were adhered to and the mechanics of the revenue and expense allocations were sound"). After Fidelity and PWC explained the issue to the SEC, the SEC closed its inquiry without action. SUF ¶¶533-542.

## ii.   Web Expense Methodology

In her May 14, 2007 OSHA complaint, Lawson alleged that (a) Fidelity's failure to implement a 2003 web expense methodology until 2005 and (b) its failure to advise FMR or PWC that it was not following the approved methodology, constituted shareholder fraud.[29] Lawson did not have an objectively reasonable belief that Fidelity's conduct with respect to the web expense methodology constituted shareholder fraud.

*(a) Plaintiff's Training and Experience*

As set forth above, Lawson was a subject matter expert in FP. SUF ¶¶67, 160, 175. A reasonable person with her level of experience would know that FP methodologies change as the business changes, and that sometimes mistakes are made when those changes are implemented.

---

[29] Lawson did not allege that Fidelity failed to inform *the Board* about the web expense error until she filed her September 2008 Amended Complaint—a full year *after* she resigned. Accordingly, that concern cannot be the basis for any adverse action by Fidelity, and thus cannot serve as the basis for her SOX retaliation claim. It is therefore not addressed here.

SUF ¶¶40, 66.  There is no evidence that the failure to update the web expense methodology was anything but human error.  Given her expertise, Lawson could not have had a reasonable belief that inadvertently failing to implement a methodology meant that Fidelity violated a law, particularly given that she was aware that FP need only be "reasonable," and the law does not set forth any requirements for FP methodologies, or how or when they can be changed.  SUF ¶¶41, 62.

Moreover, someone with Lawson's FP experience would have known that there was not a sufficient connection between this issue and fraud against shareholders because the expenses involved were so trivial.  *See In re Dell, Inc. Sec. Litig.,* 591 F. Supp. 2d 877, 894 (W.D. Tex. 2008) (small errors were not egregious in the scope of Dell's large business and accounting errors can "easily arise from negligence, oversight, or simply mismanagement, none of which rise to the standard necessary to support a securities fraud action") (citation omitted).  The Board's decision-making was not impacted when it learned of the error. SUF ¶¶319-320, 324. The web expense error involved only $11 to 18 million - – far from the swing of hundreds of millions of dollars it would take to impact the Board's decision-making.  *Id.*

*(b) Company's Prior Knowledge and Efforts to Address the Issue*

Fidelity, PWC, and the Chair of the Board's Audit Committee knew about the failure to implement the web expense methodology before Lawson filed her December 20, 2006 OSHA complaint and did not express any concerns.  SUF ¶¶311-324.

*(c) Company Response to Plaintiff's Complaint*

In response to Lawson's December 20, 2006 OSHA complaint regarding the web expense error, Hankins and McSwain spoke to various in-house attorneys and confirmed that Farinacci and the Board were aware of the issue.  SUF ¶¶506-507.  Farinacci testified that the

error was not "significant enough" to include in the Board materials.  SUF ¶318.  Other than

informing Lawson that the company believed the issue had been handled correctly, Fidelity took

no further action with respect to web expense because none was warranted.

### (d) Opinion of Internal Compliance Officers and Regulators

Farinacci, PWC, in-house attorneys and compliance officers knew about Lawson's web

expense methodology complaint and had no concern that the error constituted fraud.  SUF

¶¶311-324, 506, 507.  The Chair of the Board's Audit Committee, an Independent Trustee, was

informed and did not consider the error material.  SUF ¶43.  After the issue was explained to the

SEC, it closed its inquiry.  SUF ¶¶533-542.

### iv.    Call Content Model

In her counsel's September 29, 2006 letter, Lawson alleged that (a) PI "manipulated" the

"call content model" to achieve desired results, i.e., to lower the profitability margin on the TA

contract so that the Board would not decrease TA fees; and  (b) the SSBSG had not adequately

researched the model.  SUF ¶¶434-435.[30]  At the time, Lawson stated that this issue could be

"chalked up to miscommunications, differences in understandings or professional opinions, or

simply mistakes."  SUF ¶435.  Lawson has admitted that the call content allocations were a

matter of debate that lasted for a long period of time.  SUF ¶435.  She did not have an objectively

reasonable belief that Fidelity's actions with respect to the call content model constituted

shareholder fraud, nor did she even allege shareholder fraud.

### (a) Plaintiff's Training and Experience

Lawson's claim regarding "manipulation" of the call content model appears to be based

on email exchanges in September 2006 in which two other Fidelity employees in PI tried to

---

[30] The call content model was a methodology for allocating expenses attendant to call center
representatives fielding calls from the public.  The allocation was either to sales (distribution) or service
(processing) or a percentage to both dependent upon the interaction with the customer.  SUF ¶416.

reconcile numbers in a cost allocation model.  SUF ¶431.  By September 14, 2006, Lawson's direct report Mark McManus stated "I feel comfortable with where we stand now."  SUF ¶431. Any reasonable FP expert with Lawson's level of experience would know that FP methodologies change as the business changes, and that during the SSBSG's review of the changes, various pieces of data were tested to determine accuracy and effectiveness.  This does not mean that data was "manipulated" in any nefarious sense of that word.

Further, there is no evidence to support Lawson's assertion that shareholder fraud is implicated in the SSBSG inadequately researching the model.  First, it is undisputed that beginning in 2004, Lawson and the SSBSG were involved in months, if not years, of discussions regarding the model.  SUF ¶¶418-443.[31]  Moreover, whether or not the SSBSG researched the model to the extent deemed sufficient by Lawson is an internal matter related to an internal group, and unrelated to shareholders.  *See Xie*, 2011 WL 3921451 at #3.

*(b) Company's Prior Knowledge and Efforts to Address the Issue*

Fidelity did not know about the alleged manipulation or failure to research the model because neither happened.

*(c) Company Response to Plaintiff's Complaint*

In response to Lawson's call content complaint – in which she stated that the methodology might well be correct – Hankins and McSwain met with Lawson to understand her concerns, and spoke with Freeman and others, who explained the issue Lawson raised.  SUF

---

[31] Lawson's theory that the call content model was "manipulated" to lower the profitability margin on the TA contract so that the Board would not decrease TA fees is illogical.  It is undisputed that the expenses would be allocated to *either* the TA or the management contract, thus raising one margin and lowering the other.  Accordingly, even under Lawson's implausible theory, these changes would result in decreased profit margins being reported to the Board under *either* the TA contract *or* the management contract. Notably, certain errors Lawson complains about (i.e., web expenses) would have *inflated* the TA profit margin so under Lawson's theory the Board would have decreased TA fees.  Of course, as explained above, there was no basis to believe a trivial error such as the call content issue would have a material impact on *any* of the profit margins reported to the Board.

¶¶444-445, 503.  Other than informing Lawson that the company had investigated and confirmed

that nothing improper had occurred, Fidelity took no further action with respect to Lawson's

concerns because none was warranted.  SUF ¶¶503-504.

### (d) Opinion of Internal Compliance Officers and Regulators

As explained above, Farinacci, PWC, and the Board understood that the issue Lawson

raised with respect to call content was trivial and not concerning.  In 2004, the Board had been

informed of changes to the call content model and expressed no concerns. SUF ¶¶419-420.

Similarly, the SEC did not pursue the issue after it was explained.  SUF ¶¶533-542.

### v.   Guidance Expenses

On June 6, 2007, Lawson sent a memorandum to Fidelity General Counsel Goldberg

claiming that Fidelity's methodology for allocating the expenses associated with Guidance[32] was

fraudulent and violated the Transfer Agent ("TA") contract.[33]  Lawson was part of the team that

had worked for two years to determine Guidance expense allocation methodology.  Lawson had

no objectively reasonable belief that the Guidance methodology constituted shareholder fraud.

### (a) Plaintiff's Training and Experience

As set forth above, Lawson was an FP expert.  As such, she should have known that FP

falls within the discipline of cost accounting, which is an art, not a science.  *Krinsk*, 715 F. Supp.

at 489 ("[A]llocation of costs . . . is an art rather than a science"); *Schuyt*, 663 F. Supp. 962 at n.

---

[32] Fidelity's customers seek input from Fidelity representatives regarding their investment strategy and asset allocation, retirement planning, and planning for various life events like job changes, inheritance, or a new child.  The process of discussing these matters with customers is known at Fidelity as "Guidance". Fidelity determined that certain aspects of Guidance involved "services" to shareholders and should be allocated to the Transfer Agent ("TA") contract and other aspects of Guidance involved "sales" and should be allocated as such.  Lawson asserted that, instead, 100% of the costs associated with Guidance should be allocated to the "sales" function, and none should be allocated to the TA function.  Lawson claims that the TA contract does not permit *any costs* to be allocated as service.

[33] Lawson has no legal expertise and was not an expert in contract interpretation.  SUF ¶68.

48.   There are no governing rules or standards such as GAAP which apply to FP methodologies, so that knowledgeable, experienced cost accountants can reach different results even if they start with the same base data.  SUF ¶¶40, 490.  In addition, she knew that FP methodologies can and do change as the business changes.  As a result, a reasonable person with her level of FP and over *two years* of personal involvement with the analysis of the Guidance methodology, could not have had a reasonable belief that the company was defrauding shareholders by choosing not to adopt the methodology for allocating Guidance-related costs that Lawson preferred.  Lawson's complaint represented nothing more than a difference of opinion among the individuals and groups involved in the open and transparent discussion about cost allocation in Guidance.[34]

Second, given her FP expertise, Lawson could not have had an objectively reasonable belief the methodology constituted shareholder fraud because she should have known that the issue was too trivial to impact shareholder interests.  As explained above, it would take a swing of hundreds of millions of dollars to create a change large enough to impact the Board's decision-making, and the Guidance methodology change only involved $3.5M increase in FP expenses in 2005.  *See* Materiality Chart, *supra* at 31.  This amount increased to approximately $130M in 2006.  This, compared to $4.8 *billion* in total FP expenses, is far too trivial to ever impact shareholders equating to less than 3% of total FP expenses.  Indeed, even after the Board learned in 2005 that the Guidance methodology would allocate some costs to service, the issue did not impact its decision-making, and it approved the methodology and the TA contract with that methodology in place.  SUF ¶439.  Since the Independent Trustees serve as the

---

[34] Stating a difference of opinion about an internal business matter is not protected activity under §1514A. *See, e.g., Marshall v. Northrup Gruman Synoptics,* 2005 WL 4889013, at *3 (Dep't of Labor June 22, 2005) (finding that plaintiff who reported concerns regarding improper financial accounting methods and ethical lapses and other internal policies was not protected activity); *Xie,* 2011 WL 3921451, at *2 (failure to comply with internal control policies does not constitute fraud against shareholders and cannot support a claim under SOX).

representative of the shareholders, and implicit in the approval was the Board's recognition that Guidance expense would continue to grow in succeeding years, Lawson can hardly claim that she reasonably believed that choosing one methodology over another defrauded shareholders. *Id.*

Lawson likewise had no objective reasonable belief that the guidance methodology violated the terms of the TA contract. The TA contract governs the relationship between Fidelity Funds and the Transfer Agent. SUF ¶422. Lawson is not a lawyer and has no experience interpreting legal contracts. SUF ¶68. As a result, she had absolutely no basis for believing that Fidelity's interpretation of the contract was incorrect – much less unlawful or fraudulent.

### (b) Company's Prior Knowledge and Efforts to Address the Issue

Fidelity, PWC, and the Board were all aware of the differences of opinion about Guidance allocation methodology before Lawson raised any concerns about it. SUF ¶¶419, 439-443. The methodology was evaluated by numerous people each year and had been discussed for over 18 months before Lawson announced her objections to it in January of 2007, and it had been evaluated for two years before she sent her letter to Goldberg. SUF ¶¶416-443. Neither PWC nor the Board ever expressed any concerns about the methodology. To the contrary, between 2003-2008, PWC annually certified that Fidelity's methodologies, including the Guidance methodology, were reasonable. SUF ¶415.

### (c) Company Response to Plaintiff's Complaint

Lawson first raised her claim that the Guidance methodology constituted fraud during a January 22, 2007 meeting that Farinacci encouraged her to schedule in order to discuss her concerns with the group that had been evaluating the methodology. SUF ¶462. This meeting (which included many Fidelity individuals as well as PWC all invited by Lawson) occurred over

a year and half *after* the SSBSG (including Lawson) knew that some Guidance expenses would be allocated to service.  SUF ¶421.  After Lawson questioned the methodology at this meeting in January 2007, Fidelity formed a working group to re-evaluate the methodology; the group confirmed that the methodology was reasonable.  SUF ¶463.  Therefore, in response to Lawson raising her Guidance-related concerns to Goldberg, Hankins wrote to Lawson to inform her that Fidelity had discussed the Guidance methodology with the business unit, in-house Legal Department, and PWC, all of whom agreed that the methodology was reasonable.  SUF ¶522. No other action was required.

*(d) Opinion of Internal Compliance Officers and Regulators*

As explained above, Farinacci, PWC, and the Board were not concerned about the Guidance expense allocation issue.  In fact, after the January 22nd meeting in which Lawson had detailed her concerns to PWC (among many others), PWC did not deem any further action necessary apart from generally checking in on the activity of the working group.  Similarly, after the issue was explained to the SEC, its inquiry was closed.  SUF ¶¶533-542.

**vi.    NF's Retention of 12b-1 Fees**

As explained above, in the fall of 2006, Fidelity discovered certain 12b-1 fees had been retained by National Financial Services LLC ("NF" or "NFS").  SUF ¶¶350, 362.  Although the total amount of 12b-1 fees the particular funds paid had been disclosed to the Board, the fact that NF had retained a small amount of those fees had not been identified separately, and the retained fees had not been included as revenue in FP calculations.  SUF ¶¶350-369.  Lawson was asked to assist with a portion of Fidelity's research into the error several months after it had been identified.  SUF ¶¶373-392.  In March 2007, Fidelity gave the Board several memoranda

detailing the history of the issue and the bases for retention.  The Board then voted to approve

both prior retention and future retention of 12b-1 fees.  SUF ¶¶362-369.

Komishane asked Lawson to assist with a memorandum to Clare Richer, CFO of FMR

Co., to explain how the error happened and how it could be prevented from happening again.

SUF ¶¶388-391.  Lawson responded to this assignment by insisting that she was not to blame for

the error.  Komishane explained that "[Richer] does not care which group within FBC was to

blame" but wanted to understand what had happened.  SUF ¶391.  Lawson declined to

participate in the work assigned to her, and instead requested (and received) a number of

documents that had been shared with the Board concerning the NF issue.  SUF ¶¶393-398.  On

May 10, 2007, Lawson sent a memorandum to Fidelity's General Counsel concerning NF's

retention of 12b-1 fees.  SUF ¶400.  In that memorandum, Lawson claimed that (a) NF's failure

to disclose the retention of 12b-1 fees was a violation of securities laws; (b) a March 7, 2007

memo to the Board explaining NF's retention was incomplete and misleading because it did not

reflect that the fees were withheld by NF without authorization and without notice to the SSBSG,

and because the SSBSG had received no records that NF incurs expenses and performs

traditional distribution activities, as the memo stated; and (c) Lawson did not have clear authority

that the Board had given approval for NF to retain the 12b-1 fees.  *Id.*  Lawson did not have an

objectively reasonable belief that NF's retention of 12b-1 fees and the Board memos concerning

that retention constituted shareholder fraud.

*(a) Plaintiff's Training and Experience*

The March 7, 2007 Board memo explaining NF's retention, which Fidelity provided to

Lawson before she delivered her May 10, 2007 internal complaint letter.  SUF ¶¶365-367.  It

explained why the retention of 12b-1 fees began, that retention was common in the industry and

justified by the expenses NF incurred, that the retention was undertaken pursuant to a *Board-approved* Selling Dealer Agreement ("SDA"), and the impact the retention had on FP.  *Id.;* SUF ¶¶350, 356, 367.  As set forth above, Lawson had no experience with Board meetings or materials, had no legal background, and did not know how the Board weighed various pieces of information.  SUF ¶¶68, 74.  She therefore could not have had any objectively reasonable belief that the Board memo explaining NF's retention of 12b-1 fees was insufficient.  In addition, since the Board memo explicitly stated that the retention was undertaken pursuant to a Board-approved SDA, Lawson had no objective reasonable belief that NF's failure to disclose the retention was a securities law violation or that the Board had not previously approved the retention.[35]

Lawson likewise could not have had an objectively reasonable belief that this conduct was sufficiently related to fraud against shareholders.  First, she complains that it was somehow shareholder fraud to fail to tell the Board that the SSBSG (i.e., Lawson) did not know about the retention.  That information is simply not relevant to the Board; the Board memo fully explained the NF retention issue and its impact.  Whether the SSBSG knew or was to blame for the NF retention-related errors would be immaterial to the Board, and certainly to shareholders.

Second, Lawson should have known that the issue was too trivial to impact shareholder interests.  The retention did not impact the total amount of fees the funds paid, and the approximately $10M retained by NF was insignificant relative to approximately $200M in paid fees.  Even after the Board learned NF had retained the 12b-1 fees and the impact of the retention, it approved the 12b-1 plans specifically approving NF's past and future retention.  SUF ¶400.  *See also* Materiality Chart, *supra* at 31.

---

[35] Similarly, Lawson's complaint that the SSBSG had not been provided with documentation concerning what expenses and distribution activities performed by NF that justified retaining 12b-1 fees is nonsensical.  The SSBSG could not have been provided with such information when the retention itself had not been identified and considered as part of the FP process.

*(b) Company's Prior Knowledge and Efforts to Address the Issue*

Fidelity learned about NF's retention of 12b-1 fees in the fall of 2006, long before Lawson's supervisors told her about the issue in January 2007.  Fidelity completely resolved the issue in March 2007, before Lawson sent her May 10, 2007 letter.  SUF ¶¶362-369.

*(c) Company Response to Plaintiff's Complaint*

Lawson raised her concerns regarding NF's retention of 12b-1 fees more than six months *after* the Company had learned of the matter and more than two months after the Board had been notified and expressly approved both the past and future retention of 12b-1 fees.  Accordingly, Fidelity took no additional action in response to Lawson's NF complaint, other than to confirm that the issue had already been identified, investigated, and resolved, and inform Lawson that the retention was permissible under Rule 12b-1 and the Board-approved 12b-1 plans and agreements.  SUF ¶¶401, 408, 516, 519, 521.

*(d) Opinion of Internal Compliance Officers and Regulators*

After the Board was notified of NF's retention of 12b-1 fees, it authorized the 12b-1 plans that specifically permitted NF's retention.  SUF ¶¶350, 368.  After Fidelity explained to the SEC that the Board had been informed of the retention in March 2007, the SEC requested the Board memorandum and one additional piece of information received it from Fidelity, then closed its inquiry without action.  SUF ¶¶533-542.  Given the foregoing, Lawson could not have had an objectively reasonable belief that NF's retention of 12b-1 fees or the wording of the related Board memos constituted shareholder fraud.[36]

---

[36] Lawson has recently shifted her theory of wrongdoing to assert that her actual concern was that *NF* (a business unit) not National Financial Services LLC ("NFS", the legal entity) was improperly retaining the fees.  She points to several Fidelity documents that refer to "NF" retaining fees.  As a preliminary matter, Lawson never raised that concern while she was employed, so it cannot serve as the basis of her SOX retaliation claim.  To the contrary, when Hankins responded to Lawson and told her that NFS was lawfully retaining the fees, Lawson never attempted to clarify that she had actually been concerned about

### ii.      Marketing Methodology

In her May 21, 2007 internal complaint to Goldberg, Lawson claimed that Fidelity's conduct with respect to a marketing methodology was fraudulent because a memorandum to the Board concerning the methodology (a) allegedly told the Board that the failure to update the methodology was an "FP error" and (b) failed to inform the Board that the "methodology had been stale since 2003."  Unlike the back office methodology error, Lawson did not claim that the failure to update the marketing methodology was fraudulent or unlawful, as Lawson herself would be culpable (given that she knew about it for over a year and a half without ever raising any concerns about it).  SUF ¶332.

First, there is no evidence that the Board was ever told that the failure to update the marketing methodology was an "FP error" and Lawson has no basis to have reasonably believed that such language was ever used.  With respect to Lawson's second claim, as set forth more fully below, Lawson did not have an objectively reasonable belief that Fidelity's disclosure to the Board concerning the marketing methodology constituted shareholder fraud.

### (a) Plaintiff's Training and Experience

Lawson acknowledges that her role did not expose her to information about what information the Board needed or requested in order to make its decisions.  As a result, she had no basis for claiming that the information about the implementation of the marketing methodology had been inadequate or somehow fraudulent.  Indeed, the fact that she is quibbling with a few words in the Board disclosure (*i.e.,* she claims that instead of saying "In 2006, the Retail channel

---

NF the business unit.  Second, any such claim is nonsensical, as NF (the business unit) is not a legal entity and does not even have a bank account.  It therefore could not have retained any fees.  SUF ¶355.  As Lawson, a 10-year Fidelity employee with financial expertise who had been researching the retention issue for 6 months before making her claim, would know, Fidelity employees regularly use the acronyms NFS as NF interchangeably – but they understand that NFS is a legal entity that is a registered broker dealer and has a bank account in which hold fees, while NF is a business unit that cannot.  *Id.*

discovered that certain expense allocations has not been updated," the memo should have stated

that the "methodology had been stale since 2003") demonstrates the absurdity of her claim.  SUF

¶348.  Moreover, there was no support for Lawson's contention that the failure to update the

methodology was described as an "FP error," so Lawson could not have reasonably believed that

was shareholder fraud.  SUF ¶¶344-345.

*(b) Company's Prior Knowledge and Efforts to Address the Issue*

PWC knew about the marketing methodology error in March 2007, and certified that

Fidelity's methodologies, including marketing, were reasonable.  SUF ¶415.  The Board was

informed about the error in April 2007, before Lawson complained about the error in May, 2007.

SUF ¶343.  The April 2007 Board memorandum fully disclosed the impact of the error, and

neither PWC nor the Board took any action based on the error or the disclosure.  *Id.*  Given that

the Board was informed that there had been an error and the extent of the impact, whether an

internal memo that was never shared with shareholders used the specific words Lawson would

have preferred does not impact shareholders and cannot constitute fraud.

*(c) Company Response to Plaintiff's Complaint*

In response to Lawson's May 21, 2007 complaint regarding the marketing methodology,

Hankins and McSwain spoke to Farinacci, who put the issue in context, explained why he was

not concerned with the issues Lawson raised, and why the Board disclosure was adequate.  SUF

¶¶349, 519.  Other than informing Lawson that the company was not concerned about the issue,

Fidelity took no further action with respect to Lawson's claim because none was warranted.

*(d) Opinion of Internal Compliance Officers and Regulators*

As explained above, Farinacci, PWC, and the Board knew about and were not concerned with the marketing methodology error or the Board disclosure.  The SEC took no action following presentations by PWC and Fidelity concerning the issue.  SUF ¶¶533-542.

> **d)**    ***Lawson Had No Subjective Reasonable Belief that Any of Her Complaints Concerned Shareholder Fraud[37]***

Lawson did not have a subjective reasonable belief that Fidelity's conduct with respect to any of her complaints constituted shareholder fraud.

To establish a subjective reasonable belief under either *Day* or *Sylvester*, Lawson must show that she "actually believed the conduct complained of constituted a violation of pertinent law."  *Day*, 555 F.3d 42, 54 n.10; *see Rhinehimer v. U.S. Bancorp Invs., Inc.* 787 F.3d 797, 811 (6th Cir. 2015).  As the court noted in *Day*, "the law is not meant to protect those whose complaints are not undertaken in subjective good faith."  555 F.3d at 54.  A plaintiff must submit evidence that she had the belief of shareholder fraud at the time of the complaint.  *Beacom v. Oracle Am., Inc.,* 2015 WL 2339558, at *5 (D. Minn. Mar. 11, 2015).  As to the subjective belief requirement, courts typically consider the employee's training, experience and education, her contemporaneous communications on the issue, the information known to her when she raised her concern, and her credibility.  *Id.; Day*, 555 F.3d at 54 n.10.

Analysis of each factor considered by Courts in determining whether a plaintiff had a subjective reasonable belief of shareholder fraud demonstrates that Lawson had no such belief at the time of her complaints.

> ## i.    Plaintiff's Training/Experience

For the same reasons set forth above, an individual with Lawson's FP expertise should have known that the trivial errors she raised and the issues already known to Fidelity (and in

---

[37] For ease of the Court's consideration, Exhibit 7 of the Addendum sets out the Objectively Reasonable and Subjective Belief factors as applied to each claim in summary form.

some cases, already corrected by the time of her complaint) did not constitute a violation of any law. *See, e.g., Stewart*, ALJ No. 2013-SOX-00019, at 30-31 (belief not subjectively reasonable because given plaintiff's vast experience as an auditor, she should have known that she was not being asked to rubber stamp an audit).[38]  Similarly, she had no legal expertise nor any reason to believe that the TA contract's interpretation by Fidelity's management, Legal Department and PWC regarding the Guidance methodology was somehow fraudulent.

In addition, Lawson had reviewed the March 7, 2007 Board memo concerning retention of 12b-1 fees and was told that the Board had ratified the prior retention.  SUF ¶398.  Lawson could not have actually believed that the retention was unlawful, because the fees were retained pursuant to a Board-approved Selling Dealer Agreement ("SDA").  SUF ¶367.

### ii.     Plaintiff's Contemporaneous Communications Did Not Allege Fraud

Lawson's contemporaneous communications as to each of her "complaints" reveal that she had no concern about shareholder fraud at the time she communicated each complaint.  Her September 29, 2006 internal letter that highlights the back office and call content issues contains no allegation of wrongdoing or fraud; to the contrary, it admits that the issues "perhaps could somehow be chalked up to miscommunications, differences in understandings or professional opinions, or simply mistakes."  SUF ¶¶128-130.  Lawson likewise admitted during her first meeting with Fidelity's in-house lawyers in October 2006 that the back office error would be corrected in the third quarter report and would cause no impact to 2005 reporting.  SUF ¶¶490-

---

[38] *See also Deremer*, 2007 WL 6888110, at *38 (plaintiff, who had decades of accounting and auditing experience, including internal control procedures, "would surely have been aware that compensating controls may have existed which could have negated the effect of the software feature.  Therefore, Complainant could not have held a subjective belief that this software feature [and] other internal control deficiencies, constituted a significant deficiency in Respondent's internal controls.").

491. In her deposition, Lawson admitted that whether shareholders would be harmed was not the subject of her back office concern at the time.  SUF ¶298.

Likewise, it is undisputed that Lawson was involved in the analysis of the back office changes from the summer of 2005 through the end of 2006.  SUF ¶285.  In March 2006, she met with Russ Peppet, an FP expert Fidelity had retained in connection with a separate ligation, and endorsed Fidelity's FP process and methodologies at that time.  SUF ¶¶90-92.  On September 12, 2006, Lawson met with a very large group of people to discuss the back office methodology changes, and on September 21, 2006, she discussed the impacts of the changes and the various action items necessary to adjust for the changes.  SUF ¶¶290, 293.  During that entire period and at all those various meetings, she never raised any concerns about the back office error, the impacts that it had, or the Q1 and Q2 12b-1 reports.  Her failure to raise any concerns for months preceding her letter belies her assertion that she actually believed Fidelity's conduct was improper.  For example, in *Nance v. Time Warner Cable,* 433 Fed. Appx. 502, 504 (9th Cir. 2011), the court found that the fact that the plaintiff had signed representation letters every quarter for a year before he made any mention of his purported concern demonstrated that he had no subjective belief that company had engaged in fraudulent activity.[39]  Lawson raised her concern only days after failing to get Freeman's position – making her motivation clear.

In addition, Lawson did not have a subjective reasonable belief that Fidelity's alleged failure to adequately research the call content model constituted shareholder fraud.  She was involved in the analysis of the call content and Guidance models from October 2004 through her

---

[39] *See also Hillenbrand v.* ALJ No. 2008-SOX-00010, at 82 (given employee's outspoken nature, her failure to speak up about her concerns suggested that she did not have a subjective reasonable belief of fraudulent conduct until after she made a specific report); *Fraser v. Fiduciary Trust Co., Int'l*, 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009) (granting summary judgment for employer, court noted that employee's three-month delay between drafting and sending email complaining of activity "casts doubt on [his] subjective belief that the [complained-of-activity] constituted a violation"), *aff'd*, 396 Fed. Appx. 734 (2d Cir. 2010).

resignation, including multiple meetings and emails in 2006 where SSBSG analyzed changes to the model.  SUF ¶¶418-478.  During that time, in September 2006, she was copied on a number of emails in which two of her colleagues were trying to reconcile the numbers, ultimately concluding that they were "comfortable with where we stand now".  SUF ¶431.

Lawson's December 7, 2006 internal letter states that "Ms. Lawson does not take the position that the [call content] model is necessarily incorrect."  SUF ¶444.  She has likewise admitted that the "call content issue was a matter of debate that lasted for some period of time."  SUF ¶438.  In short, Lawson first learned of the call content methodology change in June 2005, but did not raise any concerns until 2007, despite many opportunities to do so, including during her March 2006 meeting with Peppet.

Similarly, Lawson learned about the web expense error when Fidelity did—in the summer of 2005.  SUF ¶¶312-313.  She had been aware of the issue for nearly 18 months when she filed her December 20, 2006 OSHA complaint.  That complaint made no allegation of wrongdoing or securities fraud with respect to the web expense issue.  She did not communicate *any* concerns about alleged fraud regarding the web expense methodology *to anyone* until May 14, 2007, including during her March 2006 meeting with Peppet.  SUF ¶¶90-02.  Her failure to raise any concerns until May 2007, despite numerous instances when she could have done so, strongly demonstrates that she did not actually believe Fidelity had engaged in shareholder fraud as to the web expense methodology.

Lawson became aware that NF was retaining 12b-1 fees as early as January 5, 2007, when Komishane sent her an assignment concerning accounting for the fees.  For over four months, Lawson communicated and worked with her team to understand why the retained fees had not been included in FP.  Not until May 10, 2007, after she had been informed that the issue

53

was already resolved with the Board, did she raise any concerns about the retention of these fees. This strongly suggests that she did not actually believe the retention was fraudulent.

Lawson learned about the marketing methodology error in June 2005, and again in March 2007.  SUF ¶332.  She did not raise any concerns about the failure to implement the methodology or the language in the Board memo from June 2005 to May 2007, including during her March 2006 meeting with Peppet.  SUF ¶¶90-92.  From March 2007 to May 2007, she did not raise any issues despite seeing multiple documents and presentations (including PWC's presentation to the Board) which described the marketing methodology error and its impact, and being asked to review and comment on them.  SUF ¶¶334-343.  In fact, Lawson never complained about the issue or how it was described until after she received an oral warning for insubordination.  Even then, she did not assert that that the failure to update the marketing methodology was fraudulent.  The fact that she did not raise any concern about a failure to update the methodology, or about the language Fidelity was using to describe the error, strongly suggests that she did not actually believe Fidelity's actions constituted shareholder fraud.

These communications – and her lack of complaints for months (sometimes years) while she had full exposure to these issues – demonstrate that she did not actually believe that Fidelity had engaged in any wrongdoing at the time she made her complaints.  *See, e..g., Gale v. U.S. Dep't of Labor*, 384 Fed. Appx. 926, 930 (11th Cir. 2010) (where plaintiff testified that he did not believe the company was engaged in any illegal or fraudulent activities and admitted that he did not know whether the action was prohibited, court concluded that he did not have a subjective reasonable belief of a violation); *Pearl v. DST Sys. Inc.*, 2008 WL 8602367, at *14 (W.D. Mo., Apr. 25, 2008) (because "plaintiff had scant factual information on which to make

the allegation" and "admits he did not have sufficient knowledge to know if a SOX violation had

occurred. . . . plaintiff did not have a **subjective** belief that a violation had occurred").

### iii.     Information Known to Plaintiff at the Time of the Complaint

When Lawson sent her September 29, 2006 letter, Lawson knew that the SSBSG was still

evaluating the impact of the back office allocation changes.  SUF ¶¶289-293.  She was aware

that PWC and FMR Co. knew about the change and had not objected to it or raised any concerns

about the Q1 or Q2 12b-1 reports.  *Id.*  Similarly, Lawson knew that the company had been

analyzing the call content model for approximately two years, and that the analysis was ongoing,

because she was a part of the group that was conducting that analysis.  SUF ¶¶418-433.  She also

knew that McManus, who reported to her, had indicated he was comfortable with the numbers,

and that PWC had never expressed any concerns with the model. *Id.*

Given that she knew that Fidelity was evaluating the impact of the back office and call

content methodology changes and that the independent accounting firm PWC had expressed no

concerns, Lawson could not have actually believed that Fidelity had engaged in any wrongdoing.

In fact, she acknowledged as much when she met with Fidelity's lawyers and stated that the error

had been corrected.

Likewise, before Lawson sent her May 10, 2007 letter to Goldberg about NF's retention

of 12b-1 fees, Fidelity had already provided her information showing that the issue had been

fully explained to the Board, and that the retention had occurred pursuant to a Board-approved

Selling Dealer Agreement.  SUF ¶398.  She therefore knew that Fidelity and the Board were

aware of the issue before filing her complaint.  In addition, she knew (since she had been asked

to work on the issue) that the company was trying to resolve the accounting issue so that the fees

would be reported as revenue in the future.  SUF ¶¶389-391.

When Lawson filed her May 14, 2007 OSHA complaint, she was well aware that the web expense methodology issue had long since been resolved.  SUF ¶315.

By the time Lawson sent her May 21, 2007 letter raising concerns about the marketing error and the associated Board memo, Lawson had known about the failure to update the methodology for two years, and had known about the language the company was using to describe the error for nearly two years.  SUF ¶332.  She also knew that FMR, PWC, and the Board all knew about the error**.**  SUF ¶¶332-347.  Yet, she had never expressed any concern about either prior to that time.  *Id.*

Finally, by the time she sent her June 7, 2007 letter regarding the guidance methodology, Lawson knew that the SSBSG, FMR Co., and PWC had all reviewed the methodology and expressed no concerns.  SUF ¶¶416-478.  By the time she filed her OSHA complaint on the same topic, she also knew that the Fidelity Legal Department had reviewed the issue and had no concerns.  SUF ¶481.

### iv.    Plaintiff's Credibility

Each of Lawson's complaints lack credibility because she knew that they did not concern "fraud", knew that they were immaterial matters, and because each complaint was made immediately following an employment decision she did not like.  For example, Lawson's back office complaint lacks credibility because it was made a mere eight days after Komishane told Lawson that his decision to give Cadogan the job was final.  As set forth above, the timing of this complaint demonstrates that her motive in filing this complaint was to object to Cadogan getting the position that Freeman vacated, not any real concerns regarding shareholder fraud.  This conclusion is reinforced by the fact that even after Fidelity's in-house legal team met with Lawson in December to report that Farinacci did not have any concerns about the back office

refinement, and despite her concessions about the lack of impact of this issue, she continued to pursue the matter and filed her December 20, 2006 OSHA complaint.  The timing of her complaints, her refusal to accept Fidelity's legal team's findings, and her disintegrating performance and professionalism all demonstrate that Lawson was motivated by a desire to undermine Cadogan's authority, not shareholder fraud.  *See Stewart*, ALJ No. 2013-SOX-00019, at 30 (finding that plaintiff lacked credibility and had no subjective reasonable belief because she failed to give any weight to the findings of the firm's legal department and demonstrated she was motivated by a desire to frustrate her manager's efforts to do her job and as a continuing affront to her manager's authority).

Similarly, Lawson's May 14, 2007 letter lacks credibility because it was made only days after Komishane insisted Lawson revise her NF memo and shortly after Komishane told her she had no authority to issue an offer to an employee he and Cadogan had rejected, and six days after Cadogan told Lawson her refusal to follow up on the 12b-1 accounts was unacceptable.  SUF ¶210.  The timing of these complaints demonstrates that her motive in filing them was to object to the various directives she had received, not shareholder fraud.

As noted above, Lawson's credibility with respect to the web expense issue is severely undermined by the fact that she claims that the failure to update the *web expense* methodology was fraudulent, yet does not claim that the failure to update the *marketing expense* methodology was fraudulent.  This inconsistency (which is likely explained by the fact that Lawson knew about the failure to update the marketing methodology for an entire year before she raised any concerns about it, so would appear complicit should she allege it was shareholder fraud) undercuts any claim that she had an actual belief that the failure to update the web expense methodology was fraudulent.

Lawson's call content complaint lacks credibility because it was made a mere eight days after Komishane told her that his decision to give Cadogan the job was final.  Addendum Ex. 4.  Moreover, even after members of Fidelity's legal department met with Lawson in December 2006 to report that Farinacci did not have any concerns about the call content model, she continued to pursue the matter through her December 7, 2006 internal letter and December 20, 2006 OSHA complaint.

Lawson's Guidance complaint lacks credibility because it was made a mere week after Connolly and Cadogan asked her to write up her point of view on the methodology.  The timing of this complaint demonstrates that her motive in filing it was to object to these demands, not any concerns regarding shareholder fraud.  This conclusion is reinforced by the fact that even after Lawson knew that PWC, too, had not expressed any concerns, she continued to pursue the matter.

Lawson's NF retention complaint lacks credibility because, even though Lawson knew about the issue for five months, she did not raise any complaint about it until just days after Komishane and Cadogan communicated criticism about her work.  *See* Addendum Ex. 4 (Trigger Chart).  In fact, *before* she filed her complaint, Fidelity's Legal Department had already provided Lawson the Board memos informing the Board about NF's retention of fees.

Lawson's marketing complaint lacks credibility because, even though she had known about the failure to update the methodology for *two years* and had known about the language the company was using to describe the error for months, she only raised her concern a mere five days after Komishane issued her an oral warning for insubordination.

The timing of her complaints, her refusal to give any weight to the conclusion of Fidelity's Legal Department, and her deteriorating performance and lack of professionalism all demonstrate that she was motivated by a desire to undermine Cadogan, not shareholder fraud.

### e)    *Lawson Cannot Establish Intent to Defraud*

Lastly, under the *Day* standard of evaluating reasonable belief, Lawson will be required to prove that Fidelity had the intent to deceive or defraud investors.  "Without such evidence, the Court cannot conclude plaintiff complained of any fraud which would trigger Section 1514(a)(1) liability."  *Adaya v. Atlas Air, Inc*., 2012 WL 1871511, at *4 (S.D.N.Y. Apr. 30, 2012).  Lawson fails to proffer any such evidence, because undisputed facts demonstrate that Fidelity and the Board of Trustees knew about each of the errors Lawson raised before Lawson raised her concern, and had either already corrected them or were in the process of doing so.  In fact, Lawson herself was involved in identifying and correcting the errors (back office, marketing, web expense), explicitly was asked to assist with determining how to resolve the issues (NF's retention of 12b-1 fees), or was asked to share her opinion and concerns regarding the issues (Guidance).  This evidence of Fidelity's efforts to resolve Lawson's complaints undercuts any allegation of intent to defraud or mislead investors.  *See Xie*, 2011 WL 3921451, at *5 (no evidence of intent to mislead where plaintiff was asked to investigate discrepancy); *see also Livingston v. Wyeth, Inc*, 520 F.3d 344, 354 (affirming summary judgment where there was no evidence that defendant intended to make false or misleading statements to shareholders).

Unable to point to any actual evidence of intent, Lawson posits a theory of inferred intent, which is wholly untethered from reality.  Lawson claims that the Chief Financial Officers of Fidelity's business units had an incentive to manipulate the FP methodologies to control FP results.  The theory is based on the premise that a higher profit margin, at the individual fund

level, would lead the Board to seek lower management fees.  Because management fees are the dominant revenue source for each business unit, Lawson contends that the CFOs have an incentive to prevent fee reductions by the Board by allocating more expenses to profitable funds making them seem less profitable.  Lawson claims that this incentive creates a "conflict of interest" between the allegedly "independent" SSBSG and the business units, and that Cadogan's hiring exacerbated this conflict of interest, because Cadogan had "strong loyalty and ties to PI Finance".  SUF ¶131.  From this alleged incentive and conflict of interest, Lawson attempts to manufacture intent.

Not only is this theory unsupported by a single shred of evidence, it is contradicted by the undisputed facts.  First, her claim that the SSBSG was somehow "independent" is nonsensical, because Lawson, like everyone else working in that group, as well as the CFOs, was employed by Fidelity.  In fact, as part of the Finance group, Lawson ultimately reported up through Komishane who reported to FBC's CFO.  Most business units' board support groups remained within the business units– the SSBSG was 'outside' of the business units only in the sense that it serviced multiple units simultaneously to make their work more efficient.  SUF ¶¶48-50, 66. Their FP data and methodologies were still expected to reflect the business that was conducted within the relevant business unit.

Notably, before she began reporting to Cadogan, Lawson participated in and acknowledged the partnership between the business units and the SSBSG.  During those two years, Lawson never once complained about her supervisor Freeman having a conflict of interest even though he—like Cadogan—had worked in PI Finance before coming to the SSBSG.  SUF ¶132.

Lawson's theory is also based on the highly questionable premise that the CFOs would

60

actually be capable of influencing the Board's decision-making with respect to the approval of management fees.  Of course, profit margins are only one of many factors that the Board considers in evaluating the funds' management fees and, given the magnitude of the revenues and expenses at issue, the amount of expenses required to meaningfully impact the funds' profit margins is so large as to make it virtually impossible for the CFOs to influence the Board's approval of fees through manipulation of the methodologies.  Additionally, given the multiple layers of review over the methodologies, both internal (*i.e.* FMR Co. BSG, Board review) and external (PWC), it would be exceedingly difficult for the CFOs to somehow unreasonably alter the methodologies surreptitiously.[40]

For the foregoing reasons, Lawson's far-fetched conflict of interest theory, which is contradicted by the undisputed evidence, fails to establish the element of intent to defraud.

## II.   EVEN IF LAWSON WERE ABLE TO ESTABLISH A PRIMA FACIE CASE, FIDELITY HAS MET ITS BURDEN OF SHOWING THAT IT WOULD HAVE TAKEN THE SAME ACTION WITH RESPECT TO LAWSON REGARDLESS OF ANY PROTECTED ACTIVITY.

Even if Lawson could establish a *prima facie* case of retaliation, summary judgment must enter for Fidelity because there is clear and convincing evidence establishing that Fidelity would have taken the same employment actions with respect to Lawson even in the absence of her alleged protected activity.  *See Day*, 555 F.3d at 53 (if employee makes *prima facie* showing, "[t]he burden then shifts to the employer to rebut the employee's *prima facie* case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity").

---

[40] For ease of the Court's reference, a summary of the changes that would be needed to materially impact profit margins is set forth at Exhibit 8 of the Addendum (Impact Chart).

As set forth above, the undisputed evidence[41] shows that Lawson's professionalism and performance deteriorated rapidly after she learned that Komishane had selected Cadogan to be her new boss.  She was angered and embittered by the decision, and became hostile toward Cadogan, neglected her job responsibilities, and openly challenged Cadogan's authority, telling her that she was "clueless" and not qualified for the position.  SUF ¶¶171, 176.  She also told Cadogan that she "did not care" what work Cadogan wanted her to do.  SUF ¶153.  In addition, she attempted to offer a job to a candidate that her supervisors, Komishane and Cadogan, had rejected.  SUF ¶¶211-219.

Such conduct is prohibited by Fidelity's personnel policies, and as a practical matter, is not tolerated.  SUF ¶¶19, 174.  The evidence is undisputed that an employee conducting herself as Lawson did would receive warnings and critical reviews as she did.  *See Guitron v. Wells Fargo Bank, NA, et al*., 619 Fed. Appx. 590, 591 (9th Cir. 2015) (affirming summary judgment where clear and convincing evidence showed employee had failed to meet her sales goals, been insubordinate to her direct manager, and refused to return to work); *Riddle v. First Tenn. Bank, N.A.*, 497 Fed. Appx. 588, 596 (6th Cir. 2012) (plaintiff would have been fired absent protected activity where employer had received complaints about his performance and plaintiff had received a written warning referencing termination).[42]

---

[41] The record of Lawson's performance deficiencies is undisputed; that Lawson may disagree with Fidelity's assessment of her performance does not create a genuine issue of fact.  *Quinones v. Buick*, 436 F.3d 284, 290 (1st Cir. 2006) (plaintiff's self-serving statements regarding his performance insufficient to rebut employer's contentions of poor performance); *Miller v. Stifel, Nicolaus & Co.*, 812 F. Supp. 2d 975, 989 (D. Minn. 2011) (summary judgment granted where "[t]here is no competing evidence—aside from Plaintiff's personal views—that [employer] was incorrect in its assessment of her lagging performance"); *Pardy v. Gray*, 2008 WL 2756331, at *7 (S.D.N.Y. July 15, 2008) ("As a legal matter, Plaintiff's own assessment of her performance is not cognizable on summary judgment… her employer's assessment …controls.").

[42] *See Halloum v. U.S. Dep't. of Labor*, 307 Fed. Appx. 106, 107 (9th Cir. 2009) (affirming ARB's finding that employer would have taken employment action even in absence of protected activity where,

Moreover, as explained above, the undisputed facts establish that Komishane —the only individual alleged to have engaged in purported "adverse actions" in 2005 and 2006—*did not know about Lawson's complaints until after she filed her December 20, 2006 letter*. SUF ¶¶134, 185. Of course, he could not have made these decisions in retaliation for complaints that he knew nothing about. *See Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006) (affirming summary judgment where terminating supervisor could not have retaliated because he had no knowledge of plaintiff's protected activity).

In reality, Lawson was treated *more favorably* because she had raised concerns. Under normal circumstances, an employee who is as rude, unprofessional, and disrespectful as Lawson was would have been terminated immediately, or at least removed from her position and transferred to another position where she could work more productively. SUF ¶124. Indeed, in early December 2006, *before* Komishane knew that Lawson had filed any complaints, but immediately after Komishane learned that Lawson had called Cadogan "clueless" and told Cadogan that she was tired of having to deal with her, Komishane sent an email to Human Resources indicating that he wanted her out of his group due to her conduct. SUF ¶¶172-173. However, after he learned that Lawson had raised concerns regarding fund profitability, Komishane was concerned that Lawson would accuse him of retaliation, so he tolerated her behavior and attempted to improve her performance. SUF ¶225.

## III.   LAWSON'S CLAIM FOR BACK PAY AND FRONT PAY DAMAGES IS BARRED BECAUSE SHE FAILED TO MITIGATE HER DAMAGES

Even if Lawson's retaliation claim survives summary judgment, Fidelity is entitled, at a minimum, to partial summary judgment on the issue of back and front pay damages. Lawson is not entitled to any back or front pay damages because it is undisputed she has not made any

---

*inter alia*, employee missed meetings, failed to perform duties expected of a group leader, and shifted his work responsibilities to other group leaders).

reasonable effort to look for another job.  Although the burden is typically on the employer to demonstrate the availability of substantially equivalent jobs in order to prove that an employee failed to mitigate his damages, the First Circuit has adopted an exception to that rule.  In cases where the employee failed to make any effort to find employment, the defendant-employer is relieved "of the burden to prove the availability of substantially equivalent jobs in the relevant geographic area once it has been shown that the former employee made no effort to secure suitable employment".  *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) (citations omitted).   The court noted that "it will be the extraordinary case in which [a plaintiff's] decision to withdraw from the job market can be found to have been justifiable, given that virtually all reemployment prospects are plainly precluded absent some effort to reenter the job market." *Id.*

Lawson has not been employed since she resigned in September 2007.  SUF ¶269.  When Lawson quit, she declined outplacement services Fidelity offered to her without any requirement that she promise or provide anything to Fidelity in return.  SUF ¶270.

In the eight years since she quit, Lawson has not applied for even one specific open position.[43]  SUF ¶¶269-282.  She claims to have had one interview in eight years, but she cannot remember which company interviewed her or when it occurred.  SUF ¶277.  She has produced no documents or testimony to establish she ever visited a career center, nor that she joined or networked through any professional organization.  SUF ¶278.  There is likewise no evidence she has made any effort to take classes or pursue any certifications or advanced degrees to enhance her resume.  SUF ¶279.  And she declined Fidelity's offer of six months of outplacement services, which would have included one-on-one career management consultation, coaching on

---

[43] In 2010, she sent her resume to approximately four companies and five staffing companies, but she sent them to global email boxes without targeting a specific recipient or open position. She never met with any of the staffing companies.  SUF ¶275.

resume writing, networking skills, interviewing skills and job search strategy.  She did, however, receive unemployment benefits totaling $33,000**.**  SUF ¶271.  And she testified that she spent time after she resigned renovating four to five rooms in her Brookline home.  SUF ¶280.

Accordingly, Fidelity is entitled to a ruling that Lawson is precluded from seeking any back or front pay damages.  *N. L. R. B. v. Arduini Mfg. Corp.*, 394 F.2d 420, 424 (1st Cir. 1968) (where plaintiff failed to diligently seek new employment, court "cannot but conclude that he was not too anxious to get off the unemployment rolls").[44]

## CONCLUSION

For the foregoing reasons, Fidelity respectfully requests that this Court grant summary judgment in its favor and dismiss Lawson's complaint.

---

[44] Because Lawson did not search for a job, the Court must dismiss her claims for back and front pay. Even if Lawson could show that she searched for a job (which she did not), however, Fidelity has identified 177 positions that Lawson could have sought and secured had she tried.  SUF ¶278.

Dated: January 27, 2016                Respectfully submitted,

FIDELITY MANAGEMENT & RESEARCH
COMPANY, FMR CO., INC. and FMR LLC,
f/k/a FMR CORP.,

By their attorneys,

/s/ William H. Kettlewell
William H. Kettlewell BBO# 270320
Victoria Steinberg BBO# 666482
COLLORA LLP
100 High Street, 20th Floor
Boston, MA  02110
Tel. (617) 371-1000
wkettlewell@collorallp.com
vsteinberg@collorallp.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document, filed through the CM/ECF
system, will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on
all counsel who are not served through the CM/ECF system on January 27, 2016.

/s/ William H. Kettlewell

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JACKIE HOSANG LAWSON,<br><br>                    Plaintiff,<br><br>          vs.<br><br>FMR LLC, dba FIDELITY INVESTMENTS;<br>FMR CORP., dba FIDELITY INVESTMENTS;<br>and FIDELITY BROKERAGE SERVICES LLC,<br>dba FIDELITY INVESTMENTS,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.: 1:08-cv-10466 DPW<br>)<br>)<br>)<br>)<br>)<br>) |

**FMR LLC, FMR CORP. AND FIDELITY BROKERAGE SERVICES LLC'S
ADDENDUM OF EXHIBITS IN SUPPORT OF SUMMARY JUDGMENT**

TAB 1:      ORGANIZATIONAL CHART

TAB 2:      SUMMARY OF CLAIMS

TAB 3:      FIDELITY PRIOR KNOWLEDGE CHART

TAB 4:      TRIGGER CHART

TAB 5:      OBJECTIVE & SUBJECTIVE FACTORS APPLIED

TAB 6:      *STEWART*

TAB 7:      *KILPATRICK*

TAB 8:      IMPACT CHART

# TAB 1

Fidelity Organizational Structure:   FBC Flow of Information



# TAB 2

## SUMMARY OF CLAIMS

## LAWSON LETTERS AND COMPLAINTS

| Date of Letter/Complaint | Subject Matter | Assertion in Letter/Complaint |
|---|---|---|
| September 29, 2006 | Back Office Methodology | • The back office methodology was changed without proper review, and 12b-1 reports for Q1 and Q2 2006 were performed with information obtained using this methodology incorporated in the results.<br><br>• When this methodology was finally analyzed in September 2006, two major errors were found, resulting in more expenses allocated to The Fidelity Mutual Funds, and expenses being incorrectly sent to the 'Distribution and Processing' service segments.<br><br>• While the errors were identified and corrected, the incorrect 12b1 reporting for Q1 and Q2 has not been disclosed to FMR Co.<br><br>No allegation of shareholder fraud. |
| September 29, 2006 | Call Content model #1 | Call content model results were manipulated by PI finance to achieve desired results, and then submitted to the SSBSG to be used in analysis. The result of the adjustments made to the model is that more expenses were added to the Transfer Agent P&L for 2006, effectively lowering the margins.<br><br>No allegation of shareholder fraud. |
| December 7, 2006 | Call content model #2 | The call content model may not be incorrect, but the SSBSG has not adequately researched the model for accuracy; if model is incorrect, it will impact TA margins that were submitted to Board in November 2006 and a have a large impact on FP P&L in 2007.<br><br>No allegation of shareholder fraud. |
| December 20, 2006 OSHA Complaint | Call content model #3 | Year over year changes in allocation of call-related expenses have resulted in a large shift in expenses from Distribution to Processing. The increased expense in processing has contributed to a lower margin on the 2006 TA Profit and Loss Statement. Rooney yelled at her for raising this concern. |

1

| December 20, 2006 OSHA Complaint | Web expense #1 | SSBSG discovered in 2005 that a new web expenses methodology approved in 2003 was never implemented. Lawson told Freeman, and they worked closely on an impact analysis. The error was presented to Komishane, Raymond, Lyons, and Cahill. |
|---|---|---|
| May 10, 2007 | NF's Retention of 12b-1 Fees | • NF's failure to disclose the retention of 12b1 fees is a violation of securities laws.<br><br>• The 3/7/07 Board Memo about the retention was incomplete and misleading because it did not reflect that the fees were withheld by NF without authorization and without notice to the SSBSG. It stated in part "FMR has also learned that the revenue from these 12b1 fees was improperly omitted from FP, and therefore FP for these funds was understated during the 2003-2005 period".<br><br>• The 3/7/07 Board Memo about the retention was misleading because the SSBSG has no records tying NF's expenses and distribution activities to 12b1 fees. The memo stated in part that "NF incurs expenses and performs traditional distribution activities that support retention of 12b1 fees"<br><br>• Lawson does not have clear authority that the Board has given approval for NF to retain 12b1s. |
| May 14, 2007 | Web expense #2 | In the summer of 2005, Lawson and her team discovered that the Board had approved a new internet expense methodology in 2003, and that PI had failed to implement it, and failed to advise FMR, PWC or the Board that it was not following the approved methodology. |
| May 21, 2007 | Marketing methodology | • The Board was not advised that the "methodology had been stale since 2003".<br><br>• The significant impact of the issue was falsely characterized as an "FP Error" supposedly committed by the SSBSG.<br><br>• PWC expressed concerns about how it was reported to the Board.<br><br>• Komishane endorsed the cover up, and Cadogan falsely told Moran it was an "FP Error." |
| June 6, 2007 | Guidance | The treatment of guidance interactions expense for PI is enabling Fidelity to commit fraud against its shareholders by charging the Fidelity Mutual Funds excessive TA fees. This fraud was perpetuated by the allocation of a significant amount of guidance interactions expense to the TA |

2

| August 2, 2007 | Catch-All | P&L, which resulted in an understatement of the TA P&L margins reported to the Board for both 2005 and 2006. Therefore the annual decision to renew the TA contract for 2006 and 2007 was based on false and "deceptively incorrect" data.<br><br>• Fidelity's annual reports that are required to be submitted to the SEC under Section 30b2 of the Investment Company Act and Section 15d of the Securities Exchange Act, which contain a lengthy section entitled "Board Approval of Investments Advisory Contracts and Management Fees" with a subsection called "Cost of the Services and Profitability" are false and misleading in that they do not disclose that incorrect information was submitted to the boards, that some methodologies approved by the boards were not implemented, and that other methodologies were implemented without being approved by the boards.<br><br>• Fidelity Funds' prospectuses and SAIs and annual reports to shareholders contain statements that are designed either generally or specifically to give the impression that Fidelity is trustworthy and cares about SEC compliance when in fact it is vigorously contesting that the SOX whistleblower provisions apply to it. |
| September 2008 Amended Complaint, para 36.1 | Web expense #3 | In addition to reiterating the allegations outlined above, Lawson adds a claim that when FMR presented the change to the methodology to the Board in November 2005 as part of the 2005 Semi Annual FP review, it "failed to note that the [web expense] methodology had been approved two years earlier and had not been implemented for two years." |

3

**TAB 3**

## FIDELITY'S PRIOR KNOWLEDGE

| Issue | Fidelity Knew Before Lawson Sent Complaint Letter | Lawson Knew Fidelity Knew Before Lawson Sent Complaint Letter | PWC Knew Before Lawson Sent Complaint Letter | Lawson Knew PWC Knew Before Lawson Sent Complaint Letter | Board Knew Before Lawson Sent Complaint Letter | Lawson Knew Board Knew Before Lawson Sent Complaint Letter | Lawson Knew Fidelity Resolved or Was Attempting to Resolve Issue Before Lawson Sent Complaint Letter |
|---|---|---|---|---|---|---|---|
| 2005 PWC Findings | Yes[1] | Yes[2] | Yes[3] | Yes[4] | Board was not informed because error resolved before PWC reported to Board[5] | NA | Yes[6] |
| Back Office | Yes[7] | Yes[8] | Yes[9] | Yes[10] | Informed in the regular course in 11/06, two months after 9/29/06 letter[11] | NA | Yes[12] |
| Web Expense | Yes[13] | Yes[14] | Yes[15] | Yes[16] | Knowles, Chair of Audit Committee, was informed.[17] | Lawson admittedly not knowledgeable about Board materials. | Yes[18] |
| Marketing | Yes[19] | Yes[20] | Yes[21] | Yes[22] | Yes[23] | Lawson admittedly not knowledgeable about Board materials.[24] | Yes[25] |
| Guidance | Yes[26] | Yes[27] | Yes[28] | Yes[29] | Yes[30] | Lawson admittedly not knowledgeable about Board materials. | Yes (issue was under discussion)[31] |
| NF | Yes[32] | Yes[33] | PWC does not report on 12b1 fees | PWC does not report on 12b1 fees | Yes[34] | Yes[35] | Yes[36] |

[1] **Steinberg Aff. ¶ 10** FID0019298-99 (3/29/05 email from Lawson to Komishane and Freeman with a "one-pager that will be attached to the agenda for the close meeting tomorrow with FMR Co. and PWC", which identifies the error caused by the switch from IFB to Phoenix).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] **Kettlewell Aff. ¶__** FID0004809 - FID0004988 (PWC's report to Board for year ended 12/31/05, indicating that there were no findings, and that the methodologies were reasonable).

[6] **Steinberg Aff. ¶ 10** FID0023061 (10/19/05 email exchange between Freeman and Lawson in which Lawson recognizes that one of the "things we've fixed in FP over the last year" was "moving from Phoenix back to IFB as a source system for billable transactions").

[7] **SUF ¶¶ 290, 430** (FID0025520-59) (9/12/06 email from Lawson to Freeman, Lyons, Cahill, Rooney, et al. re: back office methodology changes and their impact).

[8] *Id.*

[9] **SUF ¶ 287** (FID0025841) (3/27/06 email from Freeman to PWC, cc'ing Lawson: "We are just beginning to evaluate the changes that PI Finance is making to Back Office expenses.  We will review these changes with you during the normal semiannual cycle.").

[10] *Id.*

[11] **SUF ¶¶ 303, 439-440** (FID0057610-74) (11/15/06 Wynant presentation to Audit Committee, noting methodology refinements, including "Back Office: "Update[d] FPl back office activities and methodologies resulting in approximately $6.9m decrease in FP expenses").

[12] **SUF ¶¶ 290, 430** (FID0025520-59) (9/12/06 email from Lawson to Freeman, Lyons, Cahill, Rooney, et al. re: back office methodology changes and their impact).

[13] **SUF ¶¶ 311, 312** (FID0053576 - FID0053576) (7/29/05 email from Freeman to Komishane stating "we are still researching this. After talking to John Fitz, the changes they made in 11/03 that were communicated to the board re: web exp should not be resulting in the same distrib/processing split since 2001. It is possible that we implemented this correctly back in '03 at the function level, but not in FP since there was a lot of turnover at the beginning of 2004 for the FP group.").

[14] **Steinberg Aff. ¶ 10** (FID0006681-710) (5/11/06 email from Grundig to Rooney attaching various documents that discuss the web expense methodology change, and indicating that Lawson had reviewed the assumptions in the documents).

[15] **SUF ¶ 322** (FID0027028 - FID0027054) (4/7/06 email from Trerice to Knowles, stating "In the process of executing this revised methodology for 2003 annual FP, there was an over allocation of $11m "in FP" and $18m in 2004.").

[16] **Steinberg Aff. ¶ 10** (FID0023688 - FID0023692) (3/24/06 email from Freeman to Brashaw, copying Lawson, disagreeing with PWC's summary of the web expense error).

[17] **SUF ¶ 322** (FID0027028 - FID0027054) (4/7/06 email from Trerice to Knowles, stating: "In the process of executing this revised methodology for 2003 annual FP, there was an over allocation of $11m "in FP" and $18m in 2004.")

[18] **Steinberg Aff. ¶ 10** (FID0006681-710) (5/11/06 email from Grundig to Rooney attaching documents discussing web expense methodology change, and indicating that Lawson had reviewed the assumptions in the documents).

[19] **SUF ¶ 341** (4/5/07 email from Cadogan to Lawson with Business Overview, asking her to let her know "if there is any methodology updates that I have missed or that is not described correctly or if there is anything that you see that doesn't look correct." The Business Overview stated: "In 2005, the percentages used to allocate promotion and advertising acquisition related expenses to the fund disciplines was not updated. Had this update occurred, the expense allocated to Money Market funds would have been higher by $36M and the expense allocated to Equity and Fixed Income funds would have been lower by $25M and $11M, respectively." The Overview does not call it a "Fund Profitability error", or cast any blame for the failure to update the methodology.).

[20] *Id.*

[21] **SUF ¶¶ 338, 339** FID0033648 - FID0033651 (4/3/07 email from Lawson to Guinta, McManus, Olsson, Johnson indicating that PWC presented a document to FMR the previous day, stating that: "During the course of our agreed-upon-procedures FBC noted that the methodology document had not been updated for changes in the business since 2003, consequently marketing expenses were under allocated to money market funds and over allocated to bond and equity funds in 2004 and 2005.").

[22] *Id.*

[23] **SUF ¶¶ 43, 343** (FID0002715 - FID0003176) (4/2007 Board materials stating "In 2006, the Retail channel discovered that certain expense allocations had not been updated. In 2005, the Retail channel under-allocated approximately $36M in acquisition-related costs to money market funds and over-allocated $25M and $11M to equity and bond funds, respectively. In total, FMR estimates that this did not impact the level of expenses included in Fund Profitability. Where meaningful, FMR has discussed the impact of this allocation as part of the variance analysis for certain representative funds.").

[24] Amended Complaint, Dkt No. 22, Ex. 3 (5/21/07 email from Lawson to Goldberg re marketing methodology, asserting that the Board had not been advised that the PI marketing "methodology had been stale since 2003" yet admitting that she requested a copy of the Board memo and her request was denied).

[25] **SUF ¶ 341** (FID0005247) (4/5/07 email from Cadogan to Lawson with Business Overview, asking her to let her know "if there is any methodology updates that I have missed or that is not described correctly or if there is anything that you see that doesn't look correct." The Business Overview stated: "In 2005, the percentages used to allocate promotion and advertising acquisition related expenses to the fund disciplines was not updated. Had this update occurred, the expense allocated to Money Market funds would have been higher by $36M and the expense allocated to Equity and Fixed Income funds would have been lower by $25M and $11M, respectively." The Overview does not call it a "Fund Profitability error," or cast any blame for the failure to update the methodology.).

[26] **SUF ¶ 462** ( FID0017076-17100) (1/22/07 email from Lawson to Farinacci, Raymond, Cahill, and PWC with materials expressing her concerns re: guidance methodology).

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] **SUF ¶ 420** (FID0004444-4522) (4/21/05 PWC annual FP presentation to the Board, acknowledging 2004 "[c]hanges and refinements to methodologies" including those "improving the classification of activities between marketing and distribution versus servicing" in Retail Phones. PWC concluded that "based on the scope of our work, we have reported that the allocation methodologies used in the Analysis...'are reasonable in all material respects....'"); FID0057610 - FID0057674 (11/15/06 Wynant presentation to the Audit Committee regarding Fund Profitability Methodology. In that presentation, he reported a number of methodology refinements, including Phone Guidance: "allocate a portion of guidance expense to servicing, consistent with methodology for branches and web; Estimated $3.5m increase in Fund Profitability expense with a $12m expense shift from Marketing and Distribution to servicing (0.03% reduction in after-tax margin)").

[31] **Steinberg Aff. ¶ 10** (FID0017014 - FID0017014) (1/24/07 email from Cadogan to individuals who attended Lawson's January 22nd presentation, including Lawson and PWC, to inform them that "We will form a group to review the treatment of guidance. If any issues are discovered in time for the FP cycle, they will be raised with FMR to discuss actions to be taken. If conclusions are not available at that time, we will continue to review until a determination can be made. If any changes are recommended at that point, they will be proposed for the Mid-Year methodology reviews. Decisions on changes will be based on the consensus of FBC, FMR and PWC."); FID0045880-81 (5/29/07 email from Connolly summarizing the guidance meeting and asking Lawson to write up her concerns regarding the guidance methodology).

[32] **SUF ¶¶ 226, 350, 362, 370** (FID0016270 - FID0016271) (11/21/06 email exchange between Cadogan and Komishane re "status of the issue around NF retaining 12b1s").

[33] **SUF ¶ 373** (FID0029050 - FID0029052) (1/5/07 email from Johnson with minutes "NF 12b-1, Is the practice ok? Have we properly informed the board? Follow up with Tom Lux on FIIS practice. What is the status and can we help."); FID0016379-80 (12/15/06 Calvani email to Cadogan and Komishane, forwarded to Lawson on 1/9/07, providing spreadsheet and indicating that "the issue was that were not previously aware of a source of 12b1 payments directly to NFS").

[34] **SUF ¶ 365** (FID0055892-56043 at FID0055892-902) (March 7, 2007 Overview of Rule 12b1 Plans and Plan Related Agreements).

[35] **SUF ¶¶ 393, 394** (FID0025068) (4/24/07 email chain from Cannon to Lawson providing March 7, 2007 Board Overview memo).

[36] **SUF ¶¶ 374** (FID0016379-80) (12/15/06 Calvani email to Cadogan and Komishane, forwarded to Lawson on 1/9/07, providing spreadsheet and indicating that "the issue was that were not previously aware of a source of 12b1 payments directly to NFS"); FID0025068 (4/24/07 email chain from Cannon to Lawson providing March 7, 2007 Board Overview memo); FID0023705 - FID0023708 (1/16/07 email from Komishane to Lawson and Cadogan asking to "understand how big of an issue this is and what we need to do about it"); FID0016394 - FID0016397 (1/16/07 email from Cadogan to Lawson asking Lawson to have someone look at "how much retained 12b1 revenue we have retained over the past several years (2003 to current)" and indicating that "we should consider including 12b1 revenue in FP. Let me know what the major issues would be to prevent this from happening for 2006.").

**TAB 4**

# TRIGGER EVENTS

| Trigger Event | Letter/Complaint |
|---|---|
| **September 21, 2006:** Lawson is informed Cadogan would be her boss.[1] | **September 29, 2006:** Lawson's attorney sends letter re call content/back office[2] |
| **December 4, 2006:** Claire disagrees with Lawson's unilateral decision to change the guidance driver, and asks her to schedule a meeting with the group to discuss[3] | **December 7, 2006:** Lawson's attorney sends letter re call content model and driver[4] |
| **December 15, 2006:** Lawson gets $19,575 bonus[5] | **December 20, 2006:** Lawson files OSHA complaint re 2005 PWC Findings, call content[6]. |
| **April 30, 2007:** Komishane insists Lawson revise her NF/FP memo[7]<br><br>**May 4, 2007:** Komishane tells Lawson she has no authority to issue offer to Melkonian[8]<br><br>**May 8, 2007:** Cadogan tells Lawson her refusal to follow up with another employee on the 12b1 accounts is unacceptable[9] | **May 10, 2007:** Lawson sends letter re NF[10]<br><br>**May 14, 2007:** Lawson sends a letter to OSHA alleging that the failure to update the web expense methodology was fraudulent[11] |
| **May 17, 2007:** Lawson receives oral warning[12] | **May 21, 2007:** Lawson sends letter re marketing methodology[13] |
| **May 29, 2007:** Connolly asks Lawson to write up her point of view on Guidance, as well as identify the individuals she had been speaking with at Treasury.[14] | **June 6, 2007:** Lawson sends letter re guidance methodology[15] |
| **July 17, 2007:** Lawson receives Merit Review[16] | **August 2, 2007:** Lawson sends letter re annual reports (catch-all complaint)[17] |

---

[1] SUF ¶116.
[2] Amended Complaint, Dkt. No. 22, Ex. 1.
[3] SUF ¶179.

# TRIGGER EVENTS

---

[4] Amended Complaint, Dkt. No. 22, Ex. 10.

[5] SUF ¶ 181.

[6] SUF ¶ 450.

[7] SUF ¶ 397.

[8] SUF ¶ 217.

[9] SUF ¶ 209.

[10] Amended Complaint, Dkt. No. 22, Ex. 3.

[11] Amended Complaint, Dkt. No. 22, Ex. 8.

[12] SUF ¶ 215.

[13] Amended Complaint, Dkt. No. 22, Ex. 3.

[14] SUF ¶ 475.

[15] Amended Complaint, Dkt. No. 22, Ex. 3.

[16] SUF ¶ 243.

[17] SUF ¶ 523.

# TAB 5

# OBJECTIVE REASONABLE BELIEF CHART

| | Back Office (9/29/06) | Call Content (9/29/06, 12/7/06, 12/20/06) | Web Expense (5/14/07) | Marketing (5/21/07) | Guidance (6/6/07) | NF (5/10/07) |
|---|---|---|---|---|---|---|
| **Claim** | (1) the back office methodology was changed without proper review<br><br>(2) Fidelity failed to go back and correct the Q1 and Q2 12b-1 reports | (1) the call content model was manipulated to achieve desired results<br><br>(2) the SSBSG had not adequately researched the model | (1) Fidelity failed to implement board approved methodology<br><br>(2) Fidelity failed to inform PWC and FMR | (1) Board was not advised that "the methodology had been stale since 2003"<br><br>(2) Board was advised it was an "FP error" | The methodology is incorrect because it allocates some of the expense associated with guidance interactions to processing, instead of %100 sales, which violates the TA contract | (1) NF's failure to disclose the retention was violation of securities laws<br><br>(2) March 7, 2007 memo misleading because it did not reflect that the fees were withheld by NF without authorization and without notice to the SSBSG<br><br>(3) March 7, 2007 memo misleading because it stated that NF incurred expenses that support retention, when the BSG had no records of such expenses<br><br>(4) Lawson had not clear authority that the Board had approved NF's retention of 12b-1s |
| **Training and Experience** | FP expert; no Board experience | FP expert | FP expert; no Board experience | FP expert; no Board experience | FP expert | FP expert; no Board experience |
| **Company Knowledge** | Fidelity and PWC knew before Lawson raised concern; working to resolve | Fidelity did not know because neither happened. | Fidelity, PWC, and Board knew before Lawson raised concern; already resolved | Fidelity, PWC, and Board knew before Lawson raised concern; already resolved | Fidelity, PWC, and Board knew before Lawson raised concern; nothing to resolve | Fidelity, PWC, and Board knew before Lawson raised concern; already resolved |
| **Company Response to Complaint** | Fidelity not concerned; took no action | Fidelity not concerned; took no action | Fidelity not concerned; took no action | Fidelity not concerned; took no action | Fidelity formed working group to confirm reasonableness of methodology; took no other action | Fidelity not concerned; took no action |
| **Opinion of Internal Compliance or External Regulator** | Farinacci, PWC, Board not concerned; SEC closed inquiry | Farinacci, PWC, Board not concerned; SEC did not investigate | Farinacci, PWC, Board not concerned; SEC closed inquiry | Farinacci, PWC, Board not concerned; SEC closed inquiry | Farinacci, PWC, Board not concerned; SEC closed inquiry | Farinacci, PWC, Board not concerned; SEC closed inquiry |

## SUBJECTIVE REASONABLE BELIEF CHART

| Claim | Back Office (9/29/06) | Call Content (9/29/06, 12/7/06, 12/20/06) | Web Expense (5/14/07) | Marketing (5/21/07) | Guidance (6/6/07) | NF (5/10/07) |
|---|---|---|---|---|---|---|
| **Claim** | (1) the back office methodology was changed without proper review<br><br>(2) Fidelity failed to go back and correct the Q1 and Q2 12b-1 reports | (1) the call content model was manipulated to achieve desired results<br><br>(2) the SSBSG had not adequately researched the model | (1) Fidelity failed to implement board approved methodology<br><br>(2) Fidelity failed to inform PWC and FMR | (1) Board was not advised that "the methodology had been stale since 2003"<br><br>(2) Board was advised it was an "FP error" | The methodology is incorrect because it allocates some of the expense associated with guidance interactions to processing, instead of %100 sales, which violates the TA contract | (1) NF's failure to disclose the retention was violation of securities laws<br><br>(2) March 7, 2007 memo misleading because it did not reflect that the fees were withheld by NF without authorization and without notice to the SSBSG<br><br>(3) March 7, 2007 memo misleading because it stated that NF incurred expenses that support retention, when the BSG had no records of such expenses<br><br>(4) Lawson had not clear authority that the Board had approved NF's retention of 12b-1s |
| **Training/ Experience** | FP expert; no Board experience | FP expert | FP expert; no Board experience | FP expert; no Board experience | FP expert | FP expert; no Board experience |
| **Lawson's Prior Communications** | Lawson admits it could be miscommunication or mistake; Lawson admitted error would be corrected and no impact on FP; Lawson never raised concern with Peppet | Lawson admits it could be miscommunication or mistake; Lawson admits admits model may not be incorrect; Lawson knew for over two years without raising concerns; Lawson never raised concern with Peppet | Lawson knew about issue in summer of 2005 but did not raise it until May 2007; Lawson never raised concern with Peppet | Lawson knew about failure to update methodology in June 2005, but did not raise concern until May 2007; Lawson knew about the language used to describe error for months before she complained; Lawson never raised concern with Peppet | Lawson knew for almost two years before raising concern; Lawson never raised concern with Peppet | Lawson knew for five months before raising concerns; Lawson received Board memo before raising concern |
| **Information Known to Lawson** | Lawson knew Fidelity and PWC knew | Lawson knew Fidelity and PWC knew | Lawson knew Fidelity and PWC knew | Lawson knew Fidelity and PWC knew | Lawson knew Fidelity and PWC knew | Lawson knew Fidelity and Board knew |
| **Lawson's Credibility** | Letter sent 8 days after Komishane selected Cadogan | Letter sent 8 days after Komishane selected Cadogan | Letter sent 14 days after Komishane insists Lawson revise NF memo, 10 days after Komishane says no authority to offer job, and 6 days after Cadogan says refusal to follow up is unacceptable | Letter sent four days after Lawson received oral warning | Letter sent seven days after Connolly demanded Lawson write up her views | Letter sent 10 days after Komishane insists Lawson revise her NF memo, six days after Komishane tells her she has no authority to issue offer to Melkonian, and two days after Cadogan tells Lawson her refusal to follow up on the 12b-1 accounts is unacceptable |

# TAB 6

**U.S. Department of Labor**     Office of Administrative Law Judges
5100 Village Walk, Suite 200
Covington, LA 70433



(985) 809-5173
(985) 893-7351 (Fax)

Issue Date: **24 January 2014**

CASE NO:     **2013-SOX-00019**

**IN THE MATTER OF**

**TERESA STEWART,**
             **Complainant**

     **v.**

**LOCKHEED MARTIN AERONAUTICS COMPANY,**
             **Respondent**

## DECISION AND ORDER

This proceeding arose from an action filed by Teresa Stewart (Complainant) against Lockheed Martin Aeronautics Company (Respondent or LM Aero) under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX" or "Act") and the employee protective provisions promulgated hereunder at 29 C.F.R. Part 1980.

On July 23-26, 2013, a formal hearing was held in Dallas, Texas. The parties were afforded a full opportunity to adduce testimony, offer documentary evidence, and submit post-hearing memoranda. Claimant offered eighty exhibits, which were admitted into evidence. Employer offered eighty-eight exhibits, which were admitted. The parties also proffered two exhibits to be attached to the record as ALJ 1 and ALJ 2. This decision is based upon a full consideration of the record.[1]

## I. STATEMENT OF THE CASE

Complainant worked for Respondent for twenty years until December 1, 2012. She filed a complaint under SOX on September 23, 2012 alleging that, during her employment, she engaged in protected activity under SOX for the time period of January-April 2012. Complainant further alleges that Respondent retaliated against her for engaging in protected activity by subjecting her to a hostile work environment, by failing to comply with the Americans with

---

[1]   References to the record are as follows: Transcript – Tr.; Complainant's Exhibits – CX; Respondent's Exhibits – RX; Complainant's Post-Trial Brief – Comp.'s Br.; Respondent's Post-Hearing Brief – Resp.'s Br.

Disabilities Act regarding her accommodation, and by constructively discharging her. Complainant seeks damages to include back pay, front pay, and mental anguish.

In turn, Respondent argues that Complainant's claim is time-barred, that Complainant did not engage in protected activity, and that her protected activity was not a contributing factor to the complained of employment decisions. Respondent further contends that Complainant is not entitled to any damages and that any award should be reduced pursuant to the after-acquired evidence doctrine, because she failed to mitigate her damages, and because she failed to prove her mental anguish, medical benefits, and 401(k) contribution damages with sufficient certainty.

## II. ISSUES

1. Whether Complainant timely complained of the alleged adverse action(s).
2. Whether Complainant engaged in protected activity.
3. Whether Respondent took adverse action(s) against Complainant.
4. Whether the protected activity was a contributing factor to the adverse action(s).
5. Whether Complainant is entitled to back pay, front pay, and mental anguish.

## III. WITNESS TESTIMONY

### A.    Complainant Teresa Stewart

In 2002, Complainant suffered severe injuries to her leg after she fell down some stairs while on the job. As a result of complications from those injuries, Complainant developed Reflex Sympathetic Dystrophy (RSD), a neurological disorder. She has had RSD for about 10 years. (Tr. 90-91; RX-87, pp.7, 9-10). As a result of RSD, Complainant has experienced significant loss of leg and foot functionality. She is susceptible to falling down and is only able to stand and walk while using a cane. Complainant suffers from severe chronic pain from RSD. (Tr. 92-94). She reached maximum medical improvement with respect to the injury on August 18, 2008 in connection with her workers' compensation claim. (Tr. 328; RX-51).

Complainant has been a Certified Public Accountant since the late 1980s. (Tr. 90). Over her 23 years of employment, Complainant received many awards and accolades as it related to performing her job. (Tr. 87, 90, 107, 310-11; CX-80). In 2007, she notified Respondent that she had discovered fraudulent activity by one of the company's subcontractors. She worked with the Ethics and Legal Departments, audited the subcontractor, and disallowed the subcontractor's fraudulent billings. Complainant was not disciplined for taking these actions but, instead, was honored and nominated for the 2008 Chairman's Award. (Tr. 114-17, 347-350; CX-80).

In about 2009, Respondent began offering a telecommuting option for employees and determined that the jobs in the subcontracts audit group were suitable for that. Complainant availed herself of Respondent's new policy and began telecommuting from home several days a week. She testified that telecommuting permitted her to strike a more effective balance between periods of walking and resting her leg and to take a more effective dosing of narcotic pain medication. (Tr. 97-102).

In 2011 and 2012, Complainant was a lead in the subcontract audit group of the Internal Controls and Audit ("IC&A") Department at Respondent, a position she had held for many

years. (Tr. 99, 333). In that position, Complainant was responsible for overseeing the non-lead auditors in the subcontract group, approving and signing off on their work, and performing her own audits. (Tr. 105, 333). These specialized audits involved government procurement contracts and required compliance with FAR (Federal Acquisition Regulations), CAS (Cost Accounting Standards), and TINA (Truth in Negotiation Act). The audits Complainant performed mirrored the audits performed by the DCAA (Defense Contract Audit Agency). (Tr. 105-07). From her training, Complainant understood that if a prime or subcontractor does not comply with FAR, TINA, and CAS, she can be debarred from doing business with the U.S. Government, subjected to monetary penalties for defective pricing, and subjected to criminal penalties for fraud. In addition, Complainant understood that individuals can also be held criminally responsible. (Tr. 111-12).

In late 2011, Complainant was assigned to perform a rate review for Tata Lockheed Martin Aerostructures Limited ("TLMAL"), the joint venture between Lockheed Martin Corporation and Tata Advanced Systems. (Tr. 118-32, 339). TLMAL was physically located in India. (Tr. 108-10, 124-25). Around the same time, Complainant's long-time supervisor, Harry Davis, retired. Complainant testified that this concerned her because the new management team, which consisted of Supervisor Carmen Ferguson and Director Kay Cosper, had no subcontract audit experience. (Tr. 118-121).

In January 2012, Complainant raised concerns she had about the audit. (Tr. 108-11, 122-25, 130, 156-57; RX-10, 11, 16, 29). Complainant had received a revised TLMAL contract proposal to audit, but the proposal did not contain the necessary data to perform the rate audit. She was instructed to complete the audit within two weeks. Complainant sent a response email in which she informed her superiors that the proposed schedule could not be met because it would take longer than two weeks to obtain the data to audit. (Tr. 148-52; CX-48). Complainant testified that she received a telephone call from Ferguson in which Ferguson told Complainant, "you don't know what we can do," and directed her to retract her email. Complainant did so. (Tr. 152-53, 160-61; CX-47). Soon thereafter, Complainant verbally informed Ferguson of the independence and conflict of interest concerns she had about the TLMAL audit. Later, on January 16, 2012, she emailed Ferguson and the Ethics Department about these same concerns, referencing Federal Acquisition Regulation 9.5. (Tr. 155-57, 160, 431-32; CX-6). She testified that she was not sure whether such a conflict actually existed. (Tr. 421). In a second email, she reported the phone call from Ferguson and claimed she was being harassed for raising her independence concern. (Tr. 423-26).

In late January 2012, Ferguson informed Complainant that the TLMAL audit had been reassigned to a co-worker, Jon Kulpaca. She testified that she believed that Ferguson's reassignment of the TLMAL audit lead to Kulpaca was in retaliation for the concerns she raised about the TLMAL audit. (Tr. 166-68). The audit was reassigned back to Complainant in February. (Tr. 69-71).

Once reassigned to her, Complainant testified that she continued to voice concerns about the audit, which concerns she felt were not adequately addressed by the Legal Department. (Tr. 172-74, 184-86; CX-8, 52). She exchanged emails with contract negotiators of the joint venture and concluded that a determination on the issue needed to be made by someone in the Legal Department. (Tr. 172, 174-75, 176-81, 188-90; CX-8, 50, 51). On February 8, 2012,

Complainant emailed the Ethics Department about the joint venture and price audit. (Tr. 186-191; CX-8, 9).

Because the information Complainant testified she felt was necessary had not been received, she took no steps to complete the audit. (Tr. 191-92). She testified that, on February 21, she approached Ferguson to discuss the lack of data and her emails. Complainant denies that Ferguson told her that she needed to return to India at that time or ever. (Tr. 196-97).

Complainant alleges that Respondent violated SOX by harassing and retaliating against her for objecting to the TLMAL audit. Specifically, Complainant alleges that, shortly after objecting to the audit, she became the target of intimidation, harassment, and abuse from Respondent management. (RX-44). She also complains that management retaliated against her by rescinding permission to telecommute two days per week and not making an exception to permit her to telecommute as a disability-related accommodation. (Tr. 133, 212-13, 270-73; RX-44). Complainant denies that anyone at Respondent ever offered her a medical scooter or medical parking space. (Tr. 219, 287).

Complainant testified that Ferguson wanted her to "rubber stamp" the TLMAL audit without supporting data and was harassing her in retaliation for raising "legal and ethical concerns" about the rate review. (Tr. 299). She also testified she believes her managers as well as employees in Respondent's Ethics, Legal, Equal Opportunity Programs ("EOP"), and Procurement departments were intentionally conspiring to set her up to take the fall for engaging in criminal activity by "rubber stamping" the audit. (Tr. 359-72). Complainant never told anyone at Respondent that she believed she was being pressured to "rubber stamp" or approve the audit without sufficient data. (Tr. 359-72). She also admits that no one ever directly told her to approve the audit even though she did not have data, and that her belief as to that fact came from what she believes was indirect pressure. (Tr. 374).

In late February or early March 2012, Complainant learned that one of the four TLMAL proposals being audited had migrated to a signed memorandum of understanding. She testified that she concluded TLMAL was receiving contract monies and that an actual defective pricing or fraud situation could presumably have arisen if there were irregularities and noncompliance. (Tr. 181-82). On March 23, 2012, Complainant met with Ferguson, a representative from the Legal Department, and Haydee Neeham. She testified that she verbally reiterated the issues she raised in her emails. Ferguson addressed Complainant, but Complainant focused only on the Legal Department representative in this meeting. (Tr. 231-39; RX-26).

On or about March 20, 2012, Josephine Alexander, Respondent's Senior Equal Opportunity Representative, met with Complainant. Complainant testified that she understood that her request to telecommute one day per week had not been decided yet. A second meeting occurred on March 23, and Complainant understood from that meeting that her request for situational telecommuting due to inclement weather was granted and that her request for first class seating on international travel would have to be submitted to the Medical Department for decision. (Tr. 248-51; CX-15).

On Wednesday, March 28, 2012, Ferguson sent Complainant an email telling her that the report on her TLMAL concerns was due that day. Complainant responded by noting that she said

she would get the report out by Thursday, March 29. Ferguson responded that did not align with her memory and told Complainant to complete the report, which she could title "preliminary" if she wanted to identify additional issues later. (CX-17; RX-26). Complainant submitted her report on Thursday. (CX-17). A few days later, on April 3, 2012, Ferguson told Complainant via email that Complainant needed to be more forthcoming in communicating with her superiors and be more willing to take direction from her leadership. (CX-2, 18). Complainant forwarded this email to the Ethics Department, claiming that she was being put into a position of committing fraud or breaking the law. She later complained to the Ethics Department superior that she was being harassed and accused of having a communication problem. (Tr. 948-49).

Complainant testified that she was called to a meeting on April 12, 2012, which she referred to as intimidating and harassing. In that meeting, Ferguson directed Complainant to write a report on how to build a bridge of communication. She testified that she attempted to address her medical restrictions, but no one was willing to do so. (Tr. 270-72, 553-54, 841-42). That day, Complainant reported the perceived harassment to the corporate office. (Tr. 1049-54; RX- 34, 35).

On April 13, 2012, Complainant's doctor recommended that she take two weeks off work. (Tr. 103, 281). She continued her medical leave for a number of months, through November 2012, and eventually voluntarily resigned effective December 1, 2012. (Tr. 104, 298; RX-53-58; CX-69). She testified that her medical and mental condition degraded because of perceived harassment and intimidation at work after expressing concerns about the audit. (Tr. 281-83, 289). She claims that, as a result of Respondent's actions as alleged, she suffered damages in the form of lost wages, lost benefits and/or cost of replacement benefits, and special or mental pain suffering and anguish damages. Complainant asserts that reinstatement is neither feasible nor workable as the relationship is irreparably broken, she requires a 20-hour-per-week telecommuting accommodation, and now suffers irreparable physical damage as a result of the actions as alleged. (Tr. 88-89, 96-97, 281-85, 299-305, 444-47, 459-60, 584, 589, 624-25, 628-33, 966-67; CX-69, 71, 72).

Shortly after going on medical leave, Ferguson called Complainant at home and left a voicemail message in which she told Complainant that she was counting her leave as vacation time and that Complainant was to report to Jo Alexander upon her return from medical leave. Complainant testified that Ferguson used an intimidating and harassing tone of voice. (Tr. 285-86, 562-63). Sometime in June 2012, Complainant was contacted by CIGNA, the short term disability carrier. The CIGNA representative asked Complainant if she could use a scooter instead of telecommuting one day per week. Complainant testified that she informed the person that she did not know and that she was concerned about operating a scooter on the medication she was taking. (Tr. 286-88).

While on leave, on September 19, 2012, Complainant filed her SOX complaint with OSHA. (Tr. 595). Before going on medical leave, Complainant blind-copied and emailed documents containing Respondent's proprietary and confidential information to her personal email address. (Tr. 633-43; RX-16, 66). She claims she did so to use the information in them to report what had happened to the government. (Tr. 641).

Complainant denies ever refusing to perform the audit or refusing to travel to India. She claims she was never provided the data necessary to perform the audit or ever told she needed to travel to India to procure the data. She testified that could not travel to India even if she had been specifically told that the data was available there for her to obtain due to her medical restrictions. Complainant testified that she complied with all requests by her supervisors but could not write an audit report that disallowed all costs because that is not what subcontract auditing does. She also claims that Ferguson never informed her as to what issues, if any, she had about past audits Complainant had performed. (Tr. 474-77, 512-13, 810-32, 1252, 1261-62; RX-1, 4, 26).

Complainant testified that she did not refuse to communicate verbally to Ferguson or any of her superiors. Instead, she stated that she requested a preference that communication with Ferguson also be confirmed in writing. Complainant also denies ever purposefully or disrespectfully refusing to acknowledge or speak to Ferguson or physically turning her back to Ferguson. She denies ever acting like she was going to be violent towards Ferguson in the meeting they had to go over her performance review. She claims she hugged Ferguson at the end of the meeting. Complainant also denies ever having an issue with answering to supervision or using inappropriate language in an email. She claims that, as of the time she went on medical leave in April 2012, she had done nothing to warrant disciplinary action. (Tr. 205-06, 234-37, 289-96, 306-10, 479-81, 485, 807, 997-98, 1250-51; CX-1, 4). Complainant also denies ever refusing to meet with Ferguson one-on-one. (Tr. 1254-55).

**B.    Paul Stewart, Complainant's Husband**

Paul Stewart and Complainant have been married for 31 years. (Tr. 444). Prior to her injury in 2002, Complainant was frequently engaged in physical activities for recreation. (Tr. 449-50). Losing her ability to do those sorts of activities following the injury was a significant emotional blow to Complainant. (Tr. 450).

In mid-January 2012, Mr. Stewart noticed that Complainant was "a little standoffish" and "was becoming irritated over things…that normally didn't bother her." (Tr. 446). After one or two months, Mr. Stewart and Complainant discussed her behavior, and Complainant disclosed that she was feeling stressed about her work. (Tr. 446-447, 452-53). Following that discussion, the Stewarts' relationship returned to normal. (Tr. 453-54).

Complainant still engages in the same types of recreational activities with approximately the same frequency as she did before 2012. (Tr. 454-457). Complainant has never been diagnosed with depression, seen a professional counselor, or been prescribed anti-depressants. (Tr. 450-51). Mr. Stewart believes that Complainant's baseline of pain is a little worse today than it was after it normalized in 2005 through 2008. (Tr. 451).

**C.    Mary Ann Evartt, Complainant's Sister**

Mary Ann Evartt is Complainant's sister. (Tr. 459). Evartt and Complainant have been neighbors since 1999. (Tr. 461).

Before 2012, Evartt and Complainant participated in weekly Bible studies together and performed housework at each other's homes. (Tr. 461-62). They still engage in weekly Bible studies and visit each other multiple times per week. (Tr. 464-66).

The fact that Complainant lost the ability to engage in physical recreational activities in 2002 was a significant blow to her emotional state. (Tr. 463). Complainant has never seen a professional counselor, been prescribed anti-depressants, or been diagnosed with depression. (Tr. 463).

Complainant's and Evartt's relationship is the same now as it was before 2012. (Tr. 465). The issues that arose during the final year of Complainant's employment with Respondent did not affect their relationship. (Tr. 465-66).

**D.      Patrick McGeehan, Expert in Auditing Procedures**

Patrick McGeehin is an expert in the field of auditing procedures used by the Defense Contract Audit Agency ("DCAA"). (Tr. 654, 663). When performing an audit, DCAA auditors must comply with the Federal Acquisition Regulations ("FAR") and the Defense Contract Audit Manual ("DCAM"). (Tr. 659).

McGeehin testified that, if a DCAA auditor was performing an audit and the subject company did not provide requested cost and pricing information, the auditor's first approach would be to aggressively follow-up with the company to obtain that information. The auditor should be in touch with the contractor or subcontractor "continuously and often" to obtain the information that the auditor needs. If the company continued to refuse to provide the requested information, the auditor would document that refusal in his or her report by noting the ways in which the contractor's or subcontractor's records were inadequate. If the DCAA auditor believed that he or she did not have sufficient data from the contractor or subcontractor, the auditor would either set aside the costs as questioned or designate them as "Lacking Documentation" in the report. (Tr. 664-65).

It is common for the DCAA to audit a subcontractor where there is a joint venture between the subcontractor and the prime contractor. Such an arrangement does not violate the applicable rules. (Tr. 665-66, 671-73). Nor is it a violation of the applicable rules for a prime contractor to second or assign one of its employees to the joint venture. (Tr. 666-69). To the contrary, the DCAA frequently encounters such "secondments" and assignments. (Tr. 669). The DCAA's audit function is an advisory one; it does not make the decision whether to enter into a contract and, if so, on what terms. It simply provides the contracting parties with information from which to make that determination. (Tr. 666).

If a DCAA auditor suspects fraud in connection with an audit, or if the auditor believes that he or she is being pressured to fraudulently approve pricing that is unsupported by the data, the DCAM requires the auditor to complete and submit a form to his or her superiors describing the suspected fraud or improper pressure. (Tr. 669-70). The DCAA auditor would then be expected to continue with the audit. The DCAA auditor would not simply refuse to conduct the audit. (Tr. 670-71).

**E.      Kay Cosper, Respondent's Director of IC&A**

Kay Cosper is the Director of IC&A for Respondent. The IC&A Department serves as the internal audit organization for the company. (Tr. 676).

Cosper became Complainant's director in 2009 after Complainant's longtime former supervisor, Harry Davis, retired. (Tr. 678-680). Cosper's subordinate, Carmen Ferguson, then became Complainant's director. (Tr. 680-81). Cosper testified that Ferguson's management style was more demanding than Davis's style. (Tr. 681-82). In addition, Ferguson had higher performance expectations of her subordinates than Davis did. (Tr. 719-20). Cosper observed Complainant engaging in disrespectful and unproductive behavior toward Ferguson in late 2011 and that behavior became increasingly worse in 2012. (Tr. 714-18).

After assuming responsibility for the IC&A Department, Cosper began evaluating the department and determining how to improve its productivity, as there was a backlog of audits that needed to be performed, as well as improve its value. Among other things, she discovered that the team members telecommuted quite frequently, with each member acting independently in conducting his or her assigned audits. (Tr. 699-708, 722-25). Cosper made the decision to suspend telecommuting in the IC&A Department for the first quarter of 2012. Everyone in the IC&A Department, including Complainant and others who were regularly telecommuting at the time, were required to abide by that decision, which was announced at an all-hands meeting in December 2011. (Tr. 699-708; RX-6). At the time she made the decision, Cosper was unaware of any legal or ethical concerns Complainant may have had. (Tr. 708, 874-75).

Complainant requested an exception to the decision, and Cosper denied it. Among other things, Cosper believed Complainant needed to take the lead in training several recently hired subcontract auditors. (Tr. 757-58, 780). She also believed Complainant's presence in the office would help repair the relationship between her and Ferguson. (Tr. 768-69). Cosper did believe, however, that Complainant should have access to medical parking and a medical scooter if she wanted it, and that she should be able to telecommute in cases of inclement weather. Cosper authorized that those same alternative accommodations be made available to Complainant. (Tr. 766-67, 779). Cosper had made those same alternative accommodations available to another IC&A lead, Jenny Garberson, who had a mobility impairment and who had regularly telecommuted before the telecommuting suspension. Like Complainant, Garberson requested an exception to the suspension, which Cosper denied. (Tr. 759-765).

Cosper learned of Complainant's concerns regarding the TLMAL audit in January 2012. (Tr. 729-30; RX-10). Cosper reviewed the Legal Department's response to Complainant's complaint, was satisfied that the matter had been resolved, and expected Complainant to complete the audit. (Tr. 732-33, 740-41). Cosper believed Complainant should have been more aggressive in seeking the data she needed to complete the TLMAL audit, and if she ultimately could not get the data, to document that fact and close out the audit. (Tr. 741-44, 748-49, 782-83). Cosper never attempted to pressure Complainant to approve costs associated with the TLMAL audit that were not supported by data. (Tr. 783-84).

On March 29, 2012, Cosper held an all-hands meeting for the IC&A Department in which she outlined parameters by which employees could request telecommuting during the second quarter of 2012. Among other things, non-lead employees without performance issues would be allowed to telecommute. Lead employees like Complainant, however, would not be allowed to telecommute so that they could supervise, direct, and train the other auditors and additional planned new hires. Complainant was not the only lead employee in the IC&A

Department, and all lead employees in that department were equally impacted by the decision. (Tr. 788-91; RX-38).

Cosper testified that Complainant never reached out to her to discuss the logistics of situational telecommuting. Following Jo Alexander's recommendation, she set up a meeting on the topic between Complainant, Ferguson, and Needham for April 12, 2012. (Tr. 794-99).

Cosper testified that her decisions regarding Complainant's request to telecommute were not motivated by the fact that Complainant had raised legal and ethical concerns about the TLMAL audit. (Tr. 806-07).

F.      **Carmen Ferguson, Respondent's Director-Process Integrator for IC&A**

Carmen Ferguson became the Director-Process Integrator for the IC&A subcontractor group in September 2011. At that time, she became Complainant's supervisor. Ferguson testified that she has a more aggressive, hands-on management style than her predecessor, Harry Davis. Complainant did not adapt well to that management style, and often took offense to what she saw as Ferguson challenging her technical expertise. (Tr. 847-50).

Complainant demonstrated poor communication habits toward Ferguson in 2011. Those negative communication habits became more pronounced in 2012. (Tr. 854-57). For example, Complainant often refused to respond verbally to Ferguson during conversations, and instead would turn away or ignore Ferguson. (Tr. 933-40). Ferguson went on a business trip to Israel with Complainant in September 2011 so that she could accompany (shadow) Complainant on an audit. (Tr. 864). As a result of what she observed on that trip, Ferguson was concerned that the auditors in the subcontractor group did not have the skills that she initially thought they had. (Tr. 864-65). She therefore began to review prior audits from the group to determine whether her concerns were well-founded. (Tr. 881-85; RX-76-77, 79-80).

On December 20, 2011, Ferguson offered to allow Complainant to assign the TLMAL audit to someone else in the group. (Tr. 885-87; RX-80). She did so because she knew that Complainant had a number of open assignments from other auditors in the group to review. Even if Complainant had accepted the offer, however, she still would have been responsible as the lead for reviewing the final work product of the lower-level auditor. (Tr. 885-86, 898-99).

Ferguson delivered Complainant's 2011 performance assessment and development review ("PADR") to her on or about December 14, 2011. Complainant was upset about her overall rating on the PADR of "Successful Contributor" because in previous years she had received higher ratings. (Tr. 289-95; RX-7).

On January 16, 2012, Ferguson received an email from Complainant from which she learned for the first time that Complainant had legal concerns about the TLMAL audit. (Tr. 889-93; RX-10). Ferguson forwarded the email to Respondent's Legal Department. (Tr. 731, 890-91). Ferguson continuously told Complainant that she was free to raise any legal or ethical concerns she had about the audit, but that, while the matter was being reviewed by the appropriate departments, she should continue to work on the audit and note therein any concerns that she had. (Tr. 900-04, 908-17; RX-14, 21).

Ferguson testified that, if an auditor is attempting to conduct a rate proposal but the data submitted by the subcontractor does not support the prices in the proposal, or if the auditor cannot obtain the necessary supporting data after engaging in reasonable due diligence, the auditor should complete the audit and disallow the costs. (Tr. 853, 904-06). That is what Ferguson expected Complainant to do with respect to the TLMAL audit: diligently attempt to get the required data, including by going to India to get it if necessary, and then closing out the audit noting the costs asserted are unsubstantiated if she was unable to obtain the supporting data. (Tr. 927-29, 951, 973-76). Ferguson never attempted to pressure Complainant into approving the TLMAL audit without appropriate supporting data; to the contrary, Ferguson would have been very concerned if Complainant had approved costs without supporting data. (Tr. 906-07, 929-30).

On February 22, 2012, Complainant sent an email to the TATA/TLMAL buyer stating that IC&A was "unable to continue [the rate review] until legal clarification and data is provided." (RX-20). Ferguson also understood Complainant to advise her that TATA refused to provide information to perform the rate review. But, after communicating further with the buyer, Ferguson concluded that Complainant had misrepresented TATA's position because TATA did not refuse to provide the information for the audit. Rather, TATA stated that IC&A would need to travel to India to obtain the information on-site, something Complainant appeared unwilling to do. (Tr. 908-14; RX-20). Ferguson therefore emailed Complainant on February 24, 2012 and said that she believed that Complainant had misled her about the availability of the information, and that it was in fact available in India. Ferguson once again told Complainant that, although she was free to continue to raise additional legal and ethical concerns about the TLMAL audit, she needed to continue to work on it while those issues were vetted. (Tr. 908-14; RX-20).

Because Complainant had raised additional legal concerns related to the audit, Jeff Skrocki, Respondent's Senior Manager of Ethics, arranged a meeting with Complainant, Ferguson, and representatives of the Ethics, Legal, and HR Departments to discuss and resolve any of Complainant's outstanding concerns. That meeting took place on March 23, 2012. During this meeting, Complainant reiterated her concern that IC&A could not perform an independent and objective rate review, that the joint venture presented an organizational conflict of interest, and further explained her additional legal concerns. She primarily addressed her comments to the Legal Department representative rather than Ferguson during that meeting. Complainant ignored Ferguson during the meeting and acted as if she was not in the room. (Tr. 933-40; RX-24, 26).

On April 12, 2012, Complainant met with Ferguson and Needham to discuss the ongoing communication problems between Complainant and Ferguson and to discuss the logistics of situational telecommuting. One of the issues raised during that meeting was that, if Complainant wanted to telecommute on a regular basis in the future, and assuming that she improved her communication issues, she could assume a non-lead rule. (Tr. 954-63; RX-41).

After Complainant went on medical leave, Ferguson and two others in her group (John Kulpaca and Lynn Tennison) went to India, obtained the available data without any difficulty, and completed the TLMAL audit in three weeks. That audit ultimately disallowed $99 million of the $167 million proposed costs. (Tr. 976-79). No one within Respondent objected to that result, nor did Ferguson or the other auditors receive any pressure to allow more costs. (Tr. 980).

The Defense Contract Audit Agency (DCAA) informed Respondent that it would be conducting its own TATA/TLMAL audit in light of the fact that "LM and TLMAL are not independent of one another." However, the DCAA did not indicate that Respondent had done anything unethical, illegal, or inappropriate in conducting the TATA/TLMAL audit itself. (Tr. 979-80; RX-47).

### G.   Jeff Skrocki, Respondent's Senior Manager of Ethics

Skrocki is the Senior Manager of Ethics for Respondent's Fort Worth facility, which is the highest-level ethics personnel at that location. (Tr. 1013-14).

On January 16, 2012, Complainant's two ethics complaints were forwarded to Skrocki. (Tr. 1014-16, 1019-20; RX-10, 11). Skrocki referred the complaint regarding TLMAL to Respondent's Legal Department. (Tr. 1017-18, 1024). He referred the complaint regarding harassment to Respondent's EOP Department which was leading that investigation. (Tr. 1019-22). The Legal Department reviewed the complaint, the TATA/TLMAL subcontract proposal, the conflict-of-interest guidelines, and the professional internal auditing standards of the Institute of Internal Auditors and provided a response to Ferguson on January 18, 2012. (CX-49). The response concluded that there was no evidence to suggest that an auditor in the IC&A Department could not perform an independent, objective, and unbiased review of the proposal that was consistent with applicable auditing standards. (RX-14; CX-49). Specifically, the response noted that the IC&A Department frequently performed audits on partially-owned or wholly-owned interests, and, as such, there was no problem with IC&A performing the rate review at issue. The response further found no organizational conflict of interest in the joint venture. (CX-49).

As Skrocki coordinated with the Legal Department, EOP Department, and Complainant, he determined that the parties might benefit from face-to-face interaction. (Tr. 1028). He therefore arranged an in-person meeting between Complainant, Ferguson, T.J. Hasty from the Legal Department, and HR Business Partner Haydee Needham. (Tr. 1028-34; RX-24). Skrocki had to miss the meeting due to his own medical issues, but Needham updated Skrocki after the meeting to let him know what had taken place. (Tr. 1033-34; RX-26). Based on that update, Skrocki understood the Ethics Department would continue to provide support to the Legal and EOP Departments regarding Complainant's complaints. (Tr. 1035-36).

Skrocki testified that Star Willis, Director of Ethics and Business Conduct, and Leo Mackay, Vice President of Ethics and Business Conduct, concluded that Complainant's ethics concerns had been addressed thoroughly. (Tr. 1048-56, RX-34, 35).

Skrocki believes that Complainant was never singled out or discriminated against for having made internal complaints. (Tr. 1060-62).

### H.   Haydee Needham, Respondent's Human Resources Business Partner for IC&A

Haydee Needham was the HR Business Partner for IC&A for a period of time in 2011 and 2012. (Tr. 1073). HR Business Partners work with internal clients to coordinate human-resources related functions. (Tr. 1074).

- 11 -

In March 2012, Needham's director requested that she assist with performance issues involving Complainant. Needham met with Ferguson in March 2012, and Ferguson related that she and Cosper were experiencing difficulties with getting Complainant to produce a work product in relation to the TLMAL audit. In particular, Ferguson explained that, although the legal and ethical concerns that Complainant raised had been or were being resolved, she refused to move forward with the audit. Ferguson also discussed her communication problems with Complainant. Needham's goal was to improve the communication between Ferguson and Complainant so that Complainant could be a productive member of the department. (Tr. 1076-80). Needham subsequently met with Ferguson and Complainant to work toward that goal. (Tr. 1081, 1087-90).

During her interactions with Ferguson and Complainant, Needham observed that their communication was very strained, sometimes to the point of being antagonistic. (Tr. 1081-82). For example, Complainant would avoid directing comments to Ferguson, ignored Ferguson, or intentionally turned her back on Ferguson during meetings. (Tr. 1082-83). These sorts of actions were very unusual for someone at Complainant's level. (Tr. 1102).

Complainant, Needham, and Ferguson met on April 12, 2012 to discuss the logistics of Complainant's situational telecommuting. (Tr. 1112, 1120; RX-41). Needham and Ferguson also offered Complainant a medical scooter, an ergonomic assessment, and medical parking during that meeting, but she rejected all three offers. (Tr. 1114-15). Complainant was unwilling to consider any accommodation other than regular telecommuting. Ferguson did not act threatening or inappropriate during the April 12 meeting. (Tr. 1116). Complainant's communication style with respect to Ferguson had not improved from the first time Needham had observed their interactions. (Tr. 1116-19).

I.       Josephine Alexander, Respondent's Senior Equal Opportunity Representative

Josephine Alexander was hired as an equal opportunity representative for Respondent in 2005. (Tr. 1132). In 2012, she was the Senior Equal Opportunity Representative responsible for equal opportunity compliance. (Tr. 1132-33). In that role, she worked in Respondent's EOP office, which serves as the company's subject matter expert in EEO compliance and work accommodations. (Tr. 1133). Alexander received significant training in compliance with the Americans with Disabilities Act. (Tr. 1134).

Alexander was the chair of Respondent's workforce placement team, which works with employees who have temporary medical restrictions on their ability to perform the essential functions of their jobs to determine whether there are accommodations that would allow the employees to remain in the workforce. (Tr. 1135-36; CX-24).

In 2012, Alexander and Complainant had numerous conversations to determine accommodations that would allow Complainant to continue performing the essential functions of her job duties. (Tr. 1139). On January 9, 2012, Complainant told Alexander she was unhappy that Cosper had denied her requests to continue telecommuting. Alexander explained to Complainant the process of requesting an accommodation from the company, and sent her the appropriate forms after the call ended. (Tr. 1150-53; RX-9).

On January 16, 2012, Complainant sent an email to Respondent's Ethics Department in which she complained that she had been harassed and threatened. (Tr. 1154; RX-40, 11). Alexander and others in Human Resources investigated Complainant's claim. (Tr. 1155-59, 1165-72, RX-12). Kim Vu was assigned to investigate those issues. (Tr. 1155, 1165-66). Vu met with Complainant on January 25, 2012 and subsequently prepared a summary of that meeting. (Tr. 1157-58; RX-12). Among other things, Vu reminded Complainant that she needed to fill out the forms Alexander had given her if she wanted to request an accommodation. (Tr. 1159).

Complainant and Alexander met on February 23, 2012 to further discuss Complainant's request for accommodation. Alexander offered Complainant medical parking and a medical scooter, but Complainant rejected both offers and insisted on regular telecommuting. (Tr. 1173-77; RX-19).

Alexander also conducted interviews with Complainant's co-workers, managers, and HR business partners between February 28 and March 14 and ultimately found that Complainant's concerns regarding alleged harassment toward other employees were unfounded. (Tr. 1189-91).

Alexander met with Complainant on March 20, 2012 and told her that she needed to discuss the logistics of situational telecommuting with her supervisors (e.g., whether they wanted her to call in, leave a message, send an email, etc.) and that she would not be allowed to telecommute on a regular basis. (Tr. 1162-64, 1192- 96; RX-25).

## J.   Lori McBride, Respondent's Human Resources Senior Manager

Lori McBride has been a Human Resources Senior Manager for the F-35 Program since January 2012. (Tr. 1229). She also chairs the Fort Worth Disciplinary Review Committee ("DRC"), which reviews all instances of disciplinary actions that could result in suspension or termination for a non-represented employee in Respondent's Fort Worth facility. (Tr. 1230-31).

In assessing what level of discipline to issue to an employee accused of misconduct, the DRC reviews the discipline that was issued in prior instances of similar misconduct. The DRC's goal is to ensure that discipline is consistently administered to employees who engage in similar misconduct. (Tr. 1232-33).

Respondent maintains and enforces rules and policies of confidentiality that employees must comply with. (Tr. 1233; RX-61-64, 83). Certain information that is particularly sensitive is marked as Lockheed Martin Proprietary Information ("LMPI"). (Tr. 1234). Employees are not allowed to distribute LMPI to any person or entity not bound by a non-disclosure agreement. (Tr. 1234, 1239).

The DRC terminates the employment of employees who intentionally distribute LMPI in violation of Respondent's policies, notwithstanding the employee's rationale for doing so. (Tr. 1240-41).

If Respondent had known during Complainant's employment that she had sent LMPI to her personal email address and taken confidential and LMPI documents before she went on medical leave, the DRC would have terminated Complainant's employment, consistent with its prior precedent. (Tr. 1244-45).

K.   **Dr. Gordon McWatt, Complainant's Treating Physician**[2]

Dr. Gordon McWatt is a Doctor of Osteopathic Medicine. (RX-87, p.5). He has been Complainant's treating physician with respect to her chronic pain disease and depression since 2008. There is no cure for Complainant's RSD; only management of the symptoms. Management of symptoms includes taking narcotic pain medication, striking a careful balance between walking and resting, avoidance of stress and weather extremes, and avoidance of situations that could result in a fall. (RX-87, pp.14-15, 20-21). Complainant's RSD caused her depression, which waxes and wanes with the severity of her chronic pain. Dr. McWatt is unaware of any other causes of Complainant's depression. As of July 17, 2013 (the date of Dr. McWatt's deposition), her symptoms of depression are no more severe than they were when Dr. McWatt first began treating her in 2008. (RX-87, pp.8-13).

The symptoms of Complainant's chronic pain disease are either the same as they were in 2008 when Dr. McWatt began first treating her or "slightly" worse. (RX-87, p.17).

Dr. McWatt believes Complainant could continue working as an auditor at Respondent if she were allowed to telecommute when she had a flare-up in her symptoms, if she were able to take first-class international flights, and if she were allowed to elevate her leg during work. (RX-87, pp.17-20, 22-24, 84-85). Dr. McWatt believes it would be medically necessary for Complainant to telecommute only when there was inclement weather or on days when her symptoms were particularly severe. (RX-87, pp.23-24).

With respect to telecommuting on a set number of days per week, Dr. McWatt's believes Complainant should have been allowed to telecommute on the days that she felt particularly bad, but that, if she felt fine every day in a given week, there would be no need to telecommute. (RX-87, pp.38-45, 49-50, 84-85).

Dr. McWatt and Complainant discussed the possibility of her using a medical scooter at work, but Complainant was not interested in doing so because she did not want to become dependent on the scooter. (RX-87, pp.50-51). They also discussed Complainant using a closer parking space at work, but Complainant told Dr. McWatt that she did not believe it would help. (RX-87, pp.51-52).

Dr. McWatt believes that Complainant reached maximum medical improvement August 18, 2008 and her condition has not materially changed since that date. (RX-87, p.31).

Dr. McWatt noticed that Complainant's chronic pain symptoms became more severe beginning in June 2011 and continuing through the date she retired. Within three months after her retirement, however, her symptoms were no longer that severe. (RX-87, pp.35-38).

---

[2] Dr. McWatt testified via deposition. His deposition has been admitted into the record as RX-87.

## IV. FINDINGS OF FACT[3]

1.      Complainant has a neurological disease called Response Sympathetic Dystrophy ("RSD") that began following an accident she had in 2002. Symptoms of Complainant's RSD include decreased mobility and chronic pain. (Tr. 90-92).

2.      Complainant has been a Certified Public Accountant since the late 1980s. (Tr. 90).

3.      The IC&A Department at LM Aero performs risk-based reviews of LM Aero's internal control systems and operational environment. The objective of its reviews is to evaluate compliance with external regulations, internal policies, and management objectives. The purpose of these audits and reviews is to ensure regulatory compliance and that the rates proposed to or passed on to the United States Government are reasonable and in compliance with the applicable regulatory requirements. (CX 37).

4.      In 2011 and 2012, Complainant worked at LM Aero's Fort Worth headquarters as a Senior Staff Auditor in the IC&A Department's Subcontract Audit Group. She had held that position for many years. The Subcontract Audit Group evaluates proposals from Lockheed Martin Corporation ("LM") subcontractors, other LM divisions, and joint ventures, looking specifically at cost and pricing data to recommend acceptable rates to LM Aero's Material Management Negotiators (who are responsible for negotiating with the subcontractors for more favorable contracts). (Tr. 99, 105-07, 113-14, 333, 345-47, 677-78; CX 37).

5.      Within the IC&A Department, Senior Staff Auditors are responsible for, among other things, performing audits as well as leading assignments, reviewing the work of less senior staff, coaching (plus training and mentoring) new staff members, and providing technical leadership on difficult assignments. (Tr. 105, 333, 853; CX 37). Complainant served as Senior Staff and a technical lead auditor. (Tr. 686, 852; CX 37).

6.      In 2007, Complainant notified Lockheed Martin that she had discovered fraudulent activity by one of the company's subcontractors. She worked with Lockheed Martin's Ethics and Legal Departments, audited the subcontractor, and disallowed subcontractor's fraudulent billings. Complainant was not disciplined for taking these actions but instead was honored and nominated for the 2008 Chairman's Award. (Tr. 114-17, 347-350; CX 80).

7.      Complainant's supervisor at LM Aero for years had been Harry Davis. For many years, Davis allowed Complainant to telecommute from home two days per week and "situationally," or whenever she had a particularly bad flare-up. Other employees in the IC&A Department also regularly telecommuted. (Tr. 386-87, 872-74).

---

[3] I have reviewed the proposed findings of fact submitted by Complainant and Respondent. In general, the proposed findings submitted by Respondent accurately reflected the record evidence and in large part have been adopted by the Court.

8.      Davis retired mid-year 2011, and Complainant thereafter began reporting to Carmen Ferguson, Director – Process Integrator, who in turn reported to the Director of IC&A Kay Cosper. (Tr. 121, 335, 339, 359-60, 676-81, 847-50).

9.      Ferguson's management style was more demanding and hands-on than Davis's style. In addition, Ferguson had higher performance expectations of her subordinates than Davis. Complainant did not adapt well to that management style, and often took offense to what she saw as Ferguson challenging her technical expertise. These problems began almost immediately after Ferguson became Complainant supervisor. (Tr. 681-682, 719-20, 847-50.)

10.     Complainant demonstrated poor communication habits toward Ferguson in 2011. Those negative communication habits became more pronounced in 2012. For example, Complainant often refused to respond verbally to Ferguson during conversations, and instead would turn away or ignore Ferguson. (Tr. 714-18, 854-57).

11.     Ferguson went on a business trip to Israel with Complainant in September 2011 so that she could shadow Complainant on an audit. As a result of what she observed on that trip, Ferguson was concerned that the auditors in the subcontractor group did not have the skills that she initially thought they had. She therefore began to review prior audits from the group to determine whether her concerns were well-founded. (Tr. 864-65, 881-85; RX 76, 77, 79, 80).

12.     In mid-2011, shortly before Davis retired, Complainant was assigned a subcontract rate review audit of C-130J proposals from TATA LM Aerostructures Limited ("TLMAL"), a joint venture between Lockheed Martin and TATA Advanced Systems Limited, an India-based business group, in which Lockheed Martin holds a 26% interest. (Tr. 118-32, 339, 690-91, 858-59; CX 37).

13.     A rate review audit consists of evaluating the cost and pricing data of a proposal to determine if the proposed costs are supported and reasonable. (CX 37).

14.     In the summer of 2011, Complainant went with a team to India to work on the TLMAL audit. Because the joint venture was so new (*i.e.*, a start-up company), the data Complainant needed to conduct the audit was not available, and she therefore was unable to complete the audit at that time. (Tr. 118-32).

15.     Ferguson delivered Complainant's 2011 performance assessment and development review ("PADR") to her on or about December 14, 2012. Complainant was upset about her overall rating on the PADR of "Successful Contributor" because in previous years she had received higher ratings. (Tr. 289-95; RX 7).

16.     On December 20, 2011, Ferguson offered to allow Complainant to assign the TLMAL audit to someone else in the group with Complainant remaining as the lead for reviewing the final product. She did so because she knew that Complainant also had a number of open assignments from other auditors in the group that she needed to review. (Tr. 885-86).

17.     After assuming responsibility for the IC&A Department, Cosper began evaluating the department and determining how to improve its productivity, as there was a backlog of audits that needed to be performed, as well as improve its value to LM Aero. Among other things, she discovered that the team members telecommuted quite frequently, with each member acting independently in conducting his or her assigned audits. (Tr. 699-708, 722-25).

18.     LM Aero's telecommuting policy gives managers discretion to approve telecommuting requests "when it is of clear benefit to both the company and the employee" and allows managers to cancel or modify a telecommuting arrangement at any time. Per the LM Aero policy, Cosper decided to temporarily suspend her team's prior option to telecommute for the first quarter of 2012, although telecommuting would be allowed in special circumstances. (Tr. 699-708, 874-75; RX 85).

19.     Cosper made this change for a variety of reasons. First, Cosper believed in-person communication would help her and the team build strong relationships with each other. Second, Cosper wanted her team in the office so that they could all have input (much of which would be provided through impromptu meetings) into the development of standardized work flow processes, audit procedures, and new tools that all auditors would use. *Id.* Third, Cosper believed that having her team in the office would help increase their productivity since they would be focused on the task at hand and have Cosper, Ferguson, and the team leads (including Complainant) available for assistance. *Id.* Fourth, Cosper and Ferguson would be better able to evaluate each auditor's strengths and weaknesses as they would be directly observing them. *Id.* Finally, Cosper wanted her team present to participate in peer reviews and training programs to become familiar with the new roles and responsibilities that were being implemented during the first quarter. (Tr. 699-708; RX 6).

20.     Neither Cosper nor Ferguson were aware at the time that they suspended telecommuting that Complainant had any legal or ethical concerns regarding the TLMAL audit. (Tr. 708, 874-75. Indeed, at the time that Cosper made that decision, Complainant acknowledges that she had not engaged in any SOX-protected activity such as filing any legal or ethics complaints about the audit. (Tr. 390).

21.     On December 13, 2011, Complainant attended a meeting of IC&A employees where Cosper announced the telecommuting suspension. At that time at least five employees in IC&A had been telecommuting on a regular basis. Complainant does not believe that Cosper made the decision to suspend telecommuting to single out or discriminate against her. (Tr. 133, 389; RX 6).

22.     Another IC&A employee, Jenny Garberson, regularly telecommuted before Cosper's decision to suspend telecommuting. Like Complainant, Garberson had impaired mobility due to her medical condition. Garberson requested an exemption from the telecommuting suspension, which Cosper denied. Garberson had not made any ethical or legal complaints at the time Cosper made that decision. Cosper offered Garberson medical parking at the front of the building and a medical scooter. (Tr. 759-765).

23.     Cosper authorized that these same alternatives be made available to Complainant, but she declined to accept them. (Tr. 766-67, 779). I find Complainant's testimony that she was not offered these alternative accommodations to be knowingly false.

24.     Jo Alexander, LM Aero's Senior Equal Opportunity Representative, worked in Lockheed Martin's Equal Opportunity Programs ("EOP") office, and is a subject matter expert in EEO compliance and work accommodations. She also chairs LM Aero's workforce placement team, which works with employees who have temporary medical restrictions on their ability to perform the essential functions of their jobs to determine whether there are accommodations that would allow the employees to remain in the workforce. (Tr. 1132-36; CX 24).

25.     On January 9, 2012, Complainant sent an email to Human Resources about her concern that Jenny Garberson, was being forced to retire. Alexander called Complainant later that day to discuss those concerns. During that call, Complainant told Alexander that she was unhappy that her own request to continue telecommuting had been denied. Alexander explained to Complainant the formal process of requesting an accommodation from the company, and sent her the appropriate forms after the call ended. (Tr. 1147-53; RX 9, 40).

26.     On January 11, 2012, Complainant received an email in which George Bailey asked the IC&A group to complete the TLMAL audit by January 20, 2012. After Complainant expressed concern that that deadline was not realistic, Ferguson asked that she provide a schedule of how long it would take to complete the audit. (Tr. 158-54; CX 6; 48).

27.     At 4:28 p.m. on January 16, 2012, Complainant sent an e-mail to Ferguson regarding the TATA/TLMAL joint venture, raising concerns that the joint venture created an organizational conflict of interest and stating that the indicators of organizational conflict needed to be reviewed and approved by the Legal Department and possibly the Ethics Department. She then forwarded that email to the Ethics Department. (Tr. 156-57; RX 10). This was the first time that Ferguson or Cosper learned that Complainant had any concerns about the TLMAL audit. (Tr. 729-30, 889-93).

28.     Complainant testified that she believed that the TLMAL joint venture potentially presented a conflict of interest that would violate Federal Acquisition Regulation ("FAR") 9.5. She was not sure whether such a conflict existed and this is why she was asking the Ethics and Legal Departments to get involved. This was the first time that Complainant contends she engaged in SOX-protected activity. (Tr. 390-92, 421, 433).

29.     Patrick McGeehin testified that, if a DCAA auditor was performing an audit and the subject company did not provide requested cost and pricing information, the auditor's first approach would be to aggressively follow-up with the company to obtain that information. The auditor should be in touch with the contractor or subcontractor "continuously and often" to obtain the information that the auditor needs. If the company continued to refuse to provide the requested information, the auditor would document that refusal in his or her report by noting the ways in which the contractor's or subcontractor's records were inadequate. If the DCAA auditor believed that he or she did not have sufficient data from the contractor or subcontractor, the

auditor would either set aside the costs as questioned or designate them as "Lacking Documentation" in the report. (Tr. 664-65).

30.     It is common for the DCAA to audit a subcontractor where there is a joint venture between the subcontractor and the prime contractor. Such an arrangement does not violate the applicable rules. Nor is it a violation of the applicable rules for a prime contractor to second or assign one of its employees to the joint venture. To the contrary, the DCAA frequently encounters such "secondments" and assignments. The DCAA's audit function is an advisory one; it does not make the decision whether to enter into a contract and, if so, on what terms. It simply provides the contracting parties with information from which to make that determination. (Tr. 665-66, 671-73).

31.     If a DCAA auditor suspects fraud in connection with an audit, or if the auditor believes that he or she is being pressured to fraudulently approve pricing that is unsupported by the data, the DCAM requires the auditor to complete and submit a form to his or her superiors describing the suspected fraud or improper pressure. The DCAA auditor would then be expected to continue with the audit. The DCAA auditor would not simply refuse to conduct the audit. (Tr. 679-71).

32.     Jeff Skrocki, Sr. Manager of Ethics and Business Conduct at LM Aero, was responsible for addressing Complainant's complaints. Among other things, Skrocki forwarded Complainant's complaints to LM Aero's Legal Department for review and response. (Tr. 1013-14, 1014-20; RX 10, 11).

33.     LM Aero's Legal Department reviewed Complainant's complaint, the TATA/TLMAL subcontract proposal, LM Aero's conflict-of-interest guidelines, and the professional internal auditing standards of the Institute of Internal Auditors and provided a response to Ferguson on January 18, 2012. The legal response, concluded that there was no evidence to suggest that an auditor in the IC&A Department could not perform an independent, objective, and unbiased review of the proposal that was consistent with applicable auditing standards. Specifically, the legal response noted that the IC&A Department frequently performed audits on partially-owned or wholly-owned LM Aero interests, and as such, there was no problem with IC&A performing the rate review at issue. The legal response further found no organizational conflict of interest in the joint venture. The legal response explained that the IC&A Department could proceed with the rate review audit as long as there were adequate safeguards in place to ensure the internal auditor's objectivity. (RX 14; CX 49).

34.     On January 18, 2012, Ferguson notified Complainant of the legal response and instructed her to proceed with the audit. (Tr. 163, 900-04; RX 14).

35.     Complainant found the legal review to be inadequate. Ferguson told Complainant that she should document her concerns and continue with the audit while those concerns were being vetted. (Tr. 164-74, 900-04; RX 14).

36.     On January 16, 2012, Complainant sent another email to the Ethics Department in which she contended that she felt harassed and threatened. An HR Human Resources Business

Partner met with Complainant on January 25, 2012 and subsequently prepared a summary of that meeting. Complainant was reminded that she needed to fill out the forms Alexander had given her if she wanted to request an accommodation. (Tr. 422, 1155-66; RX 11;12;40).

37.    On January 30, 2012, Complainant submitted the accommodation request forms that Alexander had given her on January 9, 2012. On those forms, Complainant requested that she be allowed regular telecommuting, situational telecommuting, and an ergonomic evaluation of her work area. (Tr. 139-45, 522-26, 1160-61; RX 13).

38.    On February 6, 2012, Ferguson emailed Complainant to ask about her plan on conducting the audit. Complainant responded that the audit had been assigned to another auditor in her group (Jon Kulpaca) she was assisting, and said that she had additional concerns that she wanted addressed. Ferguson asked Complainant to take the assignment back over and responded that "If you have additional issues related to TATA, please forward them to me in an email. I will send them to Legal for their disposition. Until Legal tells us that we cannot perform this review, we will continue forward to support the team and provide them with weekly status reports (you should prepare and send these while copying me) on what has been completed and what remains. Please communicate all relevant details that would help them understand why we cannot perform a review to provide an opinion of the adequacy of their proposal. The objective of our involvement is to provide that opinion, I see all other opinions as being out of scope for our activity. If there are other issues that you have on this, let's get them to legal so that they can research them and take appropriate action if necessary. If you have any other concerns, please let me know as soon as you know them so we can determine if they will alter our objectives/path." (Tr. 168-72, 183-85; RX 14).

39.    On February 8, 2012, Complainant sent a second set of concerns about the TLMAL audit to the LM Aero Ethics Department. (RX 16).

40.    On February 22, 2012, Complainant sent an email to the TATA/TLMAL buyer stating that IC&A was "unable to continue until legal clarification and data is provided." Ferguson also understood Complainant to advise her that TATA refused to provide information to perform the rate review. But after communicating further with the buyer, Ferguson concluded that Complainant had misrepresented TATA's position because TATA did not refuse to provide the information for the audit. Rather, TATA stated that IC&A would need to travel to India to obtain the information on-site. (Tr. 908-14; RX 20).

41.    On February 21, 2012, Complainant emailed the cost analyst Anthony Kim (who was then present at TATA in India) and asked him to obtain certain data in connection with the TLMAL audit. (Tr. 224-26, 352-53; CX 60).

42.    Ferguson emailed Complainant on February 24, 2012 and said that she believed that Complainant had mislead her about the availability of the information, and that it was in fact available in India. Ferguson once again told Complainant that, although she was free to continue to raise additional legal and ethical concerns about the TLMAL audit, she needed to continue to work on it while those issues were vetted. (Tr. 200-02, 908-14; RX 20). That afternoon, Complainant emailed Ferguson additional concerns that she had about the TLMAL audit.

Ferguson had no problem with Complainant raising these concerns but expected her to continue to be diligent in obtaining the necessary data. (Tr. 913-17; RX 21).

43.     On March 8, 2012, the Lockheed Martin buyer on the TLMAL joint venture, Wheaton Cave, emailed Complainant and asked for a status update regarding the TLMAL Audit. Complainant acknowledged that she had not obtained any of the data that she needed to complete the audit. (Tr. 150, 226-30; CX 61).

44.     Alexander contacted Complainant on February 21, 2012 to schedule a time to discuss her accommodation request. They spoke on February 22, and Complainant sent Alexander an email after the call with additional complaints. (Tr. 1165-72; RX 18.)

45.     Complainant met with Alexander on February 23, 2012 to further discuss her complaints and request for accommodation. Alexander offered Complainant medical parking and a medical scooter, but she rejected both offers and insisted on regular telecommuting. Complainant denies that she was offered these alternative accommodations before she went out on her medical leave, but I find this testimony to be knowingly false. (Tr. 218-22, 287, 1173-77; RX 19).

46.     On February 24, 2012, Alexander spoke with Ferguson and Cosper about Complainant's request to receive an exemption from the decision to suspend regular telecommuting in the IC&A Department. They explained to Alexander that Complainant was not being allowed to telecommute because she was a lead and it was important to have her in the office on a regular basis to train the more junior members of the team. Ferguson and Cosper also explained to Alexander that Complainant's behavior and communication style were disruptive bordering on insubordination. They told Alexander that another reason why Complainant should not be allowed to telecommute was because it would be easier to repair the communication breakdown between her and Ferguson if she came into the office every day. (Tr. 751-69, 780, 894-95, 919-27, 1179-84; RX 22).

47.     Cosper believed Complainant should have access to medical parking and a medical scooter if she wanted it, and that she should be able to telecommute in cases of inclement weather. Alexander told Cosper and Ferguson that Complainant was not interested in medical parking or a medical scooter. (Tr. 766-67, 779, 1201).

48.     I find that Cosper's decision to not allow Complainant to telecommute was not motivated by the fact that Complainant had raised legal and ethical concerns about the TLMAL audit. Cosper would have taken the same actions with respect to Complainant even if she had never raised any legal or ethical concerns about the TLMAL audit. (Tr. 806-07).

49.     Alexander engaged Jessica Waller from LM Aero's Environmental Safety and Health organization ("ESH") to conduct an ergonomic assessment of Complainant's workspace. That assessment took place on February 27, 2012, and Complainant's workspace was adjusted as a result. (Tr. 214-16, 535-56, 1185-88; RX 23, 40).

50.     Alexander met with Bob Siglin from Health and Wellness to discuss Complainant's request to fly first class on international flights. She then explained the process for requesting first-class flights to Complainant. (Tr. 1188-89; RX 40).

51.     Alexander also conducted interviews with Complainant's co-workers, managers, and HR Business Partners between February 28 and March 14 to investigate Complainant's allegations regarding Garberson and other employees. Alexander ultimately found that these complaints were unfounded. (Tr. 1189-91; RX 40).

52.     Alexander met with Complainant on March 20, 2012 and told her that she needed to discuss the logistics of situational telecommuting with her supervisors (e.g., whether they wanted her to call in, leave a message, send an email, etc.) and that she would not be allowed to telecommute on a regular basis. (Tr. 1162-64, 1192- 96; RX 25, 40).

53.     Needham met with Ferguson in March 2012, and Ferguson related that she and Cosper were experiencing difficulties with getting Complainant to produce a work product in relation to the TLMAL audit. In particular, Ferguson explained that, although the legal and ethical concerns that Complainant raised had been or were being resolved, she refused to move forward with the audit. Ferguson also discussed her communication problems with Complainant. Needham subsequently met with Ferguson and Complainant to work toward improving communications between Ferguson and Complainant. (Tr. 1077-90).

54.     During her interactions with Ferguson and Complainant, Needham observed that their communication was very strained, sometimes to the point of being antagonistic. For example, Complainant avoided directing comments to Ferguson, ignored Ferguson, or intentionally turned her back on Ferguson during a meeting. Needham advised both Ferguson and Complainant to engage in more verbal conversations as opposed to purely e-mail communications. Complainant indicated that she preferred to communicate by e-mail only to ensure that she had "documentation regarding her leadership's instruction." (Tr. 1081-90).

55.     Because Complainant had raised additional legal concerns related to the audit, Skrocki arranged a meeting with Complainant, Ferguson, and representatives from LM Aero's Ethics, Legal, and Human Resources Departments to discuss and resolve any of Complainant's outstanding concerns. That meeting took place on March 23, 2012. During this meeting, Complainant reiterated her concern that IC&A could not perform an independent and objective rate review and that the joint venture presented an organizational conflict of interest and further explained her additional legal concerns. She primarily addressed her comments to Hasty rather than Ferguson during that meeting. Complainant ignored Ferguson during the meeting and acted as if she was not in the room. (Tr. 231-39, 483-86, 933-40, 1028-34, 1099-1108; RX 24, 26).

56.     Following the meeting, Legal was to further research the concerns and get back to Complainant and the group. During the meeting, Complainant was advised that any concerns that she had should be noted in her report but that her concerns did not preclude her from performing the rate review. The group decided that Complainant would compile a "findings" report that would set out the issues she saw with the current documentation by the following week. (Tr. 231-39, 312-15).

57.     On March 28, 2012, Ferguson asked Complainant about the status of the findings report. Rather than reply as to the status of the findings report Complainant took issues as to when it was due. I found this reply to have been childish and disrespectful. Ferguson instructed Complainant to reprioritize her workload to have the report complete and submitted by the following Wednesday. Ferguson told Complainant "If you feel there are more issues to identify, you may title your report preliminary." (RX 28).

58.     On March 29, 2012, Cosper held an all-hands meeting for the IC&A Department in which she outlined parameters by which employees could request telecommuting during the second quarter of 2012. Among other things, non-lead employees without performance issues would be allowed to telecommute. Lead employees like Complainant, however, would not be allowed to telecommute so that they could supervise, direct, and train the other auditors and additional planned new hires. Complainant was not the only lead employee in the IC&A Department, and all lead employees in that department were equally impacted by the decision. (Tr. 551, 788-91; RX 38).

59.     On April 2, 2012, Complainant sent Ferguson an email raising concerns that LM Aero's Accounting Department had previously attempted to limit the scope of her review. Ferguson responded, stating that the Finance Department had become concerned with the TATA review because they mistakenly believed IC&A was attempting to perform a full-blown audit of the joint venture, rather than simply a rate review of the C-130 proposals. Ferguson explained that, once the misunderstanding had been clarified, the Accounting/Finance Department had no involvement in the rate review, and Complainant was instructed to proceed with the audit. (RX 31).

60.     On April 11, 2012, Complainant sent an email to Starr Willis, LM Aero's Director of Ethics and Business Conduct, stating that her ethics concerns had not been addressed. After conferring with Skrocki regarding his actions to date regarding Complainant's concerns, Willis responded to Complainant, explaining that she had reviewed the investigations related to her concerns and had concluded that they had been fully addressed. Complainant then forwarded her email exchange with Willis to Leo Mackay, LM Aero's corporate Vice President of Ethics and Business Conduct, who likewise ultimately concluded that the concerns had been thoroughly addressed. (Tr. 1048-56; RX 34, 35).

61.     Although Jo Alexander had instructed Complainant to discuss the logistics of situational telecommuting, Complainant never reached out to Cosper to do so. Accordingly, Cosper set up a meeting on the topic between Complainant, Ferguson, and Needham for April 12, 2012. (Tr. 794-99).

62.     On April 12, 2012, Complainant met with Ferguson and Needham to discuss the ongoing communication problems and the logistics of situational telecommuting. One of the issues raised during that meeting was that, if Complainant wanted to telecommute on a regular basis in the future, and assuming that she improved her communication issues, she could assume a non-lead rule. Complainant denies that she was offered this accommodation before she went out on her medical leave, but I find her denial is not credible. Ferguson also told Complainant

that she was free to telecommute on inclement weather days. (Tr. 270-73, 548-50, 948-63, 1112, 1120; RX 41).

63.     The topic of regular telecommuting was only briefly discussed at that meeting because the decision to not allow an exception for Complainant from the telecommuting suspension had already been communicated to her. During that meeting, Needham and Ferguson discussed alternative accommodations with Complainant, but she was unwilling to consider any accommodation other than regular telecommuting. Based on the testimony of Ferguson and Needham, I find Ferguson did not act threatening or inappropriate during that meeting and that Complainant's communication style with respect to Ferguson had not improved from the first time Needham had observed their interactions. (Tr. 1113-19).

64.     On April 13, 2012, Complainant provided documentation that she needed to be on medical leave until April 29, 2012. She subsequently requested and obtained approval for several extensions of her leave, eventually taking six months of paid short-term disability leave. (Tr. 103, 281;RX 53-58).

65.     While Complainant was on leave, LM Aero's short-term disability provider, CIGNA, offered her the same alternative accommodations that LM Aero had previously offered her, but she chose to reject those alternative accommodations once again and retire instead of accepting them and returning to work. (Tr. 287-88, 574-79; RX 59, 87 at 50-53). I find her retirement was not under such circumstances that a reasonable person in her situation would have felt compelled to resign.

66.     Complainant's voluntarily retirement became effective December 1, 2012. Her medical leave and eligibility for six-months of short-term disability paid leave expired approximately two weeks before she turned 65 and became eligible to draw her full pension retirement benefits each month. (Tr. 1104, 589; CX 69).

67.     Lockheed Martin and LM Aero maintain and enforce rules of confidentiality with which its employees must comply. Certain information that is particularly sensitive is marked as Lockheed Martin Proprietary Information ("LMPI"). Employees are not allowed to distribute LMPI to any person or entity who is not bound by a non-disclosure agreement. Complainant received training on Lockheed Martin's and LM Aero's rules regarding LMPI, and signed a confidentiality agreement with Lockheed Martin's predecessor, General Dynamics.

68.     Notwithstanding those facts, during her employment Complainant blind copied her personal email address on emails with attachments that contained LMPI documents. She also emailed herself documents that contained LMPI. She did so because she wanted to use those documents for her lawsuit.

69.     If LM Aero had known during Complainant's employment that she had sent LMPI to her personal email address, given a LM Aero legal opinion to her lawyer, and taken confidential and LMPI documents before she went on medical leave, the DRC would have terminated Complainant's employment, consistent with its prior precedent. (Tr. 1244-45).

70.    After Complainant went on medical leave, Ferguson, Kulpaca, and Lynn Tennison went to India, obtained the available data without any difficulty, and completed the TLMAL audit in three weeks. That audit disallowed $99 million of the $167 million proposed costs. No one within LM Aero objected to that result, nor did Ferguson or the other auditors receive any pressure to allow more costs. Approximately one year later, TLMAL provided additional information that resulted in a second audit. (Tr. 976-80).

71.    On September 19, 2012, Complainant filed a SOX complaint with OSHA.

## IV. DISCUSSION

### A.    Credibility

I have considered and evaluated the rationality and internal consistencies of the testimony of the witnesses, including the manner in which the testimony supports or detracts from the other record evidence. In so doing, I have taken into account all relevant, probative and available evidence, while analyzing and assessing its cumulative impact on the record. *See Indiana Metal Products v. National Labor Relations Board*, 442 F.2d. 46, 52 (7th Cir. 1971). An administrative law judge is not bound to believe or disbelieve the entirety of a witness's testimony but may choose to believe only certain portions of the testimony. *Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941 (5th Cir. 1991).

Moreover, in arriving at a decision, it is well-settled that the finder of fact is entitled to determine the credibility of witnesses, weigh the evidence, and draw his own inferences therefrom. *Duhagon v. Metropolitan Stevedore Company*, 31 BRBS 98, 101 (1997); *Avondale Shipyards, Inc. v. Kennel*, 914 F.2d 88, 91 (5th Cir. 1988); *Atlantic Marine, Inc. and Hartford Accident & Indemnity Co. v. Bruce*, 551 F.2d 898, 900 (5th Cir. 1981); *Banks v. Chicago Grain Trimmers Association, Inc.*, 390 U.S. 459, 467, *reh'g denied*, 391 U.S. 929 (1968).

Respondent pointed out several statements in Complainant's testimony to support a finding that she was not a credible witness. She testified at length about a report that Ferguson expected from her and a disagreement as to the deadline for that report. (Tr. 238-45, 265-75, 566-72; RX-29). She testified that she provided the report around six in the morning on Thursday. (Tr. 239). Evidence shows that she, instead, sent the report that night. While, at first glance, not a glaring misstatement, Complainant reinforced her testimony by claiming that she worked late Wednesday night and woke up early Thursday to send the report. Confronted with the time-stamped email, Complainant then claimed that she sent two reports and, later, withdrew her testimony, stating that she simply could not remember accurately. (Tr. 313-16).

Complainant further fabricated another event, that she observed Cosper laughing at Garberson and telling Garberson, "I pushed you out the door." (Tr. 137-38). She specifically remembered the date of the event as her anniversary, January 5, 2012. (Tr. 491-92). On cross, Complainant was informed that Cosper was not at work that day or any other day during Garberson's last week of employment. She then testified that she was not "confident" the event occurred on January 5 but, instead, was "around the time that Jenny left." (Tr. 513-14).

Complainant denies ever being offered any kind of accommodation. (Tr. 287, 541-45, 571-81). However, her doctor noted that he and Complainant actually discussed the closer parking space that had been offered to her. (RX-87, pp.50-51). This offer was made by Alexander in the course of discussion of other accommodations like the scooter, situational telecommuting, and first class air travel. (RX-19, 25). Other witnesses verified that Claimant was offered a closer parking space, a scooter, and situational telecommuting.

I find, also, that Complainant's belief that Respondent would send a hit man to her home borders on the irrational, and it appears Complainant made this statement simply for shock value. (Tr. 614-15). She also testified to an exchange she alleged occurred during the meeting between her, Ferguson, and Needham on April 12, 2012. Complainant attempted to give effect to Ferguson's bright red outfit and testified that Ferguson immediately accosted her when she entered the room, saying "Who do you think I am?" (Tr. 271). The testimony of both Ferguson and Needham contradicted Complainant's version of events.

I find this case is more about Complainant's dissatisfaction with Ferguson and Cosper's management style—especially with the decision made to eliminate telecommuting. Complainant's testimony coupled with the testimony of the other witnesses, including her own treating physician, and the documentary evidence places her credibility into question. I found the testimony of Ferguson, Cosper, Skrocki, Alexander and Needham to be consistent and credible. In contrast, I found Complainant to be evasive and less than forthcoming in her testimony. In short, I did not believe Complainant.

Accordingly, I rely more on the objective records and testimony of the remaining witnesses and give very little weight to Complainant's testimony.

**B.     Timeliness**

The Act requires an employee to file a complaint within 180 days after the employee becomes aware of the SOX violation. 29 C.F.R. § 1980.103(d). The ARB has held that this limitations period is not jurisdictional and is subject to equitable modification. *Moldauer v. Canadaigua Wine Co.*, ARB No. 022, p.5 (ARB Dec. 30, 2005).

Complainant filed her SOX complaint on September 19, 2012. Thus, she must identify adverse actions occurring between March 23, 2012 and September 19, 2012. Complainant alleges that she was harassed by Ferguson regarding the report on her TLMAL concerns on March 28, 2012 and continuing through December 1, 2012, the date Complainant alleges she was constructively discharged. Furthermore, she claims that Respondent refused to consider her request to telecommute one day per week or failed to communicate its denial of her request until April 12, 2012 in her meeting with Ferguson and Needham.

Accordingly, I find that Complainant SOX claim is timely.

**C.     Burden of Proof**

Section 806 of SOX, codified at 18 U.S.C. § 1514A, creates a private cause of action for employees of publicly-traded companies who are retaliated against for engaging in certain protected activity. Section 1514A(a) states, in relevant part:

(a) No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A(a); *see also Hendrix v. American Airlines, Inc.*, 2004-AIR-00010, 2004-SOX-00023 (ALJ Dec. 9, 2004) (unpublished).

The information or assistance must be provided to, or the investigation must be conducted by, a federal regulatory or law enforcement agency, any member of Congress, any committee of Congress, or a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct.). 18 U.S.C. §1514A(a)(1); see also, 29 C.F.R. §1980.102(a)(1). Any employer may not discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee, in the terms and conditions of employment, because of any lawful act done by the employee under the Act's protection. *Id.*

The legal burdens of proof set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121(b), govern SOX whistleblower actions. 18 U.S.C. § 1514A(b)(2)(C). To prevail, an employee must prove by a preponderance of the evidence that (1) he or she engaged in protected activity; (2) the employer knew that he or she had engaged in the protected activity; (3) he or she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor to the unfavorable action. 49 U.S.C. § 42121(b)(2)(B)(iii); *Hemphill v. Celanesse Corp.,* 430 Fed. Appx. 341,344 (5th Cir.2011); *Allen*

*v. Admin Rev. Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008); *see also* 29 C.F.R. § 1980.104(b)(1)(i)-(iv); *Getman v. Southwest Sec., Inc.*, ARB No. 04-059, ALJ No. 2003-SOX-8, (ARB July 29, 2005). A contributing factor need not be significant, motivating, substantial, or predominant; and can be any factor which alone, or in connection with other factors, tends to affect in any way the outcome of the decision. *Collins v. Beazer Homes U.S.A., Inc.*, 334 F. Supp. 2d 1365 (N.D. Ga. 2004). Ordinarily, temporal proximity between the protected activity and unfavorable personnel action will satisfy the burden of making a *prima facie* showing of employer knowledge and that the protected activity was a contributing factor. *Id.*

If the employee establishes these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(iv); *Brune v. Horizon Air Industries, Inc.*, ARB No. 04-037, ALJ No. 2002-AIR-00008, (ARB January 31, 2006); *Allen*, 514 F.3d at 476.

## D.    Protected Activity

SOX prohibits a publicly-traded company from retaliating against an employee who reports information to a supervisor "regarding any conduct which the employee reasonably believes constitutes a violation" of one of the six enumerated categories. 18 U.S.C. § 1514A(a)(1); *Marshall v. Northrup Gruman Synoptics*, 2005-SOX-00008 (ALJ June 22, 2005). SOX does not apply to generic allegations of accounting violations, violations of GAAP, or general allegations of fraud. *Marshall*, 2005-SOX-00008 at 5 (stating that, "The fact that the concerns involved accounting and finances in some way does not automatically mean or imply that fraud or any other illegal conduct took place.").

The employee's reasonable belief of a violation must be scrutinized under both subjective and objective standards. *Welch v. Cardinal Bankshares Corp.*, ARB Case No. 05-064, 2007 WL 1578493 (ARB May 31, 2007); *see also Melendez v. Exxon Chemicals Americas*, ARB No. 96-051, 93-ERA-00006 (July 14, 2000). The employee does not need to show that the employer's conduct actually caused a violation of the law, but must show that he/she reasonably believed the employer violated one of the laws or regulations enumerated under SOX, any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud against shareholders. *Id.; see also Halloum v. Intel Corp.*, ARB No. 04-068, 2006 WL 3246900 (ARB Jan. 31, 2006). The objective reasonableness of a belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee. *Allen*, 514 F.3d at 477; *see also Welch*, 2007 WL 1578493 at *7. The subjective reasonableness requires that the employee actually believe the conduct being complained of constitutes a violation of pertinent law. *Day v. Staples*, 555 F.3d 42, 54 (1st Cir. 2009); *see also Harp v. Charter Communications, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009).

Protected activity under SOX is thus essentially comprised of three elements: (1) report or action that involves a purported violation of a federal law or SEC rule or regulation relating to fraud against shareholders; (2) complainant's belief concerning the activity must be subjectively and objectively reasonable; and (3) complainant must communicate his concern to either his

employer, the federal government or a member of Congress who has the requisite reviewing ability. *See Harvey v. Safeway, Inc.*, 2004-SOX-00021 at 29 (ALJ Feb. 11, 2005).

It is undisputed that Complainant made verbal and written communications with her superiors and the Legal and Ethics Departments. She identifies these communications as "expressions of concern…about possible government procurement fraud." She also contends that her "conduct" in refusing to continue with the audit constituted a SOX complaint. (Comp.'s Br., pp.9-10; Resp.'s Br., p.13). She believes she was being forced to rubber stamp the audit.

*Subjective Reasonableness*

Complainant has been a Certified Public Accountant since the late 1980s. (Tr. 90). Over her 23 years of employment, Complainant received many awards and accolades as it related to performing her job. (Tr. 87, 90, 107, 310-11; CX-80). In 2007, she notified Respondent that she had discovered fraudulent activity by one of the company's subcontractors. She worked with the Ethics and Legal Departments, audited the subcontractor, and disallowed subcontractor's fraudulent billings. Complainant was not disciplined for taking these actions but, instead, was honored and nominated for the 2008 Chairman's Award. (Tr. 114-17, 347-350; CX-80).

Complainant testified that she believed that the TLMAL joint venture potentially presented a conflict of interest that would violate Federal Acquisition Regulation ("FAR") 9.5. She was not sure whether such a conflict existed, which is why she was asking the Ethics and Legal Departments to get involved. (Tr. 421). When the Legal Department issued its finding that no fraudulent activity or conflict of interest existed, rather than moving forward as she did in the 2007 report, Complainant continued to raise these same issues. (Tr. 172-74, 184-86; CX-8, 52).

Skrocki referred the complaint regarding TLMAL to Respondent's Legal Department. (Tr. 1017-18, 1024). He referred the complaint regarding harassment to Respondent's EOP Department which was leading that investigation. (Tr. 1019-22). The Legal Department reviewed the complaint, the TATA/TLMAL subcontract proposal, the conflict-of-interest guidelines, and the professional internal auditing standards of the Institute of Internal Auditors and provided a response to Ferguson on January 18, 2012. (CX-49). The legal response concluded that there was no evidence to suggest that an auditor in the IC&A Department could not perform an independent, objective, and unbiased review of the proposal that was consistent with applicable auditing standards. (RX-14; CX-49). Specifically, the legal response noted that the IC&A Department frequently performed audits on partially-owned or wholly-owned interests, and, as such, there was no problem with IC&A performing the rate review at issue. The legal response further found no organizational conflict of interest in the joint venture. (CX-49).

Having received this legal opinion, having been informed that if she still had concerns to document those concerns but to continue with the audit, Complainant continued to resist going forward with the audit. This continued resistance indicates to this Court that Complainant may not have been motivated by her belief that fraud was being committed. With her vast experience as an auditor, Complainant should have known of the procedures to be followed as indicated by Patrick McGeehin. But rather than documenting the issue and moving forward with the audit, Complainant appeared to do whatever it took to keep the audit from going forward.

- 29 -

As noted previously, I did not find Complainant to be a credible witness. I find that her report of concerns regarding the joint venture was not motivated by a belief that a conflict of interest existed but as a continuing affront to Ferguson's authority. This was not the first audit on partially-owned or wholly-owned interests and Complainant had not raised these issues before. When Ferguson immediately followed up on Complainant's purported concerns and Legal approved the arrangement, rather than continuing the audit, Complainant persisted with her objections. Complainant was told to document these objections. A week later when Ferguson asked for an update, rather than provide the objections, Complainant argued about when the document was due.

Complainant also testified that Ferguson wanted her to "rubber stamp" the TLMAL audit without supporting data. (Tr. 299). She also testified she believes her managers as well as employees in Respondent's Ethics, Legal, EOP, and Procurement departments were intentionally conspiring to set her up to take the fall for engaging in criminal activity by "rubber stamping" the audit. (Tr. 359-72). However, Complainant never told anyone at Respondent that she believed she was being pressured to "rubber stamp" or approve the audit without sufficient data. (Tr. 359-72). She also admits that no one ever directly told her to approve the audit even though she did not have data, and that her belief as to that fact came from what she believes was indirect pressure. (Tr. 374). In fact, Complainant acknowledged that at one point Ferguson told her to wait on the audit until she got the necessary data. (Tr. 160).

Subjective reasonableness requires that the employee actually believe the conduct being complained of constitutes a violation of pertinent law. Based on my assessment of Complainant's credibility as well as the record evidence, including Complainant's training and experience while employed with Respondent, I do not find that Complainant subjectively believed that she was reporting potential illegal activity. Rather, I find Complainant was motivated by a desire to frustrate Ferguson's efforts to get Complainant to do her job.

*Objective Reasonableness*

I further find that Complainant's beliefs as to the illegality of the action complained of were not objectively reasonable. The objective reasonableness of a complainant's belief must be based on the knowledge available to a reasonable person in the same factual circumstances and with the same training and experience as the complainant. In this case, the objective reasonableness of Complainant's beliefs must be viewed from the standpoint of a CPA with over 20 years of subcontracting auditing experience. *Allen v. Administrative Review Board*, 514 F3d 468 (5th Cir. 2008).

The evidence clearly shows that Ferguson wanted Complainant to complete the audit. But, other than Complainant's testimony, there is nothing to indicate anyone wanted Complainant to just "rubber stamp" the audit. Complainant never reported that she felt pressured to "rubber stamp" the audit and nobody told Complainant to "rubber stamp" the audit. When Complainant raised legal and ethical concerns she had about the audit she was repeatedly told that while the matter was being reviewed by the appropriate departments, she should continue to work on the audit and note therein any concerns that she had. She was further told that if the required data was not furnished she should set aside the costs as questioned or designate them as lacking documentation in the report.

Given that Complainant have many years of experience doing subcontracting audits, I find it objectively unreasonable for her to believe that Respondent wanted her to approve the audit without supporting data. This finding is further supported by the fact that when the audit was eventually completed, $99 million of the $167 million proposed costs were disallowed. The audit was not "rubber stamped" and there is no credible evidence that an auditor with Complainant's experience would have felt pressured to "rubber stamp" the audit.

I further find that Complainant's concerns about potential conflicts of interest in the joint adventure were not objectively reasonable. As McGeehin testified, it is common for the DCAA to audit a subcontractor where there is a joint venture between the subcontractor and the prime contractor. Such an arrangement does not violate the applicable rules. Nor is it a violation of the applicable rules for a prime contractor to second or assign one of its employees to the joint venture. An auditor with Complainant's experience should have been aware that such a relationship was not a violation especially since this was not the first joint venture between LM Aero and a subcontractor.

There is no evidence that Respondent was attempting to hide the relationship or the identity of any personnel working on the joint venture. When Complainant first raised concerns, the concerns were immediately addressed and cleared by the appropriate departments. Complainant was repeatedly told to disclose her concerns in her report. She testified she believes her managers as well as employees in Respondent's Ethics, Legal, EOP, and Procurement departments were intentionally conspiring to set her up to take the fall for engaging in criminal activity. There is no other evidence to support this allegation and I find this testimony to be false. I find that Complainant's alleged beliefs as to the illegality of the joint venture were not objectively reasonable when viewed from the standpoint of a CPA with over 20 years of subcontracting auditing experience.

### E.    Adverse Action

Assuming that Complainant did engage in protected activity, I now turn to the issue whether Respondent took adverse action against her. Complainant alleges the following adverse actions: harassment primarily by Ferguson; refusal to approve her request to telecommute regularly, and; constructive discharge on December 1, 2012.[4]

Section 806 of the Act prohibits covered employers and individuals from retaliating against employees because they provided information or assisted in investigations related to listed categories of fraud or securities violations. The statute provides that an employer may not "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment" because the employee engaged in protected activity. 18 U.S.C. § 1514A(a). The SOX implementing regulations state that a company may not "discharge, demote, suspend, threaten, harass or in any other manner discriminate against any employee with respect to the employee's compensation, terms,

---

[4]   Complainant also alleges that the reassignment of the TLMAL audit from her to Jon Kulpaca constitutes retaliation. However, this action took place beyond the 180-day period preceding the filing of her SOX complaint, specifically, in late January 2012. I also note that the audit was again reassigned from Kulpaca back to Complainant.

conditions, or privileges of employment" for engaging in protected activity. 29 C.F.R. § 1980.102(a). The Administrative Review Board ("ARB") has stated that SOX's language "bespeaks a clear congressional intent to prohibit a very broad spectrum of adverse action against SOX whistleblowers." *Menendez v. Halliburton, Inc.*, ARB Nos. 09-002, -003, ALJ No. 2007-SOX-005, at 15 (ARB Sept. 13, 2011) (citing *Hendrix v. Am. Airlines*, ALJ Nos. 2004-AIR-010, 2004-SOX-023, slip op. at 14, n. 10 (ALJ Dec. 9, 2004)).

The ARB has stated that adverse action "refers to unfavorable employment actions that are more than trivial, either as a single event or in combination with other deliberate employer actions alleged." *Menendez*, ARB Nos. 09-002, -003, at 17 (quoting *Williams*, ARB No. 09-018, slip op. at 12-15). The employer's action must be of such a degree as "would deter a reasonable employee from engaging in protected activity." *Menendez*, ARB Nos. 09-002, -003, at 18; *see also Hirst v. Se. Airlines, Inc.*, ARB Nos. 04-116, -160, ALJ No. 2003-AIR-47 (ARB Jan. 31, 2007).

The ARB has also noted that "terms and conditions of employment" are "not significant limiting words and should be construed broadly within the remedial context of Section 806." *Menendez*, ARB Nos. 09-002, -003 at 18. According to the Board: "Under Section 806, the language 'in the terms and conditions of employment' does not limit Section 806's intended protection to economic or employment-related actions." *Ibid.*

Retaliation, as the statute and regulations make clear, must be *in response* to a whistleblower's protected activity. 29 C.F.R. § 1980.102(a) ("No company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against any employee . . . *because* the employee . . . has engaged in" protected activity.) (emphasis added).

The Board has held that constructive discharge occurs "when an employer unlawfully creates working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Lockheed Martin v. Adm. Review Bd., USDOL*, 717 F.3d 1121, 1133 (10th Cir. 2013) (affirming case below—ARB No. 10-050, ALJ No. 2008-SOX-49 (ARB Feb. 28, 2011)), quoting *Strickland v. United Parcel Svc., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009). A complainant's burden is "substantial." Further, the "standard is objective. The employer's subjective intent and the employee's subjective views on the situation are irrelevant." Whether a constructive discharge occurred is a question of fact. *Id.* In considering whether a constructive discharge occurred, the court considers the totality of the circumstances. *Id.*, citing *Narotzky v. Natrona Cnty. Mem'l Hosp.*, 610 F.3d 558, 565 (10th Cir. 2010).

The Supreme Court set forth a similar standard for establishing a hostile work environment and applied the *Ellerth/Faragher* defenses both to hostile work environment and constructive discharge cases:

> To establish hostile work environment, plaintiffs...must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [their] employment..." Beyond that, we hold, to establish "constructive discharge," the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response. An employer may defend against such a claim by showing both (1) that it had

installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus. This affirmative defense will not be available to the employer, however, if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions.

## Harassment

Complainant alleges that Ferguson and Cosper subjected her to harassment. Testimony reveals that the alleged harassment began before she made any complaints regarding the TLMAL audit. The pre-audit harassment relates to her 2011 performance review and issues regarding a co-worker, Jenny Garberson. (Tr. 393-400, 413-15, 434-37). Complainant also identifies an email from Ferguson dated March 28, 2012, in which Ferguson requested the report on Complainant's TLMAL concerns. She identifies the email as confrontational. A review of that email, however, reveals that Ferguson remembered the report to be due that day, instead of Thursday, and a reasonable request that Complainant reprioritize and complete the report. (CX-17; RX-26). Complainant also points to Ferguson's subsequent email in which she responded to Complainant's report by identifying what Ferguson thought to be communication barriers between her and Complainant. (CX-2, 18). Complainant also testified that Ferguson's clothing, demeanor, and statements to her in the meeting on April 12, 2012 were meant to be harassing and intimidating. (Tr. 270-72, 553-54). I have previously found that Ferguson did not act threatening or inappropriate during that meeting. Complainant furthermore alleges that Ferguson left her a threatening voicemail while on medical leave. (Tr. 285-86, 562-63).

The actions, even if true, do not constitute either severe or pervasive harassment so as to create a hostile work environment. It appears that the relationship between Complainant and Respondent began to deteriorate when the decision to suspend telecommuting was made in December 2011 and when Complainant's supervisor was replaced by Ferguson, who employed, in many respects, a vastly different managing style than her predecessor.

## ADA Accommodations

In December 2011, Respondent suspended telecommuting for the entire IC&A department effective for the first quarter of 2012. On January 30, 2012, Complainant completed an ADA submission, requesting accommodation in the form of being permitted to resume telecommuting "one to two days per week" and during inclement weather as well an ergonomic assessment. (Tr. 142-45; CX-7).

Complainant met with Alexander on February 23, 2012 to further discuss her complaints and request for accommodation. (Tr. 218-22, 1173-77; RX-19). Alexander offered Complainant medical parking and a medical scooter, but she rejected both offers and insisted on regular telecommuting. (Tr. 1173-77; RX-19). Complainant denies that she was offered these alternative accommodations before she went out on her medical leave, but her denial is not credible. (Tr. 219, 287).

Ferguson and Cosper explained to Alexander that Complainant was not being allowed to telecommute because she was a lead and it was important to have her in the office on a regular basis to train the more junior members of the team. (Tr. 751-58, 780, 894-95, 919-26, 1179-84; RX-22). They were also concerned about Complainant's communication style and believed it would be easier to repair the communication breakdown between her and Ferguson if she came into the office every day. (Tr. 768-69).

On March 23, Jo Alexander sent an email to Complainant wherein she stated that Complainant's request for situational telecommuting due to inclement weather was granted and that her request for first class seating on international travel would have to be submitted to the Medical Department for decision. (Tr. 248-51; CX-15). In response to Complainant's request that Alexander address scheduled commuting, Cosper announced in a team meeting that scheduled commuting was not available for team leads. (CX-7, 15; RX- 17, 25, 40). However, Complainant testified that the April 12, 2012 meeting was the first time she knew her request for scheduled telecommuting was denied. (Tr. 272-73).

Respondent attempted to accommodate Complainant with the sole exception of scheduled telecommuting, which was not available to leads. Accordingly, I do not find that Respondent subjected Complainant to adverse actions in this regard.

### Constructive Discharge

Complainant made the decision to retire at the end of her medical leave. She contends this decision was prompted by the harassment and Respondent's refusal to accommodate her telecommuting request. Again, it appears that the relationship between Complainant and Respondent began to deteriorate when the decision to suspend telecommuting was made in December 2011 and when Complainant's supervisor was replaced by Ferguson. I find that Complainant refused to return to work simply because she could not telecommute regularly. Her treating physician opined that Complainant could work with the accommodations Respondent offered: situational telecommuting, first-class flights, and the ability to elevate her leg. (RX-87- 84-85). I find nothing to indicate that there was an abusive working environment that became so intolerable that Complainant's resignation qualified as a fitting response.

Given the facts above, the record evidence, and the credibility of the witnesses, I do not find that Respondent subjected Complainant to adverse employment actions.

**F.     Contributing Factor to Adverse Action**

Assuming that Complainant engaged in protected activity and that she was subjected to adverse actions, she must prove by a preponderance of the evidence that the adverse actions were made in retaliation to the protected activity.

Under the evidentiary framework of a SOX whistleblower cause of action, a complainant must establish that there are circumstances which suggest that the protected activity was a contributing factor to the unfavorable action. 49 U.S.C. § 42121(b)(2)(B)(iii). A contributing factor is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Allen v. Stewart Enterprises, Inc.*, ARB No. 06-081, ALJ Nos. 2004-SOX-00060 to 62 (ARB July 27, 2006). The contributing factor standard was "intended to

overrule existing case law, which requires a whistleblower to prove that her protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *Id.* To prevail, the whistleblower must show this contributing factor by a preponderance of the evidence. *Id.*

Normally the burden of establishing a contributing factor "is satisfied...if the complainant shows that the adverse personnel action took place shortly after the [reported] activity, giving rise to an inference that it was a factor in the adverse action." 29 C.F.R. §1980.104(b)(2); see also, *Kendrick v. Penske Transportation Services, Inc.*, 220 F. 3d 1220, 1234 (10th Cir. 2000). However, temporal proximity alone does not establish retaliatory intent, but may establish the causal connection component of the prima facie case. *Taylor v. Wells Fargo Bank, NA*, ARB No. 05-062, ALJ No. 2004-SOX-00043 (ARB June 28, 2007). The ARB has held that "the probative value of temporal proximity decreases as the time gap lengthens, particularly when other precipitating events have occurred closer to the time of the unfavorable personnel action." *Henrich v. Ecolab, Inc.*, ARB No. 05-030, ALJ No. 2004-SOX-00051 (ARB June 29, 2006), slip op. at 18.

A complainant does not have the burden to establish that a respondent's articulated reason for the adverse action was pretext. *Klopfenstein v. PCC Flow Technologies Holdings, Inc.*, ARB No. 04-149, ALJ No. 2004-SOX-00011 (ARB May 31, 2006). Further, the contributing factor does not have to be the primary motivating factor to establish causation. *Halloum v. Intel Corp.*, ARB No. 04-068, 2003-SOX-00007 (ARB Jan. 31, 2006).

As clarified above, a complainant must show by a preponderance of evidence that the plaintiff's protected activity was a contributing factor in the unfavorable action. If the employee does so, the burden shifts to the employer to show by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of protected behavior. 49 U.S.C. § 42121(b)(2)(B)(iv); *Allen*, 514 F.3d at 476.

The facts reveal that Respondent acted reasonably in the face of an employee upset by the fact that she could no longer telecommute regularly as she had done in the past. Complainant refused to consider or attempt the accommodations Respondent offered her and, instead, demanded the accommodation of choice. She was treated the same as a similarly situated employee, Jenny Garberson, who had not made any complaints. Both Complainant and Garberson were auditors with mobility impairment, both regularly telecommuted until the suspension, both requested an exception to the suspension, and both were denied their requests but offered alternative accommodations. (Tr. 515-19, 759-67, 779; RX-19, 25).

Accordingly, and based on my assessment of the witnesses' credibility and the record evidence, Complainant has not proved by a preponderance of the evidence that her complaints regarding the TLMAL audit contributed to the unfavorable actions she alleged Respondent took against her.

## V. ORDER

Based on the evidence as a whole, the testimony of the witnesses, and the exhibits submitted by the parties, Complainant's SOX claim is hereby **DISMISSED.**

**SO ORDERED.**



Digitally signed by LARRY PRICE
DN: CN=LARRY PRICE,
OU=JUDGE, O=Office of
Administrative Law Judges,
L=Covington, S=LA, C=US
Location: Covington LA

**LARRY W. PRICE**
**Administrative Law Judge**

**TAB 7**

**U.S. Department of Labor**     Office of Administrative Law Judges
5100 Village Walk, Suite 200
Covington, LA 70433



(985) 809-5173
(985) 893-7351 (Fax)

Issue Date: 01 November 2013

CASE NO.:  2013-SOX-00017

IN THE MATTER OF

KELLY KILPATRICK,
        Complainant

        v.

CITIGROUP, INC., and
CITIMORTGAGE, INC.

        Respondents

APPEARANCES:

BRANDON HORNSBY, ESQ.
GRAHAM SCOFIELD, ESQ.
HORNSBY LAW GROUP
        For Complainant

EARL M. JONES, ESQ,
MICHELLE B. BROOKSHIRE, ESQ.
LITTLER MENDELSON
        For Respondent

BEFORE:

CLEMENT J. KENNINGTON
ADMINISTRATIVE LAW JUDGE

**DECISION AND ORDER**

**A. Background**

      This case arises under the Sarbanes-Oxley Act of 2002 ("SOX" or "the Act"), technically known as the Corporate and Criminal Fraud Accountability Act, P.L. 107-204 at 18 *U.S.C.* §1514A *et seq.*, and the employee protective provisions promulgated hereunder at 29 *C.F.R.* Part 1980. Under SOX, the Secretary of Labor is empowered to investigate and determine "whistleblower" complaints filed by employees of publicly traded companies who are allegedly discharged or otherwise discriminated against, with regard to their terms and conditions of employment, for providing information about fraud against company shareholders to supervisors, federal agencies, or members of Congress.

      On November 6, 2012 Complainant filed a complaint with the Secretary alleging that Respondent discharged her in retaliation for providing information to Respondent's auditor and a Securities & Exchange Commission (SEC) investigator during a March 2012 audit. The Secretary investigated and on February 4, 2013 dismissed Complainant's allegations of SOX violations by Respondents finding no evidence of protected activity by contacting the SEC, until after her discharge on July 5, 2012, which Respondent did for "unabated" performance problems.

      Complainant timely appealed the dismissal to the Office of Administrative Law Judges claiming that Respondents had discriminated against her for engaging in different protected activities involving disclosures relating to fraudulent accounting practices, lack of compliance with U.S. generally accepted accounting principles (GAAP) and lack of effective internal controls at Respondent's Irving, Texas office.

      A hearing was held before the undersigned on June 13, 14, 2013 in Dallas, Texas during which Complainant testified, called witness and co-worker/mentor, Dick Irby, and introduced 8 exhibits.[1] Respondent / Employer, Citi Mortgage, Inc. called Complainant's supervisors, Dennis Steib and Jennifer Arnold and human resources generalist, Stephanie King and introduced 67 exhibits.

      After reviewing the entire record including witness testimony and exhibits, I find no evidence of protected activity by Complainant, and no evidence to link what Complainant states or rather hyperbolizes to be protected activity prior to her discharge. Rather I find, as argued by Respondent, clear and convincing evidence that Complainant's termination was caused solely by her poor performance and not for complaining about alleged data processing errors. Contrary to

---

[1] Complainant's admitted documents include CX-2 (documents summarizing Complainant' post-termination employment search); CX-3 (correspondence between Complainant and a prospective employer )); CX-5(an e-mail showing that Complainant was not given Metadat access until April 19, 2012 although she returned to duty on December 28, 2011); CX-6 (performance goals that Complainant e-mailed to her supervisor on August 8, 2011); CX-8 to11 (Share Point notifications showing program errors on Risk Data Mart ).

Complainant's assertions, I find no credible evidence that Data Mart Data (DMD) was used for financial reporting purposes or reported externally to credit agencies like Equifax[2].

## B. Complainant's Employment with CMI

Citimortgage, Inc. (CMI), is a subsidiary of Citigroup Inc.,(CITI) a public company registered under Section 12 of the Securities and Exchange Act of 1934 (Act) required to file reports under Section15 (d) of said Act. CMI is a foreign for-profit corporation doing business in the State of Texas where it engages in the banking and lending business including the origination, purchase and sale of residential mortgage loans on the secondary mortgage market. In the course of its business operations CMI sold tens of thousands of its loans to government and government related and/or backed entities including GNMA, FNMA, Freddie Mac as well as private investors.

CMI hired Complainant as a SAS programmer analyst or credit risk analyst-4 on January 3, 2011. Complainant worked as a team member in its Risk Data Mart Department using the SAS program, an analytic software program that can perform large, complex calculations to build up and analyze its data base of business information which was aggregated from a variety of internal and external and  sources (. (Tr.196-199). At the end of each month a series of about 400 programs pulled this data from its sources and amassed the data in the Risk Data Mart. The external data that was fed into the Risk Data Mart did not feed back to the original source.  A series of program codes or jobs ran in order to extract, transform, and load the data.(Tr. 175-182, 200-203).

If a job did not run to a successful completion, the data was not published or provided to the user.  Each job was assigned to a primary owner /monitor whose job it is to ensure a successful completion by investigating and resolving any error that may occur. The Risk Data Mart was not designed or used to detect fraud, did not generate Citi's public financial statements and was not included in Citi's internal control systems.  Rather the data was used for business intelligence, i.e, to determine what loans are/ were profitable. (Tr. 203-213).

From her hire date in January 20, 2011 to her termination on July 5, 2012 Complainant reported to supervisor Jennifer Arnold, Vice President of Risk Data Mart who reported to Dennis Seib, Director of Information Services for Risk Management Department.(Tr. 197, 214). Although Complainant would have the undersigned believe she had no significant problems in successfully performing her job assignments during her employment, the record contains credible and in many cases uncontested testimony of Arnold and Seib that Complainant did not timely or successfully complete her job assignments

For example one month after being employed Arnold assigned Complainant a basic task of writing a program using the SAS programming tool. Complainant was unable to complete this task and in the process deleted a co-worker's work requiring it to be reproduced with Arnold having to write the program for her. (Tr. 215, 216; RX-53).

---

2. Contrary to Complainant's assertion, I do not find Respondent to have refused to present Scott Sager in a timely fashion. Complainant could have  but did not subpoena  Scott Sager, senior vice president or question any witness to confirm her suspicions that  data mart data was used for  external financial reporting purposes..

Complainant did not focus on assigned tasks in a timely manner as can be seen in her submission of personal goals at the end of October, 2011 rather than March 2011 when requested. (RX 8,14, 38; Tr.222.).. Complainant had difficulty communicating or working with co-workers using unprofessional terms while without basis accusing them of stealing her keys and cellphone , intentionally knocking her into a pillar, laughing and talking about her, (Tr. 218-222, , 270-274, RX-6).

Arnold, Seib, and   Human Resources person, King in August 2011 recommended to Complainant that she voluntarily seek voluntary counseling from Respondent's Employee Assistance Program (EAP) to deal with her performance problems and conduct which they considered to be disruptive and unprofessional (Tr. 265, 277).   On November 4, 2011 Complainant's supervisors made the referral to EAP mandatory when she refused to take accountability for her performance problems, denying her behavior was a problem.  (Tr, 266). Complainant was placed on administrative leave on November 4, 2011, met with a psychiatrist on November 15, 2011, cleared for a return to duty that day, but not allowed to return to work until December 27, 2011 when a forensic audit of Complainant computer was completed. (Tr. 53-55, 204-06).[3]

On January 5, 2012 Arnold placed Complainant on a Performance Improvement Plan (PIP) .(RX-12).  On January 25, 2012 Complainant filed her reply to the PIP. (RX-11).. Arnold rated Complainant as "not effective" on her 20ll year end assessment which was in line with her PIP (EX-10).

In early February 2012 Complainant went on FMLA leave and returned in early April 2012. After returning Complainant showed no progress in doing those things assigned her and on June 14, 2012 was continued for another 90 days on her PIP. (Tr.246. 247). From this point on to her termination Complainant did no work and refused to respond to Arnold's request for updates. (Tr. 248,249; RX-44).

## B. Alleged Protected Activities

Complainant alleged before the Secretary two instances of protected activity involving allegedly the SEC   monitoring her e-mails at work and her indirect communication with an unnamed Citi "internal risk guy" who had access to her computer screen.  Complainant dropped these allegations before the undersigned and in pleadings before the undersigned alleged four instances of protected conduct on October 4, 2011, October 26, 2011, March 1, 2012 and June 5, 2012.  In her brief, Complainant reduced the protected activity to October 26, 2011 and March 1, 2012.

On the first occasion of October 4, 2011, she informed Arnold that 69 loan receivers were bypassing fraud detection and unresolved errors were repeatedly occurring in the system.(RX-

---

[3] In October, 2011, Complainant supervisors also became concerned that Complainant had distributed or was on the verge of distributing customer social security numbers to outside 3rd parties and directed a forensic audit of Complainant's computer. (Tr. 193, 194).

68).[4] The second occasion occurred on October 26, 2011 when she e-mailed Steib and Arnold telling them errors in the month end processing leger were serious and impacted the integrity of CMI financial reporting system and violated CMI's internal control guidelines. (Tr. 61).[5]

Complainant admitted in her e-mails of October 4 and 26, 2011, that she did not reference GAAP, raise the topic of internal controls or indicate any concern that SOX had been violated. (Tr.120). In fact neither Arnold or Seib interpreted Complainant's emails of October 4, 2011 or October 26, 2011 to indicate any possible SOX violations because the errors Complainant reported in the data mart data were responded to and corrected by internal controls within the data mart system.(Tr. 128, 129, 182, 183).

Complainant asserts that the third occasion of protected activity occurred in a March 1, 2012 meeting she had with CMI's attorney while on FMLA leave.  In this meeting Complainant made general allegations that there were errors in the month end processing which Respondent refused to correct and that she had allegedly found a fake code in the Risk Data Mart and suspected than certain loan recipients such as Dallas Cowboy's former Coach, Jimmy Johnson were receiving preferential treatment.  The basis of her suspicions was her EAP social worker. Respondent replied that the errors which Complainant reported were nothing more than a naturally occurring event akin to an Alaskan complaining about snow. (Tr. 130,183, RX-27,28,)

Finally Complainant alleges protected activity on a 4th occasion on June 5, 2012 when one of her former attorneys (Sam Boyd) allegedly met with the Department of Justice.  However Complainant had no evidence to show Respondent was aware of this meeting and both Seib and Arnold denied knowledge of such. (Tr. 133,134,187, 188, 251,252).

Respondent replied that all allegations were bogus and amount to nothing more than a red herring because while it does have "internal controls" in Data Mart, this term in Data Mart refers to efficient business practices  dealing with the accurate and complete collection of data within the data mart system and not SOX required internal control reviews. According to Seib the data mart data was an after the fact repository of those entries that have already been made, was not the producer of financial compliance reports,(Tr. 202).   Risk Management's role was to set parameters and policies for loan originations determining for example property values and income levels to qualify for mortgages by extracting data from a data warehouse that come from several external sources, were transformed and loaded by 400 programs into a staging area where it, if validated were then  published. It was not used to detect fraud or generate public financial statements. (Tr.174-82).

---

[4] Arnold explained to Complainant that 69 represented 69 duplicate accounts that were removed from  a data base which Complainant should have been able to tell from merely reading the log in question.Tr 232-33).

[5] On October 4, 2011 Complainant asserts she told Arnold that 69 loan receivers were bypassing the fraud detection system and that unresolved  errors were repeatedly occurring in the system (RX-68, Complainant's First Amended Responses to Respondent's First Interrogatories).

### C.  Burden of Proof under SOX

Section 806 of SOX, codified at 18 U.S.C. § 1514A, creates a private cause of action for employees of publicly-traded companies who are retaliated against for engaging in certain protected activity. Section 1514A(a) states, in relevant part:

(a) No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by--

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A(a); *see also Hendrix v. American Airlines, Inc.*, 2004-AIR-00010, 2004-SOX-00023 (A.L.J. Dec. 9, 2004) (unpublished). The information or assistance must be provided to, or the investigation must be conducted by, a federal regulatory or law enforcement agency, any member of Congress, any committee of Congress, or a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct.). 18 *U.S.C.* §1514A(a)(1); See also, 29 *C.F.R.* §1980.102(a)(1).  Any employer may not discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee, in the terms and conditions of employment, because of any lawful act done by the employee under the Act's protection. *Id.*

The legal burdens of proof set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121(b), govern SOX whistleblower actions. 18 U.S.C. § 1514A(b)(2)(C). To prevail, an employee must prove by a preponderance of the evidence that (1) he or she engaged in protected activity; (2) the employer knew that he or she had engaged in the protected activity; (3) he or she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor to the unfavorable action. 49 U.S.C. § 42121(b)(2)(B)(iii); *Hemphill v. Celanesse Corp.*, 430 Fed. Appx. 341,344 (5th Cir.2011); *Allen v. Admin Rev. Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008); *see also* 29 C.F.R. § 1980.104(b)(1)(i)-(iv); *Getman v. Southwest Sec., Inc.*, ARB No. 04-059, ALJ No. 2003-SOX-8, (ARB July 29, 2005). A contributing factor need not be significant, motivating, substantial, or predominant; and can be any factor which alone, or in connection with other factors, tends to affect in any way the outcome of the decision. *Collins v. Beazer Homes U.S.A., Inc.*, 334 F. Supp. 2d 1365 (N.D. Ga. 2004). Ordinarily, temporal proximity between the protected activity and unfavorable personnel action will satisfy the burden of making a *prima facie* showing of employer knowledge and that the protected activity was a contributing factor. *Id.*

If the employee establishes these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(iv); *Brune v. Horizon Air Industries, Inc.*, ARB No. 04-037, ALJ No. 2002-AIR-00008, (ARB January 31, 2006); *Allen*, 514 F.3d at 476.

## D.  Protected Activity

SOX prohibits a publicly-traded company from retaliating against an employee who reports information to a supervisor "regarding any conduct which the employee reasonably believes constitutes a violation" of one of the six enumerated categories. 18 U.S.C. § 1514A(a)(1); *Marshall v. Northrup Gruman Synoptics*, 2005-SOX-00008 (A.L.J. June 22, 2005). SOX does not apply to generic allegations of accounting violations, violations of GAAP, or general allegations of fraud. *Marshall*, 2005-SOX-00008 at 5 (stating that, "The fact that the concerns involved accounting and finances in some way does not automatically mean or imply that fraud or any other illegal conduct took place.").

The employee's reasonable belief of a violation must be scrutinized under both subjective and objective standards. *Welch v. Cardinal Bankshares Corp.*, ARB Case No. 05-064, 2007 WL 1578493 (ARB May 31, 2007). *see also Melendez v. Exxon Chemicals Americas*, ARB No. 96-051, 93-ERA-00006 (July 14, 2000). The employee does not need to show that the employer's conduct actually caused a violation of the law, but must show that he/she reasonably believed the employer violated one of the laws or regulations enumerated under SOX, any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud against shareholders. *Id.*; *see also Halloum v. Intel Corp.*, ARB No. 04-068, 2006 WL 3246900 (ARB Jan. 31, 2006). The objective reasonableness of a belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee. *Allen*, 514 F.3d at 477; *see also Welch*, 2007 WL 1578493 at *7. The subjective reasonableness requires that the employee actually believe the conduct being complained of constitutes a violation of pertinent law. *Day v. Staples*, 555 F.3d

42, 54 (1st Cir. 2009); *see also Harp v. Charter Communications, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009).

Protected activity under SOX is thus essentially comprised of three elements: (1) report or action that involves a purported violation of a federal law or SEC rule or regulation relating to fraud against shareholders; (2) complainant's belief concerning the activity must be subjectively and objectively reasonable; and (3) complainant must communicate his concern to either his employer, the federal government or a member of Congress who has the requisite reviewing ability. *See Harvey v. Safeway, Inc.*, 2004-SOX-00021 at 29 (ALJ Feb. 11, 2005).

In this case, the undersigned finds that Complainant did not engage in a protected activity with respect to any of his actions within this instant matter. During his various actions in this matter, Complainant did not reasonably believe that the conducts he was reporting violated one of the six enumerated categories under 1514A. In order to satisfy this reasonable belief burden under SOX, evidence must show that Complainant had both a subjective and an objective reasonable belief of violations at the time his complaints were made. A subjective reasonable belief requires Complainant to actually believe that the conduct he/she was complaining of constituted a violation of pertinent law; i.e., one of the six enumerated categories under 1514A. An objective reasonable belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as Complainant. Here, the evidence shows that Complainant did not have either a subjective or objective reasonable belief that Respondent was violating one of the enumerated categories under 1514A at the time of his complaints.

With regards to the objective belief standard, the undersigned must look at the totality of the circumstances, taken in context with Complainant's experience, to determine if a reasonable person would believe Respondent was violating one of the six enumerated categories under section 1514.  .Claimant had 30 years of computer programming experience with graduate level coursses in CSECS, computer science education and cognitive systems with 12 hours in accounting courses with practical experience in fraud detection at Fannie Mae.(Tr.30-33,35)..  With that background and experience both Seib and Arnold testified that Complainant should have known that the errors she reported were not significant, were remedied at the end of each month and were not related to Respondent's internal controls but rather in house usage to evaluate and establish criteria for mortgages. Complainant's contention that she held a reasonable belief to the contrary is belied by the fact that she arrived at that conclusion only after she had a conversation with an EAP counselor.

 Complainant did not even have a subjective good faith belief that her error reporting was related to Respondent's misconduct or a possible SOX violation with which she had some personal experience at Fannie Mae as evidenced by her failure to merely refer to and not complain about such when reporting recurrent errors to Arnold and Seib. Complainant moreover had no evidence to support her allegations that (DMD) was reported to Equifax and was being used in internal compliance reports as she asserted in her March 1, 2012 meeting with company attorneys.(Tr. 60-62).

**D. Contributing Factor to Unfavorable Personnel Action**

Under the evidentiary framework of a SOX whistleblower cause of action, a complainant must establish that there are circumstances which suggest that the protected activity was a contributing factor to the unfavorable action. 49 U.S.C. § 42121(b)(2)(B)(iii); A contributing factor is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Allen v. Stewart Enterprises, Inc.*, ARB No. 06-081, ALJ Nos. 2004-SOX-00060 to 62 (ARB July 27, 2006). The contributing factor standard was "intended to overrule existing case law, which requires a whistleblower to prove that her protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *Id.* To prevail, the whistleblower must show this contributing factor by a preponderance of the evidence. *Id.*

Normally the burden of establishing a contributing factor "is satisfied…if the complainant shows that the adverse personnel action took place shortly after the [reported] activity, giving rise to an inference that it was a factor in the adverse action." 29 *C.F.R.* §1980.104(b)(2); See also, *Kendrick v. Penske Transportation Services, Inc.*, 220 F. 3d 1220, 1234 (10th Cir. 2000). However, temporal proximity alone does not establish retaliatory intent, but may establish the causal connection component of the prima facie case. *Taylor v. Wells Fargo Bank, NA*, ARB No. 05-062, ALJ No. 2004-SOX-00043 (ARB June 28, 2007). The ARB has held that "the probative value of temporal proximity decreases as the time gap lengthens, particularly when other precipitating events have occurred closer to the time of the unfavorable personnel action." *Henrich v. Ecolab, Inc.*, ARB No. 05-030, ALJ No. 2004-SOX-00051 (ARB June 29, 2006), slip op. at 18.

A complainant does not have the burden to establish that a respondent's articulated reason for the adverse action was pretext. *Klopfenstein v. PCC Flow Technologies Holdings, Inc.*, ARB No. 04-149, ALJ No. 2004-SOX-00011 (ARB May 31, 2006). Further, the contributing factor does not have to be the primary motivating factor to establish causation. *Halloum v. Intel Corp.*, ARB No. 04-068, 2003-SOX-00007 (ARB Jan. 31, 2006)

As clarified above, a complainant must show by a preponderance of evidence that the plaintiff's protected activity was a contributing factor in the unfavorable action. If the employee does so, the burden shifts to the employer to show by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of protected behavior. 49 U.S.C. § 42121(b)(2)(B)(iv); *Allen*, 514 F.3d at 476.

In this case, the undersigned finds no evidence to suggest any protected activity let alone that such activity was a contributing factor in Complainant's discharge. Rather the undersigned finds the overwhelming weight of credible evidence shows Complainant was terminated for poor work performance from the date of hire to her termination on July 5, 2012 Indeed I find no credible evidence to link her discharge with protected activity. Moreover even after her discharge Respondent produced further evidence that Complainant misrepresented facts on her employment application pertaining to her discharge at Fannie Mae and Brierley, and secretly recorded conversations with supervisors and employees, all in violation of Respondent's

employment policies which would have led to her discharge notwithstanding her poor performance record. (Tr. 86-89; 130,131, 286-87, 292-93; RX-32,42.).

**E. Conclusion**

Based on the foregoing law and discussion, the undersigned finds no credible evidence of protected activity, no evidence of any protected activity contributing to any adverse action against Complainant. Rather the credible evidence shows Complainant being discharged for poor performance with after acquired evidence of further misconduct by Complainant in misrepresenting facts on her employment application related to her prior employment and secretly recording conversations with employees and supervisors in violation of company policies.

**F. Order**

For the reasons set forth above, I find no merit in Complainant complaint and accordingly dismiss it.

Digitally signed by Clement Kennington
DN: CN=Clement Kennington,
OU=Administrative Law Judge, O=Office
of Administrative Law Judges,
L=Covington, S=LA, C=US
Location: Covington LA

CLEMENT J. KENNINGTON
Administrative Law Judge

**NOTICE OF APPEAL RIGHTS:** To appeal, you must file a Petition for Review with the Administrative Review Board within ten (10) business days of the date of the administrative law judge's decision. See 29 C.F.R. § 1980.110(a). The Board's address is: Administrative Review Board, U.S. Department of Labor, Room S-4309, 200 Constitution Avenue, NW, Washington, DC 20210. Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-mail communication; but if you file it in person, by hand-delivery or other means, it is filed when the Board receives it. See 29 C.F.R. § 1980.110(c). Your Petition must specifically identify the findings, conclusions or orders to which you object. Generally, you waive any objections you do not raise specifically. See 29 C.F.R. § 1980.110(a). At the time you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8002. The Petition must also be served on the Assistant Secretary,

Occupational Safety and Health Administration and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210.

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1980.109(c). Even if you do file a Petition, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days after the Petition is filed notifying the parties that it has accepted the case for review. See 29 C.F.R. §§ 1980.109(c) and 1980.110(a) and (b).

# TAB 8

## EXPENSES NEEDED TO BE REMOVED FROM FP TO
## SIGNIFICANTLY IMPACT INDIVIDUAL FUND PROFITABILITY

All $ Amounts in Millions except for AUM

### GROWTH & INCOME FUND

|  | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| AUM ($B) | $ 27.64 | $ 30.57 | $ 31.26 | $ 30.01 |
| (% of Total Fidelity AUM) | 3.7% | 3.5% | 3.3% | 2.8% |
| Total Revenue | 232.3 | 247.3 | 256.8 | 245.9 |
| Expense | 145.5 | 149.3 | 156.5 | 164 |
| PreTax Income | 86.8 | 98.0 | 100.3 | 81.9 |
| Tax Rate | 36.8% | 36.8% | 35.9% | 35.9% |
| AfterTax Income | 54.9 | 61.9 | 64.3 | 52.5 |
| AfterTax Margin | 23.6% | 25.0% | 25.0% | 21.3% |

### ALL FIDELITY MUTUAL FUNDS

|  | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| AUM ($B) | $ 737.20 | $ 862.00 | $ 943.20 | $ 1,089.40 |
| Total Revenue | 5,558 | 6,487 | 7,060 | 8,157 |
| Expense | 3,924 | 4,530 | 4,875 | 5,909 |
| PreTax Income | 1,634 | 1,957 | 2,185 | 2,248 |
| Tax Rate | 36.8% | 36.8% | 35.9% | 35.9% |
| AfterTax Income | 1,032.7 | 1,237.0 | 1,400.5 | 1,440.9 |
| AfterTax Margin | 18.6% | 19.1% | 19.8% | 17.7% |
| In order to raise the AfterTax Margin from | 23.6% | 25.0% | 25.0% | 21.3% |
| to | 35.0% | 35.0% | 35.0% | 35.0% |
| AfterTax Income must become | 81.3 | 86.6 | 89.9 | 86.1 |
| PreTax Income must become | 128.6 | 137.0 | 140.2 | 134.3 |
| Expenses Must decrease to | 103.7 | 110.3 | 116.6 | 111.6 |
| This much expense must be removed from Growth & Income | 41.8 | 39.0 | 39.9 | 52.4 |
| This much expense must be *removed* from FP | $ 1,116.2 | $ 1,098.6 | $ 1,204.5 | $ 1,900.9 |

Similarly,

|  | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| to | 40.0% | 40.0% | 40.0% | 40.0% |
| This much expense must be *removed* from FP | 1,606.4 | 1,650.4 | 1,809.0 | 2,597.1 |
| to | 45.0% | 45.0% | 45.0% | 45.0% |
| This much expense must be *removed* from FP | 2,096.5 | 2,202.1 | 2,413.4 | 3,293.3 |
| to | 50.0% | 50.0% | 50.0% | 50.0% |
| This much expense must be *removed* from FP | 2,586.7 | 2,753.9 | 3,017.8 | 3,989.6 |

Assumptions and Notes:

1 The Growth & Income Fund was selected for this exercise because it had no "Performance Fees" during this period. The presence of Performance Fees complicates the calculations, but do not appreciably alter the magnitude of the conclusions. For Fidelity Funds as a whole, AfterTax margin does not change more than .4% in any of these years.

2 AUM is used as a single allocation proxy.

3 There is no consideration for offsetting expenses from one line of the P&L to another.

4 Only the effect of altering expenses, and not revenues, was considered.